## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

STEPHEN ELLIOTT,

*Plaintiff*,

- against -

MOIRA DONEGAN, and JANE DOES (1–30),

*Defendants*.

**Oral Argument Requested**

No. 1:18-cv-05680-LDH-SJB

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MOIRA DONEGAN'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Roberta A. Kaplan
Joshua Matz
Martha E. Fitzgerald
Thomas A. Rawlinson
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mfitzgerald@kaplanhecker.com
trawlinson@kaplanhecker.com

*Attorneys for Defendant Moira Donegan*

Served on May 8, 2019

# CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 3

STANDARD OF REVIEW ........................................................................................................ 5

ARGUMENT .............................................................................................................................. 6

I.      THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT
        MS. DONEGAN ACTED WITH ACTUAL MALICE .................................................. 6

        A.      Legal Standard ................................................................................................... 6

        B.      The Fabrication Theory ...................................................................................... 8

        C.      The Scribe Theory ............................................................................................. 10

        D.      The Circulation Theory ..................................................................................... 12

II.     SECTION 230 OF THE CDA IMMUNIZES MS. DONEGAN FROM LIABILITY
        UNDER THE SCRIBE AND CIRCULATION THEORIES ....................................... 13

        A.      Legal Standard ................................................................................................... 13

        B.      The Scribe Theory ............................................................................................. 15

        C.      The Circulation Theory ..................................................................................... 16

                1.      Circulating the Spreadsheet & Encouraging Women to Publish
                        Allegations of Sexual Misconduct by Men ........................................... 17

                2.      Highlighting Mr. Elliott's Entry in Red ................................................. 19

CONCLUSION ......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almeida* v. *Amazon.com*,
456 F.3d 1316 (11th Cir. 2006) ........................................................... 15

*Arista Records, LLC* v. *Doe 3*,
604 F.3d 110 (2d Cir. 2010) ................................................................... 8

*Armstrong* v. *Simon & Schuster, Inc.*,
85 N.Y.2d 373 (1995) ............................................................................ 5

*Ascentive, LLC* v. *Opinion Corp.*,
842 F. Supp. 2d 450 (E.D.N.Y. 2011) ............................... 15, 16, 17, 18

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ............................................................................... 5

*Barrett v. Rosenthal*,
146 P.3d 510 (Cal. 2006) ..................................................................... 16

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ............................................................................... 5

*Biro* v. *Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ............................................. 6, 7, 9, 10, 12

*Biro* v. *Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013) ............................................... 5, 7

*Cabello-Rondon* v. *Dow Jones & Co., Inc.*,
720 F. App'x 87 (2d Cir. 2018) ........................................................... 12

*Carafano* v. *Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ............................................................. 20

*Chambers* v. *Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .................................................................. 9

*Church of Scientology Int'l* v. *Behar*,
238 F.3d 168 (2d Cir. 2001) ................................................................ 12

*Cohen* v. *Facebook, Inc.*,
252 F. Supp. 3d 140 (E.D.N.Y. 2017) ................................................ 16

*Daytree at Cortland Square, Inc.* v. *Walsh*,
  332 F. Supp. 3d 610 (E.D.N.Y. 2018) ................................................................... 5

*Doe II* v. *MySpace Inc.*,
  175 Cal. App. 4th 561 (2009) .............................................................................. 19

*Doe* v. *City of New York*,
  583 F. Supp. 2d 444 (S.D.N.Y. 2008)................................................................... 20

*F.T.C.* v. *Accusearch Inc.*,
  570 F.3d 1187 (10th Cir. 2009) ........................................................................... 16

*Fair Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008).............................................. 15, 16, 17, 18, 19, 20

*Fed. Trade Comm'n* v. *LeadClick Media, LLC*,
  838 F.3d 158 (2d Cir. 2016)........................................... 14, 15, 16, 18, 19

*Garrison* v. *Louisiana*,
  379 U.S. 64 (1964).......................................................................... 3, 7, 11

*Gentry* v. *eBay, Inc.*,
  99 Cal. App. 4th 816 (2002) ................................................................... 20

*Gregerson* v. *Vilana Fin., Inc.*,
  No. 06-cv-1164, 2008 WL 451060 (D. Minn. Feb. 15, 2008)................................ 16

*Harte-Hanks Comm's, Inc.* v. *Connaughton*,
  491 U.S. 657 (1989) ..................................................................... 7, 9, 11, 12

*Hughes* v. *Twenty-First Century Fox, Inc.*,
  304 F. Supp. 3d 429 (S.D.N.Y. 2018)...................................................... 8

*Huizenga* v. *NYP Holdings, Inc.*,
  No. 17-cv-2113, 2019 WL 1620743 (S.D.N.Y. Apr. 16, 2019) ................................ 7

*Jones* v. *Dirty World Entm't Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ................................................. 15, 17, 18

*Kimzey* v. *Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ................................................... 17, 20

*Levitt* v. *Yelp! Inc.*,
  No. 10-cv-1321, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ............................... 20

*Liberman* v. *Gelstein*,
  80 N.Y.2d 429 (1992) ........................................................................ 11

*MCW, Inc.* v. *Badbusinessbureau.com, L.L.C.*,
   No. 2-cv-2727, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004) .................................................. 18

*Nemet Chevrolet, Ltd.* v. *Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) .................................................................................................... 19

*New York Times Co.* v. *Sullivan*,
   376 U.S. 254 (1964) ............................................................................................................... 6, 7

*Palin* v. *New York Times Co.*,
   264 F. Supp. 3d 527 (S.D.N.Y. 2017) ..................................................................................... 7, 8

*Reuber* v. *Food Chemical News, Inc.*,
   925 F.2d 703 (4th Cir. 1991) .................................................................................................... 13

*Spiteri* v. *Russo*,
   No. 12-cv-2780, 2013 WL 4806960 (E.D.N.Y. Sept. 7, 2013) .................................................. 9

*St. Amant* v. *Thompson*,
   390 U.S. 727 (1968) ............................................................................................................... 7, 12

*Stayart* v. *Yahoo! Inc.*,
   651 F. Supp. 2d 873 (E.D. Wis. 2009) ................................................................................. 14, 15

*Williams* v. *Calderoni*,
   No. 11-cv-3020, 2012 WL 691832 (S.D.N.Y. Mar. 1, 2012) ..................................................... 8

*Zeran* v. *America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) .................................................................................................... 13

**Statutes**

47 U.S.C. § 230 ................................................................................................................. 3, 13, 16, 17

47 U.S.C. § 230(b)(2) ...................................................................................................................... 14

47 U.S.C. § 230(c)(1) ...................................................................................................................... 14

47 U.S.C. § 230(e)(3) ...................................................................................................................... 14

47 U.S.C. § 230(f)(2) ...................................................................................................................... 14

47 U.S.C. § 230(f)(3) ................................................................................................................ 15, 17, 18, 20

**Rules**

Federal Rules of Civil Procedure, Rule 12(b)(6) ...................................................................... 5, 7

**Other Authorities**

Jodi Kantor and Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, THE NEW YORK TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html ........ 4

Jeannie Suk Gersen, *Bill Cosby's Crimes and the Impact of #MeToo on the American Legal System*, NEW YORKER (Apr. 27, 2018), https://www.newyorker.com/news/news-desk/bill-cosbys-crimes-and-the-impact-of-metoo-on-the-american-legal-system .......................................................................................... 4

Defendant Moira Donegan submits this memorandum of law in support of her motion to dismiss Plaintiff Stephen Elliott's Second Amended Complaint.

## PRELIMINARY STATEMENT

In October 2017, Ms. Donegan created a Google Spreadsheet. Many women contributed to it—most of them anonymously—and shared stories of sexual assault and abuse by men in the media industry. Mr. Elliott alleges that Ms. Donegan created this Spreadsheet because she "hates men," and seeks damages from Ms. Donegan based on the fact that someone added him to it.

An article written by Ms. Donegan for *The Cut*, which Mr. Elliott expressly relies upon and which is therefore incorporated by reference into the Amended Complaint, explains the origins of the Spreadsheet.[1] That story begins with the extraordinary revelations of widespread sexual misconduct within the media and entertainment industries that finally came to light in mid-2017.

Ms. Donegan, like many others, reflected on those news reports and sought to confront what seemed to be an "intractable problem: how women can protect ourselves from sexual harrassment and assault." Moira Donegan, *I Started the Media Men List*, THE CUT (Jan. 10, 2018) ("*The Cut*"), at 3.[2] Ms. Donegan was intimately familiar with whisper networks, "informal alliances that pass on open secrets and warn women away from serial assaulters." (*The Cut* at 3–4.) But she knew that such networks can be elitist, insular, and balkanized along racial lines. *See id.* She also knew that "[t]oo often, for someone looking to report an incident or to make habitual behavior stop, all the available options are bad ones." *Id.* at 5.

Determined to change this broken status quo, Ms. Donegan created "a place for women to share their stories of harassment and assault without being needlessly discredited or judged"—a

---

[1] (*See* Second Amended Complaint,ECF 37 ("2d Am. Compl.") ¶¶ 39, 62 (referencing Moira Donegan, *I Started the Media Men List*, THE CUT (Jan. 10, 2018).)

[2] *The Cut* is attached as Exhibit A to the Declaration of Martha E. Fitzgerald, dated May 8, 2019.

place with "women warning women, trying to help one another." *Id.* at 4–5. Specifically, she created a Google Spreadsheet entitled "Shitty Media Men," on which women could anonymously report allegations of sexual misconduct by men in magazines and publishing. *Id.* at 3. Given the overwhelming evidence that "false allegations are rare," Ms. Donegan believed that women would tell the truth—and trusted women to "judge the quality of [the] information for themselves and to make their own choices accordingly." *Id.* at 7. This, she recognized, was "radical": "the idea that women are skeptical, that we can think and judge and choose for ourselves what to believe and what not to." *Id.*

Ms. Donegan initially shared the Spreadsheet with a few friends. *Id.* But it soon spread to a wider audience: "[M]any, many more women were using the document than I had ever imagined." *Id.* at 9. Those women reported "being beaten, drugged, and raped," being "followed into bathrooms or threatened with weapons," and "being groped at work, or shown a colleague's penis." *Id.* at 7. Ms. Donegan later wrote: "I had imagined a document that would assemble the collective, unspoken knowledge of sexual misconduct that was shared by the women in my circles: What I got instead was a much broader reckoning with abuses of power that spanned an industry." *Id.* at 8–9. She did not expect the Spreadsheet to go viral, and so, 12 hours after posting it, Ms. Donegan took it down. *See id.*

One year later, Mr. Elliott sued Ms. Donegan for defamation, claiming that the Spreadsheet contained a false statement about him: "[r]ape accusations, sexual harassment [*sic*], coercion, unsolicited invitations to his apartment, a dude who snuck into Binders???" (2d Am. Compl. ¶ 25.)

Because Mr. Elliott is indisputably a limited purpose public figure, the First Amendment places a high burden on him to establish actual malice. He must show that Ms. Donegan published

a false statement about him with knowledge that the statement was false or with "a high degree of awareness" of its "probable falsity." *Garrison* v. *Louisiana*, 379 U.S. 64, 74 (1964).

Mr. Elliott does not (and cannot) meet that burden here. The Second Amended Complaint proposes three facially inconsistent allegations concerning Ms. Donegan's role in Mr. Elliott's entry: (1) that Ms. Donegan personally fabricated the statements; (2) that she served as a scribe to someone else; and (3) that she didn't write the statements but is liable for circulating them. As we will explain below, the second and third theories of defamation liability are precluded by the Communications Decency Act, 47 U.S.C. § 230, which protects providers and users of online services from liability where they didn't author unlawful content or materially contribute to its unlawful character.

Moreover, under each of Mr. Elliott's alternate tellings, he fails to plausibly allege actual malice. Ms. Donegan is a stranger to Mr. Elliot. They have no connection. They are neither friends nor enemies nor colleagues. Mr. Elliott identifies no reason at all why Ms. Donegan would reach into the void and randomly accuse him of rape. Nor does he plausibly allege that she actually doubted—or had serious reason to doubt—the allegations about his conduct included in the Spreadsheet. Under black letter law, the absence of any such allegation dooms Mr. Elliott's defamation claim and requires dismissal of the Second Amended Complaint with prejudice.

## STATEMENT OF FACTS

The factual allegations are set out in the Second Amended Complaint. Solely for purposes of this motion, we accept Mr. Elliott's properly pleaded factual allegations as true.

Mr. Elliott is a "writer," "producer," and "content creator" (¶ 50), who has authored or co-authored more than 10 books and dozens of articles and opinion pieces. He typically promotes his writings "at publicity events like interviews in various media outlets, excerpt publications, as well as public readings, panels and appearances." (¶ 35). His work has been "sold to film and television

3

productions companies for adaptation to film" (¶ 36), and it has reached "journalists, fans, friends . . . and the public at large" (¶ 50).

On October 11, 2017, days after explosive reports regarding Harvey Weinstein's sexual mistreatment of women in the film industry, Ms. Donegan created a Google Spreadsheet entitled "Shitty Media Men" (the "Spreadsheet").[3] (¶¶ 17, 39.) She "added headings including[] NAME, AFFILIATION, ALLEGED MISCONDUCT, and NOTES." (¶ 20.) At the top, Ms. Donegan wrote that "[m]en accused of physical sexual violence by multiple women are highlighted in red." (¶ 27.) The Spreadsheet was circulated to women in the media industry. (¶ 18.) Anyone with a link to the Spreadsheet could freely view and edit it instantaneously online. (*See* ¶¶ 1, 18.)

Sometime in the next 24 hours, Mr. Elliott's name was added to the Spreadsheet. (¶ 24.) Mr. Elliott's row in the Spreadsheet noted his occupation as a "[f]reelance writer/novelist" and stated, in the column labelled "Alleged Misconduct," "[r]ape accusations, sexual harassment." *Id*. His entry was subsequently edited: "[r]ape accusations, sexual harassment [*sic*], coercion, unsolicited invitations to his apartment, a dude who snuck into Binders???" (¶ 25.) The annotation "[m]ultiple women allege misconduct" was added to the "Notes" column. *Id*. "[Ms.] Donegan, both by herself and with some of the Jane Doe Defendants, outlined [Mr. Elliott's] entry . . . in red," to signify that he "was being accused of 'physical sexual violence by multiple women.'" (¶¶ 27–28.)

The Second Amended Complaint alleges, in the alternative, three inconsistent versions of Ms. Donegan's conduct relating to Mr. Elliott's entry. First, it alleges that "Donegan and/or one

---

[3] *See, e.g.*, Jodi Kantor and Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades*, THE NEW YORK TIMES (Oct. 5, 2017); Jeannie Suk Gersen, *Bill Cosby's Crimes and the Impact of #MeToo on the American Legal System*, NEW YORKER (Apr. 27, 2018) ("[A] basic concept of #MeToo is the power of numbers across time: the difference between a single victim, whose lone account might not be believed, and the choruses of 'me too' that make each individual's account that much more believable.").

or more of the Jane Doe defendants[] personally fabricated the statements contained therein," knowing they were false. (¶¶ 56–59.) Second, it alleges that Ms. Donegan added content that someone else shared with her. (*See* ¶¶ 60–64.) Finally, it alleges that she neither invented nor wrote any content about Mr. Elliott, but simply published the Spreadhseet. (¶¶ 65–72.)

Mr. Elliott alleges that the statements about him on the Spreadsheet were false. (¶¶ 2, 28, 37, 45, 47.) He also asserts that Ms. Donegan "knew or had reason to know" that those statements were false. (¶¶ 28, 47.) Mr. Elliott adds that some of Ms. Donegan's social media posts (¶ 31)— from an unspecified time and in an unspecified context—show she "really hate[s] men" (¶ 74).

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Daytree at Cortland Square, Inc.* v. *Walsh*, 332 F. Supp. 3d 610, 625 (E.D.N.Y. 2018). However, legal conclusions and naked assertions "are not entitled to the assumption of truth," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). When a plaintiff has failed to plead sufficient facts "to state a claim to relief that is plausible on its face," the claim "must be dismissed." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). The allegations must support "more than a sheer possibility that a defendant has acted unlawfully," and cannot be "merely consistent with a defendant's liability." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). Courts have recognized the "'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *Biro* v. *Conde Nast*, 963 F. Supp. 2d 255, 264 (S.D.N.Y. 2013) (quoting *Armstrong* v. *Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995)), *aff'd*, 807 F.3d 541 & 622 F. App'x 67 (2d Cir. 2015).

## ARGUMENT

Mr. Elliott's claims must be dismissed for two reasons. First, he has failed plausibly to allege that Ms. Donegan published the relevant statements with actual malice. Second, two of his three theories of liability are preempted by the Communications Decency Act ("CDA").

## I. THE SECOND AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT MS. DONEGAN ACTED WITH ACTUAL MALICE

The Second Amended Complaint roughly sketches three alternate (and inconsistent) theories of actual malice. The "fabrication theory" alleges that Ms. Donegan simply made up the defamatory accusations about Mr. Elliott and put them on the Spreadsheet. (*See* ¶¶ 56–59.). The "scribe theory" postulates that Ms. Donegan added the defamatory statements to the Spreadsheet but did so at the behest of someone else. (*See* ¶¶ 60–64.) Finally, the "circulation theory" holds that an unknown Jane Doe wrote the defamatory statements, which Ms. Donegan published when she circulated the Spreadsheet to friends. (*See* ¶¶ 65–72.) Notwithstanding Mr. Elliott's best efforts to cover every base through force of conjecture, the Second Amended Complaint remains deficient.

### A. Legal Standard

Public figures have long used defamation claims to chill and punish unwanted speech.[4] The First Amendment guards against such efforts by requiring public figures to prove that defamation defendants acted with "actual malice." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 283 (1964). In *Biro* v. *Conde Nast*, the Second Circuit confirmed that public-figure plaintiffs must "plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable

---

[4] Mr. Elliott has not mounted any serious challenge to our repeated observation that he qualifies as a limited purpose public figure. Nor could he do so under the applicable legal standard. Indeed, at the pre-motion conference held on March 1, 2019, he all but conceded that the actual malice standard applies. The Second Amended Complaint, moreover, appears to acknowledge that burden by expressly addressing itself to an actual malice pleading threshold. *See* ¶¶ 53–76.

expectation that discovery will reveal evidence of actual malice." 807 F.3d 541, 546 (2d Cir. 2015) (quotation marks omitted). This decision affirmed Judge Oetken's holding that "Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim," given "the difficulty of proving actual malice, as well as the fact that actual malice must be proven by clear and convincing evidence." *Biro*, 963 F. Supp. 2d at 278 (citation omitted). In the defamation context, that rule blends familiar pleading standards with fundamental constitutional values: "Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id*. at 279; *see also Huizenga* v. *NYP Holdings, Inc.*, No. 17-cv-2113, 2019 WL 1620743, at *2 (S.D.N.Y. Apr. 16, 2019) ("[T]he hurdles to plausibly pleading actual malice are significant given the First Amendment interests at stake." (quotation marks omitted)).

A speaker harbors "actual malice" when he or she makes a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. Here, "reckless disregard" means a "high degree of awareness" of a statement's "probable falsity." *Garrison* v. *Louisiana*, 379 U.S. 64, 74 (1964). This "standard is a subjective one," requiring "more than a departure from reasonably prudent conduct." *Harte-Hanks Comm's, Inc.* v. *Connaughton*, 491 U.S. 657, 688 (1989). "There must be sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." *Id*. (emphasis added) (quoting *St. Amant* v. *Thompson*, 390 U.S. 727, 731 (1968)). Where a speaker bases a statement on information from a third party, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* (quoting *St. Amant*, 390 U.S. at 732). "But even then, a defamation complaint by a public figure must allege

sufficient particularized facts to support a claim of actual malice by clear and convincing evidence, or the complaint must be dismissed." *Palin* v. *New York Times Co.*, 264 F. Supp. 3d 527, 536 (S.D.N.Y. 2017) (Rakoff, J.); *see also Hughes* v. *Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453–54 (S.D.N.Y. 2018) (applying this requirement).

### B.     The Fabrication Theory

The gist of the fabrication theory is that Ms. Donegan created the Spreadsheet and then randomly accused a total stranger—living hundreds of miles away, without any known personal connection—of rape. The factual basis for this allegation is non-existent. It rests on nothing more than the slender reed of "information and belief" (¶ 57)—and the only "information" identified in the Amended Complaint to support this "belief" is that neither Ms. Donegan nor anybody else has identified the author of the statements (¶¶ 59, 69). But it hardly follows from the fact that nobody has claimed authorship of Mr. Elliott's entry on the Spreadsheet that Ms. Donegan herself wrote it—especially given her utter lack of motive or personal connection to him.

While Mr. Elliott is entitled to plead allegations on information and belief, he must point to "factual information that makes the inference of culpability plausible." *Arista Records, LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). The fact that he doesn't know who wrote the entry is not, standing alone, a sufficient basis to render his fabrication theory "any more than a speculative claim." *Williams* v. *Calderoni*, No. 11-cv-3020, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012). Indeed, given that the Amended Complaint itself contains alternate *factual* allegations regarding what actually happened—*i.e.*, someone else fabricated the entry—this allegation qualifies as little more than speculation.

That conclusion is confirmed by the Amended Complaint's failure to address an obvious question: why would Ms. Donegan fabricate a lie about a total stranger? To be sure, the Second Amended Complaint refers vaguely to Ms. Donegan's supposed hatred of men, but that does little

to explain why she accused this particular man of rape, and, in any event, it doesn't qualify as a valid theory of malice. *See Harte-Hanks*, 491 U.S. at 666 n. 7 (1989) (observing that "actual malice" has "nothing to do with bad motive or ill will"). The Second Amended Complaint otherwise makes no effort to explain why a writer with the stated goal of empowering and informing women would launch that campaign with an arbitrary, fictionalized rape accusation against a stranger.

This leads to yet another flaw in the fabrication theory: its inconsistency with materials incorporated by reference into the Amended Complaint. *See Chambers* v. *Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002). In her article, Ms. Donegan explains that she created the Spreadsheet to inform women about the risk of sexual assault from repeat offenders (*The Cut* at 3, 5–6, 10); that she had no expectation of wide circulation (*id.* at 4–5, 8–10); that she shared it with a few colleagues (*id.* at 7); and that she considered it important for women to tell the truth (which she expected they would do) (*id.*). These statements are squarely at odds with the assertion that Ms. Donegan gratuitously and maliciously falsified a rape accusation against Mr. Elliot. Given that Mr. Elliott's "own pleadings are contradicted by other matters . . . incorporated by reference" in the Second Amended Complaint, this Court "is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the pleadings as true in deciding a motion to dismiss." *Spiteri* v. *Russo*, No. 12-cv-2780, 2013 WL 4806960, at *8 (E.D.N.Y. Sept. 7, 2013) (quotation marks omitted). Instead, it should treat this inconsistency as still another reason to view Mr. Elliott's "information and belief" allegation as speculative.[5]

---

[5] Of course, it is quite likely that Mr. Elliott would prefer that the Court ignore most of Ms. Donegan's article. But he is not entitled to rely on cherry-picked segments of the article, insisting that they are true and outcome-determinative, while ignoring other parts of the very same article or asserting without any basis that they must somehow be false.

Mr. Elliott might seek to rely on an out-of-context statement from the Second Circuit that "a plaintiff may allege that a story [was] fabricated by the defendant if the defendant provides no source for the allegedly defamatory statements." *Biro*, 807 F.3d at 545 (quotation marks omitted); (*see* ¶ 58; ECF 33 at 2). Such reliance would be misplaced. *Biro* does not create strict liability for any publisher who does not (or cannot) identify the author of a particular statement. Instead, *Biro* emphasizes in the preceding sentence that "whether actual malice can plausibly be inferred will depend on the *facts and circumstances of each case*," and then identifies a publisher's refusal to provide a source as one "example" of a circumstance that "may" suggest fabrication. 807 F.3d at 545 (emphasis added). The ultimate question, *Biro* confirms, is whether it is plausible to infer fabrication in light of the facts alleged. *See id.* And here, for all the reasons already given, that inference is entirely implausible. Moreover, the relevant language in *Biro* quite obviously presumes a more traditional journalistic scenario, in which an author writes an article and then declines to identify any source for an anonymous, defamatory quotation. There, since only the author (and perhaps an editor) could control the content of the article, it is reasonable to infer from the absence of any known source that the author engaged in fabrication. Here, in contrast, many people—quite a few of them anonymous—were able to modify the Spreadsheet, defeating the premise at the heart of *Biro*'s analysis.

The fabrication theory therefore fails to state a claim for defamation.

## C. The Scribe Theory

As an alternative theory of liability, the Second Amended Complaint alleges that Ms. Donegan did not engage in fabrication, but instead served as a scribe for someone else, recording the statement about Mr. Elliott with "reckless disregard" for the truth. (¶ 64.) The sole factual allegation offered to support this conclusion is an excerpt from Ms. Donegan's article, where she

notes that the Spreadsheet was "vulnerable to false accusations, a concern [she] took seriously." (¶ 62, quoting *The Cut* at 7.)

That allegation is doubly deficient. First, it rests on a misreading of Ms. Donegan's article. As Ms. Donegan makes clear, she created the Spreadsheet as a place for women to tell the truth about their experiences with men—and she expected that women would, in fact, tell the truth. (*See The Cut* at 7–8.) After reading many of the stories that appeared on the Spreadsheet, Ms. Donegan was struck by "the sense that the capacity for honesty, long suppressed, had finally been unleashed." (*Id.* at 7.) Further, while Ms. Donegan recognized the risk of "false accusations," she took steps to mitigate that risk and emphasized that "all available information suggests that false accusations are rare." (*Id.*) No fair reader of this article could conclude that Ms. Donegan believed that the Spreadsheet *in fact* contained—or even *likely* contained—false accusations. And given that Ms. Donegan's article does not refer by name to any person included on the Spreadsheet, it affords no basis for inferring that she believed that any particular entry (including Mr. Elliott's) was likely false.

This leads to the second deficiency in the Amended Complaint: a misunderstanding of the actual malice standard. In a public figure defamation case, the plaintiff must plausibly allege that the defendant had actual knowledge of falsity or a "high degree of awareness" of a statement's "probable falsity." *Garrison*, 379 U.S. at 74; *see also Harte-Hanks*, 491 U.S. at 688 (holding that "reckless disregard" means publishing a statement while "entertain[ing] serious doubts as to [its] truth" (citation omitted)). The First Amendment's actual malice standard thus requires a plaintiff to do more than allege that a speaker suspected that a statement could have been false. As the New York Court of Appeals famously explained, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter

establishes reckless disregard in a defamation action." *Liberman* v. *Gelstein*, 80 N.Y.2d 429, 438 (1992).

At most, Ms. Donegan's article suggests her awareness that some allegations on the Spreadsheet could possibly be false. That falls miles short of supporting a reasonable inference that Ms. Donegan had a high degree of awareness that the statements about Mr. Elliott—in particular—were probably false (or that she entertained serious doubts as to their truth). Such an inference is particularly unwarranted given the absence of any other allegations in the Amended Complaint that Ms. Donegan knew Mr. Elliott or harbored any specific ill will toward him. Accordingly, the scribe theory does not survive Rule 12(b)(6) and must be dismissed.

### D.      The Circulation Theory

The premise of the circulation theory is that Ms. Donegan acted with reckless disregard for the truth when she published and circulated the Spreadsheet, including Mr. Elliott's entry, "wholly on the basis of unverified information from individuals whose identities she did not know." (¶ 66.) This premise is faulty. It is true that reliance on an "unverified, anonymous source" is an evidentiary factor that is *relevant* to actual malice. *Church of Scientology Int'l* v. *Behar*, 238 F.3d 168, 174 (2d Cir. 2001). But this is not an automatic inference. In fact, the Second Circuit has held that a reporter's reliance on anonymous sources does not inherently show actual malice:

> [R]eliance on anonymous sources alone does not support an inference that the publisher acted with actual malice. The *Biro* court reasoned that "reliance on anonymous or unreliable sources without further investigation may support an inference of actual malice," *where the plaintiff includes additional allegations to buttress such an inference.*

*Cabello-Rondon* v. *Dow Jones & Co., Inc.*, 720 F. App'x 87, 89 (2d Cir. 2018) (summary order) (emphasis added) (quoting *Biro*, 807 F.3d at 546). Thus, here as elsewhere, the ultimate question is whether the defendant had good reason to doubt the truth of the relevant statement. *See id.*; *see also Harte-Hanks*, 491 U.S. at 688; *St. Amant*, 390 U.S. at 732.

12

As we have already shown, Mr. Elliott has not alleged any facts supporting an inference that Ms. Donegan viewed the statements about him as probably false. Moreover, he has not alleged any facts suggesting that she had any connection to him, or that she even had any reason to pay special attention to the allegations against him. Instead, he has quoted at length from Ms. Donegan's article in *The Cut*. But that article reveals Ms. Donegan to be a person overwhelmingly inclined to believe women when they say they were sexually assaulted. It thus further weakens any inference that she subjectively doubted statements about sexual assault that appeared on the Spreadsheet, including statements that were made anonymously. *See Reuber* v. *Food Chemical News, Inc*., 925 F.2d 703, 716 (4th Cir. 1991) (en banc) (holding that publisher did not act with reckless disregard where there was "no apparent reason to question the truthfulness" of defamatory statements in a letter that came from a "presumably reliable" (though anonymous) author).

Simply put, Ms. Donegan presumptively believes women who say they were raped. She believes them even when they speak anonymously, for fear of backlash or judgment or retaliation. And here, Mr. Elliott offers no allegations supporting a reasonable inference that Ms. Donegan knew the accusations against him were false or strongly doubted them. Ms. Donegan thus acted well within the bounds of constitutionally protected speech when she circulated and publicized the Spreadsheet. Even at the pleading stage, Mr. Elliott is not entitled to hold Ms. Donegan liable on the obsolete premise that she must have automatically disbelieved women who chose to speak anonymously about sexual abuse by powerful men in their own industry.

## II.   SECTION 230 OF THE CDA IMMUNIZES MS. DONEGAN FROM LIABILITY UNDER THE SCRIBE AND CIRCULATION THEORIES

### A.   Legal Standard

Much like the actual malice standard in defamation law, Section 230 of the CDA exists to guard against "the threat that tort-based lawsuits pose to freedom of speech." *Zeran* v. *America*

13

*Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). But unlike the actual malice standard, which applies everywhere, the CDA protects speech "in the new and burgeoning Internet medium." *Id.*; *see also* 47 U.S.C. § 230(b)(2) (stating that Section 230 exists "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation"). To accomplish its worthy goal, Section 230 declares that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It further states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

In plain English, this provision prohibits "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Fed. Trade Comm'n* v. *LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016) (citation omitted). Section 230 thus protects all providers and users of online services from liability for unlawful content that someone else created or developed. To invoke that protection against a defamation lawsuit like this one, a defendant must satisfy three elements: (1) she "is a provider or user of an interactive computer service"; (2) the claims against her are "based on information provided by another information content provider"; and (3) those claims "treat [her] as the publisher or speaker of that information." *Id.* at 173 (citation omitted).

Looking to the first element, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" 47 U.S.C. § 230(f)(2). The phrase is construed "broadly," "[c]onsistent with the Congressional policy in favor of the expansive application of [Section 230] immunity." *Stayart* v. *Yahoo! Inc.*, 651 F. Supp. 2d 873, 884 (E.D. Wis. 2009), *aff'd*, 623 F.3d 436 (7th Cir. 2010).

14

Turning to the second element, an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). Whereas "interactive computer service" is defined broadly, the phrase "information content provider" is defined "narrowly." *Stayart*, 651 F. Supp. 2d at 884. To create or develop content, one must "materially contribut[e] to its alleged unlawfulness." *LeadClick*, 838 F.3d at 174 (citation omitted). Merely exercising traditional editorial functions—such as "deciding to publish, withdraw, or modify third-party content"—is insufficient. *Ascentive, LLC* v. *Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011); *see also LeadClick*, 838 F.3d at 174. In assessing whether this requirement is satisfied, courts resolve even "close cases . . . in favor of immunity, lest [they] cut the heart out of [S]ection 230." *Fair Hous. Council of San Fernando Valley* v. *Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc); *see also LeadClick*, 838 F.3d at 173 ("Section 230 immunity is broad"); *Jones* v. *Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014); *Almeida* v. *Amazon.com,* 456 F.3d 1316, 1321 & n.3 (11th Cir. 2006) (collecting cases).

The third element is perhaps the most straightforward. In determining whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker or third-party content, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker." *LeadClick*, 838 F.3d at 175 (citation omitted).

### B. The Scribe Theory

Mr. Elliott's scribe theory satisfies all three elements of CDA immunity. *First*, Ms. Donegan is a provider and user of an interactive computer service. The "publicly accessible, shared

15

Google spreadsheet" is a straightforward example of an interactive computer service. (*See* ¶ 1.) Like an online messaging board, which is the "prototypical service" qualifying for immunity, *F.T.C.* v. *Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009), a shared Google spreadsheet provides a forum where numerous users can write and respond to comments in real time. *See id.*; (¶¶ 17–25). As the Spreadsheet's alleged creator (¶ 39), Ms. Donegan provided an interactive computer service. *See Gregerson* v. *Vilana Fin., Inc.*, No. 06-cv-1164, 2008 WL 451060, at *9 (D. Minn. Feb. 15, 2008) ("[A]n operator of a website where users can post comments[] is a provider of an interactive computer service"). The factual allegations in the Second Amended Complaint also charcterize her as a Spreadsheet user. (¶ 26); *see Barrett v. Rosenthal*, 146 P.3d 510, 527 (Cal. 2006).

*Second*, Ms. Donegan was not the "information content provider" for any of the alleged defamatory statements. By assertedly adding someone else's statements about Mr. Elliott to the Spreadsheet, Ms. Donegan did not "materially contribute to" their allegedly defamatory meaning. *LeadClick*, 838 F.3d at 174. Instead, she engaged in "the normal functions of a publisher" without "chang[ing] the meaning and purpose of the content." *Ascentive*, 842 F. Supp. 2d at 474.

*Third*, Mr. Elliott's claim treats Ms. Donegan as the "publisher or speaker" of someone else's content. Indeed, he uses the word "publish" to describe Defendants' actions no less than 25 times. Mr. Elliott's efforts to hold Ms. Donegan liable under a scribe theory are therefore prohibited.

### C.    The Circulation Theory

For the same reasons given above, the first and third elements of Ms. Donegan's CDA

defense are satisfied here.[6] That leaves only the second element: whether Ms. Donegan is the information content provider of the statements at issue. To evade the CDA, Mr. Elliott alleges that Ms. Donegan "created" and "circulated" the Spreadsheet (¶¶ 1, 46), "encourag[ed] women to anonymously publish allegations of sexual misconduct by men" (¶ 17; *see also* ¶¶ 20–21), and "outlined [his] entry in red . . . to signify he was being accused of 'physical sexual violence by multiple women'" (¶ 28). But even if Ms. Donegan did all this, she is not the information content provider of content she is not alleged to have created. Section 230 thus bars this theory of liability.

1.   *Circulating the Spreadsheet & Encouraging Women to Publish Allegations of Sexual Misconduct by Men*

It is black letter law that providing and publicizing an online forum where others can post content does not make a defendant the "information content provider" of posts published on that forum. *See, e.g.*, *Kimzey* v. *Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016). This is true even if the forum "encourag[es]" others to create negative content, "invit[es]" them "to post public complaints," or "display[s] those negative postings as prominently as possible." *Ascentive*, 842 F. Supp. 2d at 475; *see also Jones*, 755 F.3d at 402–05, 414–15.

The Ninth Circuit's *en banc* opinion in *Roomamates.com* illustrates the distinction between immunity under Section 230(f)(3) and potential liability for "developing" another user's content. *See* 521 F.3d 1157. There, a roommate matching website required users to select, from a list of presets determined by the website, discriminatory answers to a series of questions as a precondition for creating a profile and using the website's services. This feature of the website, which by virtue

---

[6] As to the third element, Mr. Elliott criticizes Ms. Donegan for "publish[ing]" the Spreadsheet without attempting "to verify or investigate" its contents. (¶¶ 65–66; *see also* ¶ 23.) Yet Section 230 immunizes such editorial decisions. *See Cohen* v. *Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017) ("[D]ecisions as to whether existing content should be removed from a website fall within the editorial prerogative."); *Roommates.Com*, 521 F.3d at 1170–71 ("[D]eciding whether to exclude material that third parties seek to post online is perforce immune under [S]ection 230.").

of its design *necessarily* developed content in violation of the Fair Housing Act, was not shielded by Section 230. *See id.* at 1165–67. In contrast, the Ninth Circuit held that Section 230 did confer immunity on another section of the very same website, where the publisher had provided an open-ended comment box for additional profile information. *See id.* at 1173–74. Even if users entered information in the comment box that raised FHA concerns—which may foreseeably occur in some circumstances—CDA immunity attached because the architecture of the website itself did not require the generation of unlawful content. Thus, the website "developed" unlawful user content, such as speech violating the FHA, only if it was necessarily generated by design. *Id.*

In elaborating on this concept, courts have held that a defendant "develops" another user's content by explicitly instructing that user as to what to say or include—not merely by creating the forum where the content is displayed. *See LeadClick*, 838 F.3d at 176 (holding defendant advertising software provider materially contributed to false ads by purposely recruiting unsavory advertisers and telling them how to write the ads to appear "realistic"); *MCW, Inc.* v. *Badbusinessbureau.com, L.L.C.*, No. 2-cv-2727, 2004 WL 833595, at *9–*10 (N.D. Tex. Apr. 19, 2004) (holding defendants developed consumer complaints by writing "disparaging titles, headings, and editorial messages" themselves and instructing consumers to take specific photos for use in the complaints).

Here, the facts alleged in the Amended Complaint do not meet that standard. Ms. Donegan created the Spreadsheet's headings, including "name, affiliation, alleged misconduct and notes." (¶ 20 (emphasis omitted).) But like the comment box in *Roommates.com*, nothing required or necessarily generated defamatory statements. And unlike the defendants in *LeadClick* and *MCW*, there is no allegation here that Ms. Donegan participated in the inception of any content in Mr. Elliott's entry.

Perhaps sensing this weakness, Mr. Elliott suggests that "encouragement" might be enough to "create or develop" content under Section 230(f)(3). That theory is incorrect as a matter of law. *See Jones,* 755 F.3d at 413–14 (explaining why "encouragement" is an unworkable interpretation of Section 230(f)(3)); *Ascentive,* 842 F. Supp. 2d at 475. And even if "encouragement" were sufficient in general, the Second Circuit has expressly embraced a material contribution test for CDA immunity—which means that a defendant would lose immunity only if he or she "encouraged" *unlawful* content. *See LeadClick,* 838 F.3d at 174. Yet Mr. Elliott alleges only that the Spreadsheet had "the stated purpose of encouraging women to anonymously publish allegations of sexual misconduct by men." (¶ 17.)  It is not unlawful for a woman to discuss sexual misconduct that she experienced or witnessed. Alleging that Ms. Donegan "encouraged" women to describe harassment therefore does not defeat CDA immunity. *See, e.g.*, *Nemet Chevrolet, Ltd.* v. *Consumeraffairs.com, Inc.*, 591 F.3d 250, 257 (4th Cir. 2009) (barring claims because "there is nothing unlawful about developing this type of content"); *Doe II* v. *MySpace Inc.*, 175 Cal. App. 4th 561, 575 (2009) (barring claims because plaintiffs "do not allege that MySpace's profile questions are . . . illegal"). Ms. Donegan offered nothing more than neutral, lawful tools for any Spreadsheet contributor to use, for good or ill. That "does not amount to 'development' for purposes of the immunity exception." *Roommates.com*, 521 F.3d at 1169.

### 2.  *Highlighting Mr. Elliott's Entry in Red*

As a fallback, Mr. Elliott asserts that Ms. Donegan is liable because he alleges that she outlined his entry in red to indicate that more than one woman had accused him of physical sexual violence. (¶ 28.) For two reasons, each of which requires rejection of his Mr. Elliott's position, this allegation fails to establish that Ms. Donegan "created or developed" defamatory content.

First, even before any highlighting was added, it was readily apparent on the Spreadsheet that Mr. Elliott had been accused by multiple women of physical sexual violence; this was

explicitly written and indicated in the substance of his entry. (*See* ¶¶ 24–25.) Adding highlighting thus did "'absolutely nothing to enhance the defamatory sting of the message' beyond the words offered by [another] user." *Kimzey*, 836 F.3d at 1269–70 (quoting *Roommates.com*, 521 F.3d at 1172).[7]

Second, as the Spreadsheet itself indicated, the addition of red highlighting reflected only the number and type of accusations against Elliott. But it is settled law that visually aggregating or classifying user content does not constitute "creation or development" under Section 230(f)(3). *See id.* (citing *Carafano* v. *Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003)); *Levitt* v. *Yelp! Inc.*, No. 10-cv-1321, 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011); *Gentry* v. *eBay, Inc.*, 99 Cal. App. 4th 816, 834 (2002). That is because such conduct is a traditional editorial function—precisely the kind of conduct the CDA was enacted to protect.

The circulation theory is thus barred by the CDA.

\*        \*        \*

## CONCLUSION

Mr. Elliott has already amended his complaint twice. For the foregoing reasons, the Second Amended Complaint should be dismissed—and that dismissal should be with prejudice.

---

[7] Contrary to the position that Mr. Elliott is likely to take, this case is nothing like *Doe* v. *City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008), which denied CDA immunity where a defendant forwarded a discriminatory email *and*—critically—"added his own allegedly tortious speech" to it.

Dated: May 8, 2019
      New York, New York

Respectfully submitted,


*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
Joshua Matz
Martha E. Fitzgerald
Thomas A. Rawlinson
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
mfitzgerald@kaplanhecker.com
trawlinson@kaplanhecker.com

*Attorneys for Defendant Moira Donegan*