# EXHIBIT A

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - -X
3  STEPHEN ELLIOTT,              : 18-CV-5680 (LDH)
                                 :
4          Plaintiff,            :
                                 :
5      -against-                 : United States Courthouse
                                 : Brooklyn, New York
6  MOIRA DONEGAN, and JANE DOES  :
   (1-30),                       :
7                                : Friday, February 7, 2020
           Defendants.           : 11:00 a.m.
8  - - - - - - - - - - - - - - - -X

9

10

11      TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
       BEFORE THE HONORABLE LASHANN DEARCY HALL
12          UNITED STATES DISTRICT JUDGE

13

14            A P P E A R A N C E S :

15  For the Plaintiff:      NESENOFF & MILTENBERG, LLP
                            363 Seventh Avenue
16                          Fifth Floor
                            New York, New York 10001-3904
17                          BY:  NICHOLAS E. LEWIS, ESQ.

18  For the Defendants:     KAPLAN, HECKER & FINK, LLP
                            Empire State Building
19                          350 Fifth Avenue
                            Suite 7110
20                          New York, New York 10118
                            BY:  ROBERTA A. KAPLAN, ESQ.
21                               MARTHA E. FITZGERALD, ESQ.

22  Court Reporter:         DAVID R. ROY, RPR
                            225 Cadman Plaza East
23                          Brooklyn, New York 11201
                            drroyofcr@gmail.com
24
Proceedings recorded by Stenographic machine shorthand,
25  transcript produced by Computer-Assisted Transcription.

```
                        Proceedings                      2
```

1           (In open court.)

2           THE COURTROOM DEPUTY:  All rise.

3           Civil cause for oral argument Docket 18-CV-5680,

4    Elliott versus Donegan.

5           Counsel, please state your names for the record.

6           MR. LEWIS:  For Mr. Stephen Elliott, Nicholas

7    Lewis of Nesenoff & Miltenberg.  Good morning, Your Honor.

8           THE COURT:  Good morning.

9           MS. KAPLAN:  Roberta Kaplan, Your Honor, from

10   Kaplan, Hecker & Fink for Defendant Moira Donegan.  And I'm

11   here with my colleague, Martha Fitzgerald.

12          THE COURT:  Good morning to you all.  You all can

13   be seated.

14          All right.  So we are here this morning -- yeah,

15   we are here this morning for oral argument related to the

16   defendants' motion to dismiss.  There appeared some

17   confusion related to the scope of the argument.  I believe

18   that my order should have explained that it is narrowly

19   tailored to the very limited issue of Mr. Elliott's status

20   as a limited public figure.

21          I would like to first hear from the defendant, if

22   you could?

23          MS. KAPLAN:  Sure, Your Honor.

24          THE COURT:  All right.  Thank you.

25          MS. KAPLAN:  So, Your Honor, I'm going to be

Proceedings                                  3

1   pretty brief because I think the answer here is pretty

2   clear.  Obviously --

3            THE COURT:  I do not think it is.  That is why we

4   are here.

5            MS. KAPLAN:  We'll see if I can convince you,

6   Your Honor.

7            THE COURT:  All right.

8            MS. KAPLAN:  Let's put it that way:  So first of

9   all, the question of whether or not an individual like

10  Mr. Elliott is a limited public figure for -- limited

11  purpose public figure for purpose of First Amendment

12  analysis is certainly a question that the Court can decide.

13           THE COURT:  Okay, you know, what?  Let me stop for

14  a second.  Absolutely.

15           There are a couple of threshold issues that you

16  all addressed in your -- I guess it would have been your

17  sur-sur reply, I think that is what it would have been,

18  concerning the propriety of the Court addressing this issue

19  whether or not Ms. Donegan had waived any arguments thereto.

20  Let me make it very clear:  I do not believe Ms. Donegan

21  waived any arguments in this regard.  That's one.

22           Two, I do believe that I have the ability to take

23  judicial notice of the materials that were attached to the

24  affidavit of one of the lawyers for the defendant in this

25  case.  So the starting point for me is in light of the

Proceedings                                      4

1   information I have, again, which I can take judicial notice

2   of, not for the truth of the matter asserted, but simply I

3   can take judicial notice of its existence and the contents

4   of the materials, and I can entertain this argument.

5              That should short-circuit some of this.

6              MS. KAPLAN:  Absolutely, Your Honor.

7              THE COURT:  Okay.

8              MS. KAPLAN:  And I won't belabor that point.

9              And I will start by saying I don't even think,

10  honestly, Your Honor even needs those materials to make the

11  determination in this case.  Because in the original

12  complaint in this action, specifically Paragraph 15,

13  Plaintiff alleged as follows:  Quote, "Plaintiff is an

14  author living in New Orleans, Louisiana.  He has published

15  multiple books and articles expressing his sexual

16  preferences.  In these nonfiction works, of which the

17  defendants are aware, Plaintiff openly describes his sexual

18  preferences in detail."  And here is the key language,

19  Your Honor.  "So that it is clear that he could not

20  physically participate in the false, unsubstantiated

21  allegations published about him in the list by defendants."

22  End quote.

23             That paragraph, Your Honor, does not appear in the

24  amended complaint.  But it was filed with this Court under

25  the standards of Rule 11, as any lawyer in any case has to

Proceedings                                                    5

1   do, and it states undisputed facts about who Plaintiff is,

2   what he's done as an author, the topics that he's written

3   about, and how, in his view, the topics he's written about

4   are squarely relevant to the allegations about what he's

5   accused of in terms of his defamation in this case.

6           And I want to go on to remind Your Honor that this

7   came up at the initial conference in the case back on

8   March 1, 2019.  Your Honor said to Mr. Lewis, "I wanted to

9   go..." -- and this is on Page 10 of the transcript,

10  Your Honor -- "I wanted to kind of go in this order so that

11  we could now then get to the heart of it, which would be the

12  defamation claim.  It doesn't seem to me, based on the

13  allegations in this complaint..." -- again, talking about

14  the original complaint -- "...that the parties are disputing

15  that the party in this case is a public figure.  I think

16  that as I read the defendants' letter you argued that you've

17  met the standard necessary to proceed with the defamation

18  claim applying the standard as it would be against a public

19  figure.  So I just want to make sure we're all operating on

20  the same sheet of music.

21          Mr. Lewis?

22          Yes, Your Honor.

23          We believe that it is the actual malice is

24  certainly met here and no discussion about public figure."

25          Now, whether or not it's a technical waiver,

Proceedings                                        6

1   Your Honor, and there is argument on either side.  If these

2   were statements made by counsel for the plaintiff in a

3   complaint filed pursuant to the Federal Rules, and what he's

4   talking about in that transcript is precisely the allegation

5   I just read to you.

6           So, as Your Honor has already concluded, I think

7   you absolutely have the ability to consider the articles

8   attached on the motion to dismiss.  We're not asserting them

9   for the truth.  We're asserting them for the fact that they

10  exist, and you can also consider them on a constitutional

11  fact doctrine, which is similar.  But one argument here

12  would be you don't really need to because you have the

13  concession by plaintiff and his counsel in the first amended

14  complaint.

15          THE COURT:  So let's assume that I don't assume

16  that there is a waiver, where are we?

17          MS. KAPLAN:  So I think it doesn't matter because

18  it's a factual -- I'm not arguing it's a waiver of a legal

19  argument.  What I'm saying is that it's a factual allegation

20  made by the plaintiff in the case under Rule 11, and in that

21  transcript he is basically agreeing that that allegation

22  pretty much takes care of the public figure analysis.  If

23  Your Honor's following me?

24          THE COURT:  I am following you.  I am following

25  what you're saying.

Proceedings                                            7

1        MS. KAPLAN:  And I don't think it's fair or

2   permissible, not talking about legal arguments, but talking

3   about facts, for a plaintiff to file an amended complaint

4   and just take it out and say oops magic, no longer a public

5   figure.

6        THE COURT:  So let's say he conceded at -- if I am

7   following your argument now, that he wrote extensively about

8   his sexual preferences.

9        MS. KAPLAN:  Yes, Your Honor.

10       THE COURT:  As I have had the opportunity to

11  review, I will confess certainly not -- I did not digest

12  Mr. Elliott's writings in total, but that it seemed as if

13  his writing, and I think in one of the articles that you

14  attached most recently, he's described as an S and M writer.

15  Right?

16       MS. KAPLAN:  True, Your Honor.

17       THE COURT:  His sexual preferences relates to

18  S and M.  That's not the same thing as writing about rape

19  and sexual assault.

20       MS. KAPLAN:  True, Your Honor.  But his writings

21  are not limited to S and M.

22       THE COURT:  Okay.  Well --

23       MS. KAPLAN:  In his writings, he talks about

24  issues of consent, issues of abuse, and to look at the

25  controversy, the public controversy about these issues as

Proceedings                                8

1   narrowly as defendant reposits, and I will go into that --

2             THE COURT:  Right.

3             MS. KAPLAN:  It's not --

4             THE COURT:  And we can talk about that.  And we

5   will talk about that because we do need to figure out what

6   the definition of the controversy is in this case and you

7   all have advanced your own versions of that controversy.

8             MS. KAPLAN:  So I think --

9             THE COURT:  But I want to be able to at least have

10  a starting point in terms of what and how it is that we are

11  characterizing his work.

12            MS. KAPLAN:  So I think what I would say with

13  respect to that allegation in the first complaint is not

14  only that this is what he writes about, but that he believes

15  that that fact that he writes about is a complete -- is a

16  defense to the alleged defamatory statements made in this

17  case.  So he's not only just saying --

18            THE COURT:  Well, that is a foolish argument, but

19  I do not think that it goes to my analysis in terms of

20  whether or not he is a limited public purpose figure.

21            It is a silly argument.

22            MS. KAPLAN:  Okay.

23            THE COURT:  I think I said that back then.

24            MS. KAPLAN:  I understand.

25            THE COURT:  Yes.

```
                         Proceedings                    9
```

1          But go ahead.

2          MS. KAPLAN:  So let me go to the legal standard on

3     this.

4          THE COURT:  Thank you.

5          MS. KAPLAN:  So the legal standard, as Your Honor

6     knows, it's a four-step analysis, four-part analysis.

7          One:  Has the individual defendant successfully

8     invited public attention to his views in an effort to

9     influence others prior to the incident that is the subject

10    of this litigation;

11         Two:  You know, has he voluntarily injected

12    himself into a public controversy related to the subject of

13    the litigation;

14         Three:  Has he assumed a position of prominence in

15    the public controversy;

16         And four:  Has he maintained regular community

17    access to the media?

18         With respect to 1 and 4, as Your Honor I'm sure is

19    aware, there is no dispute.  The defendant concedes that

20    point.

21         So what we are really focusing on here are the

22    second and third elements.

23         THE COURT:  Okay.

24         MS. KAPLAN:  Okay?  And let me start with the

25    second one.

Proceedings                                                    10

1          THE COURT:  Thank you.

2          MS. KAPLAN:  So unlike -- and the second one is

3   whether he voluntarily injected himself into a position of

4   commonance on these issues.

5          THE COURT:  And now we have -- what is the issue?

6   What's the controversy?

7          MS. KAPLAN:  So the controversy is the world of

8   'Me Too.'  The world of sexual relationships between men and

9   women that are -- with or without consent, whether consent

10  is given, what kind of conduct is okay.  What kind of

11  conduct is not okay.  If you read anything about the world

12  of conduct of 'Me Too,' and I'm sure Your Honor has --

13         THE COURT:  Yes, of course.

14         MS. KAPLAN:  -- it's been a paradigmatic change as

15  in how our society looks at these issues, okay?

16         And the Second Circuit, Your Honor, in the *Lerman*

17  case, which is still good law, made it very, very clear in a

18  decision by Cardamone -- which I think is binding on you --

19  made it very clear that the controversy for these purposes

20  should be interpreted broadly, not narrowly, because of the

21  importance of the First Amendment protection.

22         THE COURT:  Right.  So I would not, I agree,

23  define the controversy in this case limited to the statement

24  itself, for example.  Right?  I'm not going to say that

25  whatever it is that Mr. Elliott is complaining about defines

Proceedings                                11

1   controversy.  But even if I were to define the controversy

2   broadly, and broadly in terms of 'Me Too,' I am not

3   altogether convinced that there is an overlap, as it were,

4   between a controversy that, perhaps, Mr. Elliott has

5   injected himself into and the controversy as it relates to

6   'Me Too.'

7          You know, you talk in your submission about his

8   writing.  I'm looking for and looked for parts of his works

9   where he may be talking about experiences that relate to

10  issues of sexual harassment or misconduct in the workplace,

11  or more generally, which I think fairly encapsulates the

12  issues around 'Me Too,' right?

13         'Me Too,' as I understand it, and you will please

14  tell me if my characterization is an unfair one, was a

15  movement that began when a woman said, I believe that if we

16  have a chorus of voices that speak to the issue of sexual

17  harassment and sexual assault in the workplace, and more

18  generally, that chorus of voices will lend support to the

19  believability of these women when they make these

20  allegations because one voice versus a chorus of voices is

21  far stronger.  And it will speak, and it has -- certainly it

22  hasn't been limited only to the believability of women.  But

23  certainly it is specifically about, as I understand it,

24  issues related to sexual assault and sexual harassment as it

25  pertains mostly to women.

1          MS. KAPLAN:  Yes.  So I would be broader than

2    that, Your Honor, so issues of sexual assault, sexual

3    harassment, the meaning of consent and how societal views on

4    that needed to change.

5          THE COURT:  Right.

6          MS. KAPLAN:  Based on sexist, and I would argue

7    misogynistic understandings of what constituted consent,

8    what constituted assault and what constituted --

9          THE COURT:  Okay.

10         MS. KAPLAN:  So here we have a defendant who

11   himself in his writing said that he was -- I don't know,

12   it's terrible.  I felt terrible about it -- that he was a

13   victim of rape.  He has written multiple times in his

14   writings in the context of S and M about what it means to

15   give consent or not to give consent in a sexual

16   relationship.

17         THE COURT:  Direct me to that.

18         MS. KAPLAN:  Yes, Your Honor.

19         THE COURT:  I see in his writings where he talks

20   about his relationships, and there was one excerpt in

21   *The Adderall Diaries*, I believe it's at Page 137, where he

22   talks about his relationship with Patty.  But it is not a --

23   what I have seen, and again, I am not an expert on

24   Mr. Elliott's writing, but what I have seen based on my

25   cursory review of his writing is where he talks about

Proceedings                              13

1    consensual sexual relationships perhaps ones that challenge

2    social norm, perhaps ones that to some are inappropriate,

3    somehow reprehensible, but nonetheless consensual in the

4    context of S and M.

5              MS. KAPLAN:  Yes.

6              Well, first of all, let me refer you to the

7    article, and I'm going to take the next question.  Let me

8    refer you to something I don't think we submitted in our

9    most recent submission.  So the Salon article by Donna

10   Minkowitz, entitled, *The Softer Side of S and M* --

11             THE COURT:  Yes.

12             MS. KAPLAN:  -- talks about -- and I guess it's

13   Page 2 of the printout -- about sexual -- an S and M

14   encounter where someone was not asked for consent.

15             THE COURT:  It says, "Without asking his consent,

16   preferences or anything," for instance, parenthesis, Take

17   your clothes off and put them in the corner is all she says.

18   She cuts his legs with a knife, threatening, burns him with

19   a cigarette, temporarily asphyxiates him."

20             This to me describes an S and M encounter.  It

21   does not, to me, seem to overlap the issues of sexual

22   assault and sexual harassment that is the subject and the

23   target of this 'Me Too' movement.

24             MS. KAPLAN:  So later in that article -- first of

25   all, I would respectfully disagree with Your Honor on that

Proceedings                                    14

1   because I think issues of when someone gives consent and

2   when they don't, whether it's an S and M relationship or

3   it's an -- excuse my language, Your Honor, this case kinds

4   of causes language I wouldn't normally use in a court -- or

5   whether it's a Harvey Weinstein "grabbing your ass" in order

6   to get assignment, I think you are seeing a distinction

7   between those two things that is artificial.

8            THE COURT:  Well, that --

9            MS. KAPLAN:  Because the 'Me Too' in the types of

10  relationships says it's all part of the spectrum and whether

11  someone gives consent or not in any particular situation is

12  the key issue in the movement.

13           Moreover in that same article, he goes on to talk

14  about -- or the author goes on to talk about, spoke to him

15  about being raped when he was -- again, I feel horribly for

16  him -- but being raped as a child.

17           I apologize.  There's not a printout, but that's

18  like four pages away from that.

19           And then in the other article that we submitted

20  most recently, Your Honor, and this is the Stephen Elliott

21  *Moods, Masochism and Murder*, which is really purports to be

22  an interview with Mr. Elliott, he says -- and this isn't

23  distinctly about S and M -- he says, "I'm still..." -- he is

24  talking about former girlfriends here.  "I'm still on good

25  terms with all three of them, but we are not dating anymore.

Proceedings                                              15

1   I think one of the problems with being in an open

2   relationship with multiple partners is that they're not

3   always deep enough, your lives don't fully intertwine."

4           He then talks -- later in the same, talking about

5   whether kissing someone is a political act.  And he says,

6   "Actually, though, the instance really is political because

7   it was the woman who wanted to hook up with me, and she

8   thought she knew what I wanted but she had no idea what I

9   wanted.  People think because you're masculine..."

10          THE COURT:  I'm sorry, Ms. Kaplan, where are you

11  reading?

12          MS. KAPLAN:  Oh, I'm sorry.

13          THE COURT:  Just direct me to --

14          MS. KAPLAN:  That's Page 4 of 12, Your Honor,

15  about a third of the way -- starting about halfway down the

16  page at the bottom.

17          THE COURT:  Wait.

18          MS. KAPLAN:  It's starting about halfway down the

19  page --

20          THE COURT:  This is *The Softer Side of S and M*

21  article?

22          MS. KAPLAN:  Correct, Your Honor -- no, no, this

23  is *Moods, Masochism and Murder*.

24          THE COURT:  Okay.

25          MS. KAPLAN:  I'm sorry.

```
                      Proceedings                    16
```

1            THE COURT:  Okay.  Wait a minute.

2            All right.

3            MS. KAPLAN:  And I can hand it up if that would

4   help?

5            THE COURT:  Okay.  I have the *Stories of a*

6   *Troubled Man*.

7            MS. KAPLAN:  And it's got an advertising at the

8   top.

9            THE COURT:  Well, let's see...

10           MS. KAPLAN:  May I approach, Your Honor?

11           THE COURT:  Yes.

12           MS. KAPLAN:  This is my copy.

13           THE COURT:  Well, I'm certain I have it in here

14   somewhere.

15           Which exhibit number is it --

16           MS. KAPLAN:  Just a moment --

17           THE COURT:  -- do you know?

18           MS. KAPLAN:  Just a moment, Your Honor.

19           MR. LEWIS:  C.

20           THE COURT:  It's C?

21           MR. LEWIS:  Yes.

22           THE COURT:  Thank you.

23           MS. KAPLAN:  Are you there?

24           THE COURT:  All right.  Got it.

25           All right.  Go ahead.

```
                        Proceedings                      17
```

1          MS. KAPLAN:  So in this article, he's talking --

2    actually an interview, talking about issues of consent.  I

3    don't -- I think your distinction, Your Honor, between

4    quote, S and M relationship and a regular relationship is a

5    distinction that in this context --

6          THE COURT:  I don't think I said regular.  But go

7    ahead.

8          MS. KAPLAN:  In a non-S and M relationship, excuse

9    me, is a distinction that I don't think when you're talking

10   about issues like consent and whether or not someone wanted

11   or whether or not they didn't want it, I think that goes to

12   the heart of 'Me Too' and Time's Up and what is the public

13   controversy that is very much, you know, being discussed

14   today.

15         Similarly, Your Honor --

16         THE COURT:  Well, I guess my distinction was that

17   as I viewed his writing, and I am not going to -- I am just

18   going to allow the plaintiff to characterize his writing

19   more fairly because, quite frankly, I do not want to speak

20   for Mr. Elliott -- but putting that aside, what I understood

21   his writing was largely about consensual S and M

22   relationships, by and large.  And my concern is the notion

23   of conflating a consensual S and M relationship in any way

24   with circumstances where a woman is put in a position where,

25   without her consent, she is forced into a sexual dynamic.

Proceedings                                          18

1    It is, in my mind, to conflate those two so diminishing to

2    the experience of women, that that troubles me.

3              MS. KAPLAN:  Right.  So I don't want to -- and let

4    me be crystal clear here.  I don't want to conflate those

5    two things at all.  I completely agree with Your Honor on

6    that.

7              What I'm saying, though, is that in his writings

8    often in the context of talking about S and M, one of the

9    topics that Mr. Elliott talks about over and over and over

10   again is the issue of consent.  When it's given, how you

11   know it's given, what it means, et cetera.  And I don't

12   think, Your Honor -- I am not conflating the two things, but

13   I do not think that that conversation has in the context of

14   S and M and taking place in the context of 'Me Too' and

15   Time's Up is very different.  In fact, Your Honor, I think

16   it's the same conversation, they're just in different

17   contexts.

18             So I don't think that Mr. Elliott can come to this

19   Court and say, Yes, Your Honor I have spoken zillions of

20   times about what consent means in the context of the kinds

21   of relationships I've been in in my life.  And when it's

22   clear and when it's not clear and when I thought the person

23   with me was doing something out of consent and when they

24   weren't.

25             But in this context, which talks about this list

Proceedings                                      19

1   which purportedly were instances of Mr. Elliott -- and I'm

2   not -- this isn't about the truth of this hearing, but were

3   instances, allegedly, of Mr. Elliott doing things without

4   consent, you know, that is completely different.  Because in

5   that context, no one said it was S and M.  I think for

6   Your Honor to narrow the controversy that way would be, with

7   all respects, a legal error and I don't think the

8   Second Circuit, particularly in the *Lerman* case and

9   Judge Nap in the --

10              THE COURT:  In the one --

11              MS. KAPLAN:  -- *Adler* case saw the controversies

12  so narrow.

13              THE COURT:  Right.

14              But in the *Lerman* case, we had a woman who, I

15  think, concededly asserted herself in the controversy of

16  sexual morays.  She then published or was the producer of a

17  film that included an orgy scene; is that right?  But she

18  was the producer of that film and she was accused of,

19  wrongly, of being the woman, the topless woman in the orgy

20  scene.  I don't know if it requires an expansive view of the

21  controversy to be able to say that her -- the way in which

22  she viewed or spoke out about sexual norms and a film that

23  included an orgy scene about which she produced is

24  necessary.  It doesn't require an expansive view.  They seem

25  to be almost on top of each other.

Proceedings                                    20

1        MS. KAPLAN:  But that's not what the

2   Second Circuit said, Your Honor, with respect.

3        What the Second Circuit said in *Lerman* is by

4   voluntarily devoting herself to the public's interest in

5   sexual morays, there are extensive writings on the subject,

6   which is exactly what Mr. Elliott has done here, no question

7   about that, leaving profits of wide notoriety for herself in

8   the progress, I don't know, you know, how big his profits

9   were, but also true here:  "Ms. *Lerman* must be deemed to

10  have purposely surrendered part of what would otherwise have

11  been her protected technical privacy rights, at least those

12  related in some way to her involvement in writing her books

13  and screenplays."

14       The Second Circuit in *Lerman* does not use the

15  language that Your Honor is using.  It uses expansive

16  language.  And it reversed the District Court, Your Honor,

17  for doing exactly the kind of narrow constriction of the

18  controversy that the other side is proposing here.

19       Then the Second Circuit goes on and they're

20  criticizing the District Court's decision, which again, was

21  being reversed.  And it says, "The District Court rejected

22  Defendant's argument that Ms. Lerman was a public figure for

23  the limited purpose of commenting on sex and nudity in

24  films."  "The Court..." -- meaning the District Court --

25  "...reasoned that such a topic is merely a matter of incest,

Proceedings                    21

1   but not a true public controversy.  We disagree.

2           The relationship between the sexes..." -- and here

3   is the key language --

4           THE COURT:  Go ahead.

5           MS. KAPLAN:  Here is money language, Your Honor.

6           THE COURT:  I'm listening to you.

7           Go ahead.

8           MS. KAPLAN:  "The relationship between the sexes

9   and public nudity are topics of continued and general public

10  interest and may be considered public controversies, even

11  though not involving political bait or criticism of public

12  officials.  A public controversy is any topic upon which

13  sizable segments of society have different strongly held

14  views.  Certainly various groups today have vastly divergent

15  views on propriety of female or male nudity in films and the

16  print media generally.  In public controversies that daily

17  swirl about, be they politics, pocketbook issues, or, as

18  here, contemporary standards regarding nudity, some plunge

19  into the arena and enter the fray.  Plaintiff is a

20  controversial, outspoken authoress and screenwriter

21  advocating equal --

22          THE COURT:  We love it when a woman is called an

23  authoress, don't we?

24          MS. KAPLAN:  I was going to -- I was going to --

25  about to comment, so this was written in 1984, Your Honor,

1   and it --

2           THE COURT:  It is apparent from the language --

3           MS. KAPLAN:  It was from the year --

4           THE COURT:  -- that is being used.

5           MS. KAPLAN:  It was from the year, as I recall, I

6   graduated from high school.

7           But the holding of the decision remains, and this

8   was -- I am just going to say -- was written decades, many,

9   many decades before 'Me Too.'  The same issue, the same

10  controversy, just like nudity in film was a big deal in

11  1984, today, Your Honor, the big deal in the public

12  controversy is the certain standards in which women and men

13  give consent and what that means.

14          THE COURT:  I am just not -- I do not know if I am

15  as convinced as you are that his writings touch on that in

16  the way that you are describing it.  I do not know if we

17  have a disagreement about the definition of the controversy

18  here -- well, let me rephrase that.

19          If you use 'Me Too' as a backdrop, I think that

20  you advanced four versions of what the controversy is in

21  your submissions in the most recent, in the sur-sur reply,

22  you say a larger issue is 'Me Too.'  I think that that, at

23  least in my mind, more closely approximates what the public

24  controversy at issue in this case is.  What I am trying to

25  decide is whether I agree with your viewpoint of his writing

Proceedings                                    23

1   such that he can be said to have interjected himself into

2   that controversy.  So we do not have much of a disagreement

3   about what the controversy is, I do not think.  It is

4   broader than that which was advanced, I believe.

5           MS. KAPLAN:  Understood, Your Honor.

6           THE COURT:  I have made no determination so do not

7   quote me back and say you also say this was it, but the --

8   by the plaintiff, and I will note that the plaintiff does

9   look to the words of Ms. Donegan.  But there is some

10  attraction to the defendants' argument that the controversy

11  here should be defined more broadly against the backdrop of

12  the 'Me Too' movement:  That is an attractive argument for

13  me.

14          I'm trying to --

15          MS. KAPLAN:  Right.

16          THE COURT:  -- digest this man's writings to

17  discern whether I believe that there is the kind of

18  requisite intersection between his writings and that

19  controversy.  That is what I'm struggling with, quite

20  honestly.

21          MS. KAPLAN:  Understood.

22          THE COURT:  What are *The Adderall Diaries*, what

23  are they talking about?  You know, yes, I have read the

24  clips, I mean, the highlighted portions.  I have read some

25  of this, you know, just as a specific readership and so it

1   has taken me a minute to get through it, to be honest.

2          All right.  With that said, I have a question for

3   you.

4          MS. KAPLAN:  Sure.

5          THE COURT:  In *Dilworth* and *Adler*, they both talk

6   about this.  Where is the language from *Dilworth* I meant to

7   ask you.  Hold on.

8          (Pause in proceedings.)

9          MS. KAPLAN:  I apologize.  I read *Adler*,

10  Your Honor, I apologize.  So I'm not --

11         THE COURT:  That's okay.  In both *Dilworth* and

12  *Adler*, there is a suggestion in both cases, including in the

13  language that was cited by the defendant, about the audience

14  in terms of trying to discern the interjection of the

15  defendants' -- or the plaintiff's interjection, rather, of

16  themselves in a controversy.  And in *Dilworth* the Court

17  says, "But anyone who publishes becomes a public figure in

18  the world bounded by the readership of the literature to

19  which he has contributed."

20         Which suggests that I should be looking to the

21  readership and whether the people who are the audience of

22  Mr. Elliott, are similar or the same as the audience of the

23  liable list statement.

24         In *Adler* it says, "Whether the person has

25  generated amidst controversy especially within the community

Proceedings                                    25

1    to which the alleged liable was published."

2              Both of those are suggesting that I need to look

3    at the audience for both the statements that were made by

4    the defendant in the case, as well as the statements that

5    were made previously by the person who is purported to be a

6    limited purpose public figure.

7              MS. KAPLAN:  Right.

8              THE COURT:  All right.  So where does that fall

9    here?

10             MS. KAPLAN:  So I think, Your Honor, that we

11   are -- and let me just add to *Adler* what the Court says is

12   principally talking about we're not *Adler* and what she was

13   talking about was about her being fired from *Vanity Fair* and

14   then it defines the people very broadly, principally to

15   persons entrusted in literary matters.  And that's why the

16   Court found a nexus in the *Adler* case, and that was a

17   Judge Nap decision.

18             Here, I think it's the same thing.  We're

19   talking --

20             THE COURT:  Well, in *Adler* she was a *Vanity Fair*

21   editor.  It's a pretty large audience.  And then in

22   *Dilworth*, we were talking about some mathematician; isn't

23   that right?

24             MS. KAPLAN:  Yes.

25             THE COURT:  And the person who criticized him

1    called him a crank, so it was a more limited readership.  I

2    do not know the appetite in the readership for Mr. Elliott's

3    work.

4             MS. KAPLAN:  So I would say to you this:  One, I

5    don't think -- *Dilworth* is not binding on Your Honor.  It

6    was a case, I think, limited to the facts about a very

7    limited situation.  The cases that are within the

8    Second Circuit I don't think look at it that narrowly in

9    terms of you actually look at the audience.  It looks, as it

10   says in *Adler* and the same thing in *Lerman*, Your Honor,

11   about persons's interest in literary matters for *Adler.*  *In*

12   *Lerman* people participating in the controversy then about

13   nudity in films.  Those cases are on all fours with this,

14   Your Honor.

15            THE COURT:  So just tell me what the answer is

16   here.

17            MS. KAPLAN:  Right.  So Mr. Elliott has spent much

18   of his career writing on issues of sexual relationships,

19   consent in sexual relationships, how consent is given or not

20   given in sexual relationships, and, of course, what all that

21   means.

22            Now, the --

23            THE COURT:  The readership for that, for his works

24   would be defined to a --

25            MS. KAPLAN:  Your Honor, I don't think you look at

Proceedings                                                    27

1   the readership.  I don't think you look at the people who

2   buy his books.

3            THE COURT:  Okay.

4            MS. KAPLAN:  I think you look at the people who

5   are interested in those topics, and I think the people who

6   are talking about 'Me Too' are interested in those topics.

7   Just like in *Lerman*, you're not looking for people who only

8   watch nude films.  That's not what the Court says in *Lerman*

9   case.  It says that you are looking about -- or whether

10  there's an overlap in the public of people --

11           THE COURT:  Right.

12           MS. KAPLAN:  -- interested in those issues.

13           THE COURT:  Well, that is what I am asking you.

14           MS. KAPLAN:  Yes, Your Honor.

15           So there's no question that people, and some of

16  the women who are involved in 'Me Too' are not only

17  interested in talking about issues of consent in

18  relationships, but also in the same manner, -- they may look

19  at it differently than Mr. Elliott, but in the same manner

20  that Mr. Elliott does in his book and has been saying in his

21  books.  So I really don't think that's even a close

22  question.

23           THE COURT:  Okay.

24           MS. KAPLAN:  On the issue of 'Me Too,' just to be

25  clear, Your Honor, I don't think he has to inject himself in

Proceedings                                    28

1   the conversation officially denominated 'Me Too.'  I think

2   the --

3            THE COURT:  All right.  We're using 'Me Too' as a

4   prompt --

5            MS. KAPLAN:  Right.

6            THE COURT:  -- for a larger issue.

7            MS. KAPLAN:  Right.

8            THE COURT:  It is the shorthand, is it not right

9   now.

10           MS. KAPLAN:  Yeah.  So what I think has happened

11   is he has injected himself in a conversation about matters

12   of consent and dominance and abuse in sexual relations.

13           THE COURT:  Okay.

14           MS. KAPLAN:  That's a topic that is the

15   centerpiece, really, the main theme of 'Me Too' and what

16   people are talking about.

17           THE COURT:  Is that a main theme of his writing --

18           MS. KAPLAN:  Yes.

19           THE COURT:  -- matters of consent.

20           MS. KAPLAN:  Absolutely.  No question about it.

21           Let me read you another reference.  This is from

22   *The Saddest Story I've Ever Read*, and he writes in that --

23   and let me give you the reference, Your Honor.  "I was

24   writing a book about a man who equated abuse with

25   affection."

Proceedings                                    29

1          Nothing could be more on all fours --

2          THE COURT:  But that could be consensually

3    conflating abuse.  I do not think that -- well, I'm sorry.

4    I do not see how that implicates consent.

5          MS. KAPLAN:  Well --

6          THE COURT:  Unfortunately there are people in this

7    world who sadly conflate abuse with affection and do so

8    consensually.  I mean, it seems like the masochist here do

9    so.  I'm not an expert.

10         MS. KAPLAN:  Yeah, but again, Your Honor, I think

11   you're seeing it through a lens that's too narrow here.  The

12   idea of whether -- between a man and a woman, whether you

13   call it S and M or anything else, whether consent is freely

14   given and whether -- whatever happens in that relationship

15   it -- has been -- is consensual and freely given between the

16   parties and non-abusive, is the central discussion --

17         THE COURT:  Okay.

18         MS. KAPLAN:  -- that we're having in 'Me Too.'

19         THE COURT:  Yes --

20         MS. KAPLAN:  And it's --

21         THE COURT:  -- I agree with you.

22         MS. KAPLAN:  -- and I don't think there's an

23   exception for S and M because by definition, anything in

24   S and M, by definition has to have consent.

25         THE COURT:  I think you are misunderstanding my

Proceedings                                    30

1   point because that is not what I said.

2          MS. KAPLAN:  Okay.

3          THE COURT:  What I am saying is, simply because a

4   person has chosen to conflate abuse and affection and make

5   them, for themselves, have chosen for themselves, does not

6   make it one and the same, does not make it nonconsensual.

7   It may not be the way in which I would perceive, right?  I

8   may not perceive cutting as affection, but it appears to be

9   that there is a segment of the society that believes that

10  and engages in that consensually.

11         MS. KAPLAN:  Yes.  But what Mr. Elliott talks

12  about in this books is the circumstances in which consent is

13  given in that situation.  Whether --

14         THE COURT:  Or whether it is given?

15         MS. KAPLAN:  Whether it's given, when it's given,

16  and how it's shown that it's given.

17         THE COURT:  Okay.  And again, I have not digested

18  all of these books, but it is those excerpts, it is pointing

19  me to where he is grappling with issues of consent as

20  opposed to talking about, you know, encounters that others

21  might deem abusive --

22         MS. KAPLAN:  Well --

23         THE COURT:  -- but that are occurring nonetheless

24  consensually.

25         What?

```
                        Proceedings                    31
```

 1              MS. KAPLAN:  Well, no.  I'm just --

 2              THE COURT:  I would deem it personally abusive to

 3      be cut.  But if someone is engaging in that consensually,

 4      consent is not the issue.

 5              MS. KAPLAN:  But the question and he writes

 6      about this all the time -- and we can get you more

 7      reference.  The question is whether or not the person is

 8      engaging in it consensually and how you know when the person

 9      is engaging in it consensually is a central topic of his

10      writings, Your Honor.

11              THE COURT:  Well, you will have to show me that,

12      Ms. Kaplan.

13              MS. KAPLAN:  All right.  Well, we're happy to put

14      in a post-argument submission.  But there's just no question

15      that he writes about it.

16              He also writes about being raped, Your Honor, and

17      has sought to insert himself -- and again, I feel terrible

18      doing this because I feel horrible for Mr. Elliott -- but

19      has injected himself through his writings into the public

20      conversations about being raped, which is the core issue of

21      'Me Too' and Time's Up.

22              THE COURT:  So if anyone ever wrote a story --

23      well, I'm just saying, if there was a woman who wrote a

24      story about being -- well, I guess, perhaps...

25              MS. KAPLAN:  Yes, Your Honor, she would be a

Proceedings                                32

1    public figure.

2              THE COURT:  She would be a public figure on that.

3              MS. KAPLAN:  Exactly right.  She would be a public

4    figure, a limited purpose public figure.

5              THE COURT:  All right.

6              MS. KAPLAN:  As in *Lerman* I'm not sitting around

7    arguing here is a general case.

8              THE COURT:  And I don't think that you are.

9              All right.  I'm listening if you have anything

10   else.

11             MS. KAPLAN:  I'm just looking to see if there's

12   anything else, Your Honor.

13             (Pause in proceedings.)

14             MS. KAPLAN:  I think Your Honor has already said

15   this, but one key error made by my friend on the other side

16   about that, is that the controversy that Mr. Elliott

17   injected himself does not have to be the controversy about

18   whether this list was a good idea.  I think Your Honor has

19   already accepted that.

20             THE COURT:  Yeah, Ms. Kaplan, I do not think he is

21   saying that, though.  I think what he said is that the

22   controversy is as it was defined by Ms. Donegan in the cut

23   article.

24             MS. KAPLAN:  He's saying giving rise to the list.

25   He says on Page 7 --

Proceedings                          33

1           THE COURT:  Okay.

2           MS. KAPLAN:  -- of the sur reply, giving rise to

3     the list.  And I think Your Honor has already acknowledged

4     that that kind of a nexus is not required under any of the

5     Second Circuit cases.

6           THE COURT:  Okay.  Yes.

7           MS. KAPLAN:  And I think with that, Your Honor, if

8     I could have a little bit of time for rebuttal, but thank

9     you.

10          THE COURT:  You are up.

11          MR. LEWIS:  Thank you, Your Honor.

12          Your Honor, regarding Mr. Elliott's writings, the

13    writings are universally about a male figure who is a

14    masochist in consensual relationships.

15          THE COURT:  Well, Ms. Kaplan has proffered or said

16    that she will proffer me excerpts.  But again, I have not

17    digested all of Mr. Elliott's works where the theme and the

18    question of consent is going to become evident.  Are you

19    suggesting that that is not the case and that the question

20    of consent is not a topic about which Mr. Elliott's works

21    are written?

22          MR. LEWIS:  That is -- yes, I think that

23    Ms. Kaplan was unable to pull a single reference to an

24    instance in which a character was being raped, sexually

25    assaulted.

Proceedings                          34

1        THE COURT:  She did do a single reference.  She

2   did do one for certain.

3        MR. LEWIS:  And yet Your Honor noted it was a

4   consensual S and M relationship in the reference that she

5   noted.

6        But the --

7        THE COURT:  Okay.  Then let me ask you the

8   question the other way:  Should Ms. Kaplan successfully

9   identify at least two instances, let's say, in Mr. Elliott's

10  works where indeed the question of consent is a subject,

11  does your argument then fall away?  So is your argument

12  rests on the notion that the question of consent is wholly

13  absent from the works?

14       MR. LEWIS:  No.  Your Honor, my argument is that

15  the controversy as defined by Ms. Kaplan is exceedingly

16  broad and even relying on --

17       THE COURT:  The controversy as defined by

18  Ms. Kaplan or as characterized as one attracted by

19  the Court?  You should operate -- I gave a hint to you and

20  to Ms. Kaplan as to how it is that I think I am going to

21  view the controversy.  So against that backdrop of that

22  really glaring hint, you should probably make your argument

23  for me.

24       MR. LEWIS:  Well, Your Honor, I, of course, rely

25  on our earlier position about extraneous materials not

```
                        Proceedings                    35
```

1  being --

2          THE COURT:  I've rejected that already.

3          MR. LEWIS:  Okay.

4          THE COURT:  So you should probably make an

5  argument that assumes that I am going to consider the

6  materials.

7          MR. LEWIS:  Okay.

8          Well, I believe that it's not Ms. Kaplan who

9  should be defining the controversies.

10          THE COURT:  Well, she is not defining the

11  controversy, I am defining the controversy.  What I had said

12  was that that definition of the controversy as advanced by

13  Ms. Kaplan, you know, was one that was particularly

14  attractive to me and that fell against the backdrop of the

15  'Me Too' movement.

16          MR. LEWIS:  And so Mr. Elliott's writings do not

17  focus on the nonconsensual rape, sexual harassment, sexual

18  assault.  The focus that's on sexual matters is regarding

19  permissible consensual S and M relationships.

20          THE COURT:  Yes.  But to that extent -- my

21  question to you is if Ms. Kaplan is able to identify

22  instances in Mr. Elliott's writing where in the context of

23  an S and M relationship -- which was the argument that she

24  was making -- that in the context of an S and M relationship

25  he also speaks to the issue of consent in that context.  And

Proceedings                                              36

1    if she is able to show me instances of that, how do I view,

2    then, his works in terms of his interjection into the

3    controversy?

4            MR. LEWIS:  Well, I would say that he, one, not --

5    he's certainly not a prominent figure.  Your Honor, asked

6    about readership.

7            THE COURT:  Okay.  He is not a prominent figure

8    where?

9            MR. LEWIS:  Well, the test for limited purpose

10   public figure is not just that the plaintiff has voluntarily

11   injected himself into a public controversy related to the

12   subject of the litigation, but that he assumed a position of

13   prominence.

14           And, Your Honor, I certainly would posit to the

15   Court that that's never been a -- he's never assumed a

16   position of prominence, and if we're talking about general

17   matters of consent in any and all sexual relationships.  I

18   don't -- Your Honor, as far as specific readings that

19   Ms. Kaplan might produce to you, I would have to probably

20   address them as they are produced.  But I would submit that

21   Mr. Elliott certainly has not injected himself into any of

22   the controversies surrounding the 'Me Too' movement, however

23   it's defined.  And all of the writings that I have looked

24   through were from a perspective of, consensual S and M

25   relationships.  And I could speak to Mr. Elliott briefly if

Proceedings                                    37

1    Your Honor would like just to -- I haven't memorized his

2    entire canons.

3              THE COURT:  No.  But you have got to imagine that

4    you believe that this was going to be an issue discussed

5    today?

6              MR. LEWIS:  Sure.

7              THE COURT:  No surprises here.  You sent me a

8    letter of clarification about what we were talking about, I

9    narrowed it for you.  So I would have expected that you

10   would have spoken to Mr. Elliott before you walked in here

11   today.

12             MR. LEWIS:  So then I will have to see what

13   Ms. Kaplan sends.  But I have not -- my position is he has

14   not inserted himself into controversy or the --

15             THE COURT:  Related to consent.

16             MR. LEWIS:  But --

17             THE COURT:  I have a question for you.  I'm going

18   to give you a hypothetical.

19             MR. LEWIS:  Okay.

20             THE COURT:  We've been bandying these issues

21   about, and came up with one.

22             So I'm going to read it just as is.  Let's say

23   there's a very popular sex columnist who writes a column.

24   His column is called "Sex in the City," right?  She recounts

25   her personal sexual escapades.  Every week she describes her

Proceedings                           38

1   sexual encounters that she has had.  A man comes out and

2   then accuses her of rape anonymously online.  Would that sex

3   columnist be deemed a limited purpose public figure as you

4   view the world?

5               MR. LEWIS:  No.

6               THE COURT:  Why not?

7               MR. LEWIS:  Well, she's writing about consensual

8   sexual interactions.  And so under the theory that anyone

9   who writes about sex in general can then be thought of as

10  delving into whether there is consent, would mean that --

11              THE COURT:  So she could -- only if she's ever

12  written about rape before specifically could she be deemed a

13  limited public figure, though she writes about sexual

14  encounters, implicitly suggesting that they were all

15  consensual and someone says actually that one she wrote

16  about last Thursday, she raped me, not a limited public

17  purpose figure in your mind?

18              MR. LEWIS:  Well, if it was -- no, Your Honor, I

19  believe that that can't be the law.

20              THE COURT:  Well, how do you square that with

21  *Lerman*?

22              MR. LEWIS:  Well, in *Lerman*, Your Honor, the

23  writer first -- it's my understanding the writer was -- the

24  world famous Jackie Collins who --

25              THE COURT:  This is the world famous Carrie

```
                       Proceedings                    39
```

1    Bradshaw.

2              MR. LEWIS:  Right.

3              THE COURT:  Everyone knows her.

4              MR. LEWIS:  I'm familiar with her.

5              THE COURT:  Okay.  Go ahead.

6              MR. LEWIS:  So the specific issue in *Lerman* as

7    Ms. Collins took position in, was she took a public stance

8    against women being nude in film less than men.  And she

9    specifically --

10             THE COURT:  I don't -- okay.  I think it is turned

11   around, but go ahead.

12             MR. LEWIS:  So the controversy, as I understood

13   the *Lerman* Court described as the debate over sex and nudity

14   in films.

15             THE COURT:  Right.

16             MR. LEWIS:  Where Ms. Collins specifically was a

17   proponent of equal nudes for all.

18             THE COURT:  Right.

19             MR. LEWIS:  So that is narrowly a tailored

20   controversy that Ms. Collins specifically took a position

21   in.

22             THE COURT:  Okay.

23             MR. LEWIS:  If Mr. Elliott or Ms. Bradshaw took a

24   public stance about whether, I guess, consent and sex, if

25   it's -- even in describing the topic I believe it's just too

```
                     Proceedings                    40
```

 1  broad to try to --

 2          THE COURT:  Okay.  Let's try this again.

 3          MR. LEWIS:  Okay.

 4          THE COURT:  Square it with *Adler*.

 5          MR. LEWIS:  Well, *Adler* also, as, Your Honor,

 6  noted --

 7          THE COURT:  *Adler* defines the controversy in an

 8  exceptionally broad terms.

 9          MR. LEWIS:  Well --

10          THE COURT:  I'm reading from Page --

11          MR. LEWIS:  One moment, Your Honor.

12          THE COURT:  -- 1566 of *Adler*, the Court writes,

13  "The resurrection of *Vanity Fair* gave rise to a public

14  controversy into which Plaintiff injected herself in which

15  she played a prominent role.  The revised *Vanity Fair*

16  received enormous publicity even prior to the publication of

17  its first issue.  But offering her expertise and lending her

18  name to the magazine, Carrie Bradshaw, for prominent display

19  and its masthead under the title consulting editor in

20  exchange for not insignificant salary, Plaintiff represented

21  to the public that *Vanity Fair* would have the benefit or her

22  considerable expertise and excellent reputation.  In doing

23  so she injected herself into the *Vanity Fair* saga and any

24  attendant controversy and any attendant controversy."

25          Wouldn't a controversy about whether Carrie

Proceedings                                41

1   Bradshaw's sexual escapade on Friday night was consensual or

2   not be an attendant controversy to her public discussions

3   concerning her sex life?

4          MR. LEWIS:  Well, if so, if Ms. Bradshaw has this

5   readership similar to Jackie Collins, which is world

6   famous -- Your Honor, I believe asked Ms. Kaplan about the

7   audience.  So we're talking about *Vanity Fair* is a

8   significantly larger audience, and if there's something

9   specific about --

10         THE COURT:  You are not really answering my

11  question.  If you do not have an answer to my question

12  then --

13         MR. LEWIS:  Well --

14         THE COURT:  Then you should answer it.

15         MR. LEWIS:  Okay.

16         THE COURT:  Okay?  So why don't you try and answer

17  it.

18         So what I am asking you is, I think it is a

19  legitimate hypothetical, right?  I think it is a

20  particularly legitimate hypothetical in light of the

21  argument that he only spoke about consensual sexual

22  relationships in the context of S and M encounters, whereas

23  Carrie Bradshaw only talks about consensual sexual

24  relationship.

25         MR. LEWIS:  Your Honor, I'm sorry, and forgive me

Proceedings                                    42

1   if I'm not grasping the hypothetical.  The writing about

2   consent is different than just writing about the sexual

3   relationships, all of which are assumed to have a -- it's

4   not the same.

5           THE COURT:  I am talking about the breadth -- the

6   scope of defining the controversy here, and I am using *Adler*

7   as the backdrop because the controversy is defined pretty

8   broadly and one's ability to interject themselves into the

9   controversy given its breadth seems to be a bar that is not

10  merely as high as that which is advocated by the plaintiff

11  in this case.

12          MR. LEWIS:  Yes, Your Honor, I apologize.  I was

13  looking for *Adler* so I can...

14          (Pause in proceedings.)

15          MR. LEWIS:  Your Honor, if I might have the page

16  number that you're referencing?

17          THE COURT:  1566.

18          MR. LEWIS:  Okay.

19          THE COURT:  Similarly I think that Ms. Kaplan

20  identified the language in *Lerman*, which also was fairly

21  broadly defined the controversy in that case, one that seems

22  that if you aligned it, at least potentially, would make it

23  such that -- potentially could make it such that

24  Mr. Elliott's writings would be deemed to be an interjection

25  into the controversy fairly defined as one against the

Proceedings                                      43

1    backdrop of the 'Me Too' movement.  I just need you to --

2            Help me out here.

3            MR. LEWIS:  Your Honor, so in distinguishing

4    *Lerman* --

5            THE COURT:  Why should I not define the

6    controversies of *Adler*?

7            MR. LEWIS:  Because anyone who was -- who wrote

8    about sex in any fashion could then be accused of being a

9    rapist and be considered a public figure, which and the

10   First Amendment would not protect for just -- it would be

11   open season on any writer who wrote about sex in any fashion

12   or any relationship where there was a loose connection to

13   whether consent was involved.  And, Your Honor, I

14   respectfully submit that the Supreme Court has warned

15   against accepting these sort of *post hoc* arguments regarding

16   the scope of the public figure arguments.  And obviously, I

17   was referred to *Walston* where that was -- people convicted

18   of crimes --

19           THE COURT:  I'm sorry, forgive me.

20           MR. LEWIS:  Oh, I'm sorry.  *Walston* where the

21   Court ruled against open season for all who sought to defame

22   convicted criminals.

23           And so people who write about, not even

24   unconventional just any sexual desires, you know, if there

25   was a broad scope where anything where consent was involved,

Proceedings                    44

1   is permissible to be called a rapist, then it would be open

2   season and it would be an extensive reach of First Amendment

3   protection.

4           THE COURT:  All right.  I just want to make sure I

5   am clear about the distinctions that you are drawing.

6           MR. LEWIS:  Yes, Your Honor.

7           THE COURT:  All right.  Are you saying that if a

8   writer does touch on consent, then potentially, yes, a

9   limited purpose public figure; but if a writer is simply

10  talking about sex but consent is not expressly written

11  about, then no, they do not fall into the category of a

12  limited purpose public figure; or is there a third that you

13  are --

14          MR. LEWIS:  Well, so my answer would be no,

15  Your Honor.

16          THE COURT:  No --

17          MR. LEWIS:  Referring to *Lerman,* and I'm sorry for

18  the hypothetical, obviously.  I don't want to misstate

19  anything.  But my position -- the author in *Lerman*,

20  Jackie Collins, assumed a prominent position in the

21  controversy at issue and she wrote for millions of readers,

22  and so assuming a prominent position is also an element of

23  being considered a --

24          THE COURT:  Allo right.  Let's put prominence

25  aside for a moment.

Proceedings                                          45

1           MR. LEWIS:  Okay.

2           THE COURT:  I am really just trying to talk about

3    the subject matter of his writing as it relates to the

4    controversy.

5           MR. LEWIS:  Okay.

6           THE COURT:  And so my question to you was, are you

7    suggesting that a writer who writes about sex but does not

8    expressly touch on the issue of consent, could not be

9    considered a limited purpose public figure for these

10   purposes, but, you know, that if they write expressly, if

11   their writing touches on the issue of consent, is it your

12   argument that they could be, or is there a third option that

13   I'm missing?

14          MR. LEWIS:  Well, I think the -- yes, I would say

15   it is my position that there would be a third option.  That

16   it is not just writing about consent once or twice.

17          THE COURT:  Okay.

18          MR. LEWIS:  If there was a writer, say,

19   Carrie Bradshaw was commenting on the 'Me Too' movement in

20   her articles, that would be placing herself in the consent

21   portion of the controversy you are referring to here,

22   Your Honor.

23          I don't believe just because a writer has touched

24   on consent once or twice that that would qualify the writer

25   to be --

Proceedings                        46

1          THE COURT:  In the *Adler* case, the plaintiff in

2     that case, didn't she do a little more than become an editor

3     for a magazine?  I don't recall allegations where she

4     specifically addressed the vitality of *Vanity Fair* as a

5     magazine as a rag.  She simply served as an editor.  Does

6     that not undermine the argument that you are making here,

7     that there has to be an express statement explicitly

8     referencing what is identified as the controversy to allow

9     an individual to have injected themselves into that

10    controversy?

11         MR. LEWIS:  Well, Your Honor, I believe there's

12    other matters in which someone can inject themselves into a

13    controversy beyond just their writing.

14         THE COURT:  Okay.

15         MR. LEWIS:  So I do believe that there needs to be

16    more than just --

17         THE COURT:  Okay.

18         MR. LEWIS:  -- if it's just writing about

19    relationships that could be tied to consent, I don't think

20    that that person can be considered a limited purpose public

21    figure on those writings alone.

22         THE COURT:  Okay.

23         MR. LEWIS:  I think they would have to insert

24    themselves into speaking about the -- in this case, the

25    'Me Too' movement more -- I will take away prominence, but

Proceedings                              47

1    they have to explicitly be dealing with that controversy,

2    Your Honor.

3              THE COURT:  Okay.

4              All right.  I'm listening.

5              MR. LEWIS:  And, Your Honor, if I might just for

6    the record?

7              THE COURT:  Please go ahead.

8              MR. LEWIS:  The controversy that Ms. Kaplan has

9    stated in the complaint and Ms. Donegan's writing is focused

10   on is the problem of sexual assault, sexual harassment and

11   consent, specifically with women and women's issues in

12   reporting that sexual assault, rape.

13             THE COURT:  I'm sorry.  Can you please repeat

14   that, sir?

15             MR. LEWIS:  Sure.  The issues as discussed by

16   Ms. Donegan in her writing and noted in the complaint is

17   that her -- her focus is strictly on the issues of rape,

18   sexual assault, sexual harassment suffered by women and

19   the inability or the ineffectiveness of reporting that

20   sexual assault, rape, sexual harassment.  So Mr. Elliott is

21   not here to take on the entire 'Me Too' movement.  He's

22   writing his --

23             THE COURT:  He's written about his own personal

24   sexual encounters, we can say that --

25             MR. LEWIS:  Yes.

Proceedings                                    48

1              THE COURT:  -- right?

2              MR. LEWIS:  And just that fact alone.

3              THE COURT:  And the 'Me Too' movement, I just need

4    you to respond to it.

5              MR. LEWIS:  Yes, Your Honor.

6              THE COURT:  The 'Me Too' movement certainly

7    addresses personal sexual encounters and fairly broadly.

8    And then whether or not the encounters are consensual or

9    not; is that not touched upon in his writing?

10             MR. LEWIS:  Well, he's writing about his personal

11   sexual encounters where there is consent, and it's a

12   permissible sexual act; and that just writing about that,

13   does not open him or any other writer, Ms. Bradshaw, or

14   otherwise to being -- you know, where anyone can accuse them

15   of rape.

16             THE COURT:  Okay.  Let's just be clear.  The

17   question that we are answering is only whether he is a

18   limited purpose public figure.

19             MR. LEWIS:  Sure.

20             THE COURT:  So that I can then assess the standard

21   against which I should judge the pleadings, all right?  It

22   is not --

23             MR. LEWIS:  Yes.

24             THE COURT:  -- a test of whether someone is

25   permitted to be defamed, right?  There is still a defamation

Proceedings                                    49

1   claim that may or may not lie depending on what the standard

2   is.

3           So I think your argument goes just a little bit

4   too far.  We are trying to figure out what standard do I

5   employ in assessing a defamation claim.

6           All right.  Go ahead.

7           MR. LEWIS:  And, Your Honor, my position is that

8   the standard of having anyone who writes about their

9   personal sexual encounters and desires is not just

10  automatically considered a limited purpose --

11          THE COURT:  Right.

12          MR. LEWIS:  -- public figure.

13          THE COURT:  But your argument ignores that there

14  are other elements, right?  So I do not think that the

15  defendants here have suggested that simply anyone who writes

16  about their own sexual encounters becomes a limited purpose

17  public figure.  Part of what the defendant did when they

18  stood up was say, Your Honor, there are only a couple of

19  elements that I believe are in dispute.  But those are

20  elements, nonetheless, that would need to be satisfied which

21  would necessarily mean not everyone who writes about their

22  sexual encounters would be a limited purpose public figure.

23  Fair enough?

24          MR. LEWIS:  Yes.

25          THE COURT:  All right.

Proceedings                                    50

1          Is there anything else?

2          MR. LEWIS:  Well, just that the -- and so one of

3    the elements that I submit is the defendant has not met

4    their burden of proof in establishing this, but aside from

5    the voluntary injecting himself into public controversy

6    related to the subject of litigation is also the -- assume

7    the position of public prominence in both *Adler* and *Lerman*,

8    there was certainly more of a prominence in the actual

9    controversy the Court determined.

10         THE COURT:  Okay.

11         MR. LEWIS:  And, Your Honor, also just if I might

12   be -- of course, I understand Your Honor's position

13   regarding the writings and the statements.  And our position

14   is covered in our brief.

15         THE COURT:  Right.

16         MR. LEWIS:  But I just would like to add that

17   Ms. Kaplan when discussing the statements --

18         THE COURT:  Which statements?

19         MR. LEWIS:  About the statements that were in the

20   interview or even statements in the writing appeared to be

21   discussing them as true statements, the truth of the

22   statement.

23         THE COURT:  What I understood Ms. Kaplan to say

24   expressly was to make a comment saying that they are not to

25   be accepted for the truth of the matter asserted.  I think

Proceedings                                51

1   you made that statement.  I know I certainly made that

2   statement.  And I understand that you do not believe that I

3   should consider them.  I am not -- and I said that I am.

4   But I am not clear on the basis for which I wouldn't

5   consider them.  Is it something that you believe -- these

6   writings something that you do not believe that I could take

7   judicial notice of?

8           MR. LEWIS:  No, Your Honor.  But for this stage,

9   Your Honor, in particular the articles of which we were

10  given yesterday, noticed yesterday, I don't believe those

11  interviews or the answers can be considered as -- for in the

12  motion to dismiss phase.

13          THE COURT:  Okay.  Let's talk about

14  *The Adderall Diaries*.

15          MR. LEWIS:  Yes.

16          THE COURT:  Are you saying that I cannot take

17  judicial notice of The Adderall Dairies, which is a writing

18  by Mr. Elliott?

19          MR. LEWIS:  The existence of it, of course you

20  can.  That's what I understand Your Honor --

21          THE COURT:  I don't need to believe that

22  Mr. Elliott actually had the word "possessed" carved into

23  his body.  But I can take judicial notice of the fact that

24  he wrote that he had the word "possession" carved into his

25  body, correct?

```
                        Proceedings                    52
```

1           MR. LEWIS:  Well --

2           THE COURT:  That is the difference between taking

3    for the truth of the matter asserted and just simply taking

4    judicial notice of the writing itself.  Do you see the

5    distinction?

6           MR. LEWIS:  Yes, Your Honor.

7           THE COURT:  Do you agree with the distinction that

8    I've made?

9           MR. LEWIS:  Yes.

10          THE COURT:  Okay.

11          All right.  Go ahead.

12          MR. LEWIS:  And I was just referring to some of

13   the arguments made by Ms. Kaplan which to me appear to be

14   more of arguing for the truth of what the statements are

15   about.  Like the statement that he writes about regarding

16   consent.

17          THE COURT:  Well, if he does, he does.

18          MR. LEWIS:  Well --

19          THE COURT:  That is something that I could take

20   judicial notice of.  Whether in real life he did or did not

21   actually give consent, I cannot make a determination on.

22   That he wrote about consent would be appropriately a subject

23   on which I could take judicial notice.

24          MR. LEWIS:  But you're referring to his writings.

25   I was referring to his statements by an interviewer saying

Proceedings                                        53

1   he writes about consent.  That is what I was referring to on

2   that.

3           THE COURT:  Oh, you are saying the interviewer's

4   characterization of his writing?

5           MR. LEWIS:  Yes.

6           THE COURT:  Okay.  That is a fair point.  Now I am

7   following you.

8           MR. LEWIS:  I'm sorry, Your Honor.

9           THE COURT:  Do you believe that's a fair point,

10  Ms. Kaplan?

11          MS. KAPLAN:  Yes.

12          THE COURT:  Okay.

13          MS. KAPLAN:  But I don't think that's what the

14  quote was.  It wasn't talking about his writing.  He was

15  talking about his own experience at that point.  That's why

16  I was trying to be very solicitous toward that.

17          THE COURT:  Look, I know what the ground rules

18  are.

19          MR. LEWIS:  Of course.

20          THE COURT:  And I'm going to follow those ground

21  rules.

22          MR. LEWIS:  Of course.

23          THE COURT:  So that is what we will do.

24          MR. LEWIS:  Of course.

25          THE COURT:  All right.  Is there anything else you

Proceedings                                        54

1    wanted to offer, sir?

2              MR. LEWIS:  (No audible response.)

3              THE COURT:  And so we are cleared up; you do not

4    have a basis to suggest that I cannot take judicial notice

5    of Mr. Elliott's writings?  That is not your position or it

6    was, but you are not advancing that anymore?

7              MR. LEWIS:  No.  Just that what we're -- I rely

8    just on our briefs, Your Honor.  It was more the -- what we

9    were referring to when the Court said what should be relied

10   upon and I rely upon all that.

11             THE COURT:  Okay.

12             MR. LEWIS:  And I would just ask, Your Honor, I

13   would be able to, of course, respond to whatever Ms. Kaplan

14   produces to Your Honor as far as writings?

15             THE COURT:  Yes.

16             MR. LEWIS:  Thank you.  Thank you for your time,

17   Your Honor.

18             MS. KAPLAN:  Your Honor, I'll be brief.  So, of

19   course, we completely agree with Your Honor, that it's not

20   for the truth of what he has written about it.  It is for

21   the fact that he has written about it.

22             I'm going to read a couple quotes to Your Honor,

23   and then we will provide a submission.

24             THE COURT:  This is a lot of stuff.

25             MS. KAPLAN:  Well, we'll read everything he's

Proceedings                                    55

1    written over the course of however much time you give me and

2    we'll give you more quotes.  But here's the quote that we

3    have handy.

4              THE COURT:  Slowly.  Read them slowly.

5              MS. KAPLAN:  I'm so sorry.  I'm terribly sorry.

6    Two things, one even though I'm from Cleveland, Ohio, which

7    makes me terribly embarrassed to read some of these things

8    and I apologize for that, everyone thinks I'm from New York

9    because I speak too quickly and so I'm going to try to slow

10   it down.

11             THE COURT:  You have been here awhile.

12             MS. KAPLAN:  I have been, most of my life,

13   Your Honor.

14             So here is a quote.  "There was also Maria,

15   Justin's girlfriend and my first love who was beautiful and

16   tragic.  Her grandmother had kept her locked in the closet

17   and sent her door to door begging for heroin money when she

18   was only 10 or 11 years old.  She used to call me crying

19   saying that she had been masturbating with the vacuum

20   cleaner and she couldn't stop and her sides were all

21   bruised.  Or she would tell me she had walked down to the

22   gas station at night in her underwear in heels.  Everything

23   about her screamed 'rape me...' -- in quotes.  I loved her,

24   but I didn't know what to do about it."

25             That's from *The Score*, Your Honor, and again, we

Proceedings                                              56

1    can get you the precise citation when we put in the written

2    submission.

3              Similarly, Your Honor, this comes from *The Saddest*

4    *Story I've Ever Read* from 2014:  "Around this time, I went

5    to dinner with a woman, a sex worker, someone I used to

6    date, someone I dated briefly.  I always date briefly and I

7    always date sex workers because they're the only ones who

8    understand desire without sex, real desire, raw and

9    unobtainable and without purpose, desire that ends there,

10   all consuming for nothing.

11             We ended up at the back of the restaurant called

12   Delphina, and I told her I was having money problems and

13   couldn't afford a fancy dinner.  She said, Don't worry.

14   This particular woman had been raped by her father and one

15   time a client came to her.  The client looked just like her

16   father.  She tied the client to a wooden cross.  She clamped

17   into his nipples and beat him until his back was bleeding.

18   The man begged to see her again but she refused, or

19   something like that.  I told her I had dreams about my

20   father where I am holding his ears and screaming in his

21   face."  And it goes on and on.

22             One more, Your Honor, this comes from -- I know

23   some of you have been reading *The Adderall Diaries:*  "Patty

24   and I..." -- this is from Page 147 of our edition,

25   Your Honor -- "Patty and I didn't use safe words.  We didn't

Proceedings                        57

1   play safe, sane and consensually.  She told me to call her

2   daddy and threatened to shave my head.  Sometimes she hit me

3   when she was angry when we were just walking down the

4   street.  Then she started taking pills for her anger and she

5   became someone else.  I don't..." -- quote -- "'...I don't

6   know why I allow you to keep hurting me.'  Patty says,

7   sitting next to me on the bed."  And, again, it goes on and

8   on.

9           We will get you a full citation or a full

10  reference to all the citations.  But I think it's

11  indisputable, Your Honor, at this point that the topic of

12  consent, whether it's consented and the topic of rape, which

13  goes to the heart of 'Me Too' and Time's Up, is something

14  that Mr. Elliott wrote about in his works.

15          With respect to the question of audience,

16  Your Honor, in the *Chicago Tribune* in 2005, Mr. Elliott was

17  called a rock star in literary circles.  The readership of

18  the Shitty Media Men was exactly those circles.  It was

19  directed to women in the media in literary worlds.

20          THE COURT:  I'm sorry, what was that in the -- in

21  the *Chicago* --

22          MS. KAPLAN:  -- *Tribune.*  And we'll get you that

23  in our letter, 2005.

24          THE COURT:  Okay.

25          MS. KAPLAN:  Finally, Your Honor, unless

Proceedings                                58

1    Your Honor has any further questions, I want to answer the

2    Carrie Bradshaw question.  And I think the answer to that

3    question is certainly under *Lerman* and absolutely and

4    certainly a yes.  Here is what again Judge Cardamone says

5    with no descents in the *Lerman* decision.  And this, again,

6    has a kind of broad language Your Honor was referencing.

7    "By voluntarily devoting herself to the public interest and

8    sexual morays with extensive writing on this topic, reaping

9    profits, and wide notoriety for herself in the press,

10   Ms. Lerman must be deemed to have purposefully surrendered

11   part of what would otherwise have been her protectable

12   privacy of her rights, at least those related in some way to

13   her involvement in writing her books and screenplays."

14        Your Honor, with all respect, you can put in the

15   name Carrie Bradshaw into that paragraph or you could put in

16   the name of Mr. Elliott into that paragraph and the result

17   would be the same.

18        Again, you told us once to get you the submission

19   based on his writings and we will get it to Your Honor.

20        THE COURT:  Go ahead.

21        MR. LEWIS:  Thank you, Your Honor.

22        Your Honor, again, in *Lerman*, it was Jackie

23   Collins who wrote, "From what I understand, specifically

24   about sex..."  And was an advocate of the equal nudes for

25   all and how women and men are not portrayed equally in films

Proceedings                                    59

1   with regards to nudity.  And the issue was regarding a nude

2   woman in a film, and so that is just to accept Ms. Kaplan's

3   argument is just basically anyone who writes about sex or

4   whoever mentions the word "rape" can then be accused of

5   being a rapist, which is just an appalling notion; and

6   anyone who writes about these subjects does not just open

7   themselves up of being accused of rape.

8           Thank you very much, Your Honor, for your time.

9           THE COURT:  All right.  I do --

10          MS. KAPLAN:  Just to be crystal clear, Your Honor,

11   A, that's not my position, but it doesn't mean you can't be

12   sued for defamation.  It means you have to show malice.

13          THE COURT:  No, I already did that with plaintiff,

14   so I didn't figure we needed to go down that road again.

15          You understood my point when I said that to you,

16   right?

17          MR. LEWIS:  Yes, of course, Your Honor.

18          THE COURT:  All right.

19          Timing.  Ms. Kaplan, I know you said when I asked

20   you to, I am curious what date you would offer?

21          MS. KAPLAN:  I am leaving town Wednesday night,

22   Your Honor, and I would like to finish this before I leave.

23   So I'll be happy to submit it on Wednesday.

24          THE COURT:  Well, that works.

25          MS. KAPLAN:  Very well.

Proceedings                    60

1          THE COURT:  All right.  And then on Monday you'll

2    get me anything -- what day of the week is today?

3          MS. KAPLAN:  Friday.

4          THE COURT:  Okay, yeah.

5          So that -- Wednesday is what date?

6          THE COURTROOM DEPUTY:  The 12th.

7          THE COURT:  Of February.

8          THE COURTROOM DEPUTY:  Yes.

9          THE COURT:  So February 12th the defendant will

10   provide a supplemental submission related to Mr. Elliott's

11   work and the following Monday is when?

12         THE COURTROOM DEPUTY:  February 17th.

13         THE COURT:  February 17th the plaintiff will

14   provide a response, if any.  Hum.  I'm not going to give a

15   specific page limit because I want to see what it is that

16   you're identifying so...

17         MS. KAPLAN:  Yeah, if it would be easier rather

18   than to do an argument, Your Honor, we can just provide --

19         THE COURT:  I just want to know what was said.

20         MS. KAPLAN:  We'll just give you the pages and the

21   quotes.

22         THE COURT:  That's pretty much what I want.

23         To the extent you want to respond to what they

24   say, I mean, I'm not -- it is just what he said.  If you

25   think that they've misquoted something, then you can

Proceedings                                         61

1   identify that.

2          But it's not an argument submission so in terms of

3   responding, the response should be limited to identifying an

4   inaccuracy.  Or if there is, much like a counter-designation

5   if there is something else that you would like to refer me

6   to, that's how I would like this to be treated, like a

7   deposition designation.  This is not about argument.

8          Is that clear?

9          MS. KAPLAN:  Understood.

10          THE COURT:  Interesting stuff, folks.  All right.

11          MS. KAPLAN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. LEWIS:  Thank you, Judge.

14          THE COURT:  I really enjoyed hearing from you.

15          MS. KAPLAN:  Thank you.

16          THE COURT:  Okay.

17          (Matter concluded.)

18                         --oo0oo--

19

20

21   I (we) certify that the foregoing is a correct transcript
      from the record of proceedings in the above-entitled matter.
22
                                    10th Day of February,
23   /s/ David R. Roy                   2020
         DAVID R. ROY                          Date
24

25

David R. Roy, RPR, CSR, CCR
Official Court Reporter

All Word // 18-CV-5680  Elliott v. Donegan, et al.

1

---

**'**

**'...l** [1] - 57:5
**'Me** [31] - 10:8, 10:12, 11:2, 11:6, 11:12, 11:13, 13:23, 14:9, 17:12, 18:14, 22:9, 22:19, 22:22, 23:12, 27:6, 27:16, 27:24, 28:1, 28:3, 28:15, 29:18, 31:21, 35:15, 36:22, 43:1, 45:19, 46:25, 47:21, 48:3, 48:6, 57:13
**'rape** [1] - 55:23

---

**/**

**/s** [1] - 61:23

---

**1**

**1** [2] - 5:8, 9:18
**1-30** [1] - 1:6
**10** [1] - 5:9, 55:18
**10001-3904** [1] - 1:16
**10118** [1] - 1:20
**10th** [1] - 61:22
**11** [3] - 4:25, 6:20, 55:18
**11201** [1] - 1:23
**11:00** [1] - 1:7
**12** [1] - 15:14
**12th** [2] - 60:6, 60:9
**137** [1] - 12:21
**147** [1] - 56:24
**15** [1] - 4:12
**1566** [2] - 40:12, 42:17
**17th** [2] - 60:12, 60:13
**18-CV-5680** [2] - 1:3, 2:3
**1984** [2] - 21:25, 22:11

---

**2**

**2** [1] - 13:13
**2005** [2] - 57:16, 57:23
**2014** [1] - 56:4
**2019** [1] - 5:8
**2020** [2] - 1:7, 61:23
**225** [1] - 1:22

---

**3**

**350** [1] - 1:19
**363** [1] - 1:15

---

**4**

**4** [2] - 9:18, 15:14

---

**7**

**7** [2] - 1:7, 32:25
**7110** [1] - 1:19

---

**A**

**a.m** [1] - 1:7
**ability** [3] - 3:22, 6:7, 42:8
**able** [5] - 8:9, 19:21, 35:21, 36:1, 54:13
**above-entitled** [1] - 61:21

---

**absent** [1] - 34:13
**absolutely** [5] - 3:14, 4:6, 6:7, 28:20, 58:3
**abuse** [6] - 7:24, 28:12, 28:24, 29:3, 29:7, 30:4
**abusive** [3] - 29:16, 30:21, 31:2
**accept** [1] - 59:2
**accepted** [2] - 32:19, 50:25
**accepting** [1] - 43:15
**access** [1] - 9:17
**accuse** [1] - 48:14
**accused** [5] - 5:5, 19:18, 43:8, 59:4, 59:7
**accuses** [1] - 38:2
**acknowledged** [1] - 33:3
**act** [2] - 15:5, 48:12
**action** [1] - 4:12
**actual** [2] - 5:23, 50:8
**add** [1] - 25:11, 50:16
**Adderall** [5] - 12:21, 23:22, 51:14, 51:17, 56:23
**address** [1] - 36:20
**addressed** [2] - 3:16, 46:4
**addresses** [1] - 48:7
**addressing** [1] - 3:18
**Adler** [20] - 19:11, 24:5, 24:9, 24:12, 24:24, 25:11, 25:12, 25:16, 25:20, 26:10, 26:11, 40:4, 40:5, 40:7, 40:12, 42:6, 42:13, 43:6, 46:1, 50:7
**advanced** [4] - 8:7, 22:20, 23:4, 35:12
**advancing** [1] - 54:6
**advertising** [1] - 16:7
**advocate** [1] - 58:24
**advocated** [1] - 42:10
**advocating** [1] - 21:21
**affection** [4] - 28:25, 29:7, 30:4, 30:8
**affidavit** [1] - 3:24
**afford** [1] - 56:13
**agree** [6] - 10:22, 18:5, 22:25, 29:21, 52:7, 54:19
**agreeing** [1] - 6:21
**ahead** [11] - 9:1, 16:25, 17:7, 21:4, 21:7, 39:5, 39:11, 47:7, 49:6, 52:11, 58:20
**aligned** [1] - 42:22
**allegation** [4] - 6:4, 6:19, 6:21, 8:13
**allegations** [5] - 4:21, 5:4, 5:13, 11:20, 46:3
**alleged** [3] - 4:13, 8:16, 25:1
**allegedly** [1] - 19:3
**allo** [1] - 44:24
**allow** [3] - 17:18, 46:8, 57:6
**almost** [1] - 19:25
**alone** [2] - 46:21, 48:2
**altogether** [1] - 11:3
**amended** [3] - 4:24, 6:13, 7:3
**Amendment** [4] - 3:11, 10:21, 43:10, 44:2
**amidst** [1] - 24:25
**analysis** [3] - 3:12, 6:22, 8:19, 9:6
**anger** [1] - 57:4
**angry** [1] - 57:3

---

**anonymously** [1] - 38:2
**answer** [8] - 3:1, 26:15, 41:11, 41:14, 41:16, 44:14, 58:1, 58:2
**answering** [2] - 41:10, 48:17
**answers** [1] - 51:11
**apologize** [5] - 14:17, 24:9, 24:10, 42:12, 55:8
**appalling** [1] - 59:5
**apparent** [1] - 22:2
**appear** [2] - 4:23, 52:13
**appeared** [2] - 2:16, 50:20
**appetite** [1] - 26:2
**applying** [1] - 5:18
**approach** [1] - 16:10
**appropriately** [1] - 52:22
**approximates** [1] - 22:23
**arena** [1] - 21:19
**argue** [1] - 12:6
**argued** [1] - 5:16
**arguing** [3] - 6:18, 32:7, 52:14
**argument** [29] - 2:3, 2:15, 2:17, 4:4, 6:1, 6:11, 6:19, 7:7, 8:18, 8:21, 20:22, 23:10, 23:12, 31:14, 34:11, 34:14, 34:22, 35:5, 35:23, 41:21, 45:12, 46:6, 49:3, 49:13, 59:3, 60:18, 61:2, 61:7
**ARGUMENT** [1] - 1:11
**arguments** [6] - 3:19, 3:21, 7:2, 43:15, 43:16, 52:13
**article** [8] - 13:7, 13:9, 13:24, 14:13, 14:19, 15:21, 17:1, 32:23
**articles** [4] - 4:15, 6:7, 7:13, 45:20, 51:9
**artificial** [1] - 14:7
**aside** [3] - 17:20, 44:25, 50:4
**asphyxiates** [1] - 13:19
**ass** [1] - 14:5
**assault** [11] - 7:19, 11:17, 11:24, 12:2, 12:8, 13:22, 35:18, 47:10, 47:12, 47:18, 47:20
**assaulted** [1] - 33:25
**asserted** [4] - 4:2, 19:15, 50:25, 52:3
**asserting** [2] - 6:8, 6:9
**assess** [1] - 48:20
**assessing** [1] - 49:5
**assignment** [1] - 14:6
**Assisted** [1] - 1:25
**assume** [3] - 6:15, 50:6
**assumed** [5] - 9:14, 36:12, 36:15, 42:3, 44:20
**assumes** [1] - 35:5
**assuming** [1] - 44:22
**attached** [3] - 3:23, 6:8, 7:14
**attendant** [3] - 40:24, 41:2
**attention** [1] - 9:8
**attracted** [1] - 34:18
**attraction** [1] - 23:10
**attractive** [2] - 23:12, 35:14
**audible** [1] - 54:2
**audience** [9] - 24:13, 24:21, 24:22, 25:3, 25:21, 26:9, 41:7, 41:8, 57:15
**author** [4] - 4:14, 5:2, 14:14, 44:19
**authoress** [2] - 21:20, 21:23

---

**B**

automatically [1] - 49:10
Avenue [2] - 1:15, 1:19
aware [2] - 4:17, 9:19
awhile [1] - 55:11

**B**

backdrop [6] - 22:19, 23:11, 34:21, 35:14, 42:7, 43:1
bait [1] - 21:11
bandying [1] - 37:20
bar [1] - 42:9
based [4] - 5:12, 12:6, 12:24, 58:19
basis [2] - 51:4, 54:4
beat [1] - 56:17
beautiful [1] - 55:15
became [1] - 57:5
become [2] - 33:18, 46:2
becomes [2] - 24:17, 49:16
bed [1] - 57:7
BEFORE [1] - 1:11
began [1] - 11:15
begged [1] - 56:18
begging [1] - 55:17
belabor [1] - 4:8
believability [2] - 11:19, 11:22
believes [2] - 8:14, 30:9
benefit [1] - 40:21
between [10] - 10:8, 11:4, 14:7, 17:3, 21:2, 21:8, 23:18, 29:12, 29:15, 52:2
beyond [1] - 46:13
big [3] - 20:8, 22:10, 22:11
binding [2] - 10:18, 26:5
bit [2] - 33:8, 49:3
bleeding [1] - 56:17
body [2] - 51:23, 51:25
book [2] - 27:20, 28:24
books [7] - 4:15, 20:12, 27:2, 27:21, 30:12, 30:18, 58:13
bottom [1] - 15:16
bounded [1] - 24:18
Bradshaw [9] - 39:1, 39:23, 40:18, 41:4, 41:23, 45:19, 48:13, 58:2, 58:15
Bradshaw's [1] - 41:1
breadth [2] - 42:5, 42:9
brief [3] - 3:1, 50:14, 54:18
briefly [3] - 36:25, 56:6
briefs [1] - 54:8
broad [5] - 34:16, 40:1, 40:8, 43:25, 58:6
broader [2] - 12:1, 23:4
broadly [8] - 10:20, 11:2, 23:11, 25:14, 42:8, 42:21, 48:7
Brooklyn [2] - 1:5, 1:23
bruised [1] - 55:21
Building [1] - 1:18
burden [1] - 50:4
burns [1] - 13:18
buy [1] - 27:2
BY [2] - 1:17, 1:20

**C**

Cadman [1] - 1:22
can.. [1] - 42:13
cannot [3] - 51:16, 52:21, 54:4
canons [1] - 37:2
Cardamone [2] - 10:18, 58:4
care [1] - 6:22
career [1] - 26:18
Carrie [7] - 38:25, 40:18, 40:25, 41:23, 45:19, 58:2, 58:15
carved [1] - 51:22, 51:24
case [27] - 3:25, 4:11, 4:25, 5:5, 5:7, 5:15, 6:20, 8:6, 8:17, 10:17, 10:23, 14:3, 19:8, 19:11, 19:14, 22:24, 25:4, 25:16, 26:6, 27:9, 32:7, 33:19, 42:11, 42:21, 46:1, 46:2, 46:24
cases [4] - 24:12, 26:7, 26:13, 33:5
category [1] - 44:11
CAUSE [1] - 1:11
causes [1] - 14:4
centerpiece [1] - 28:15
central [2] - 29:16, 31:9
certain [3] - 16:13, 22:12, 34:2
certainly [14] - 3:12, 5:24, 7:11, 11:21, 11:23, 21:14, 36:5, 36:14, 36:21, 48:6, 50:8, 51:1, 58:3, 58:4
certify [1] - 61:21
cetera [1] - 18:11
challenge [1] - 13:1
change [2] - 10:14, 12:4
character [1] - 33:24
characterization [2] - 11:14, 53:4
characterize [1] - 17:18
characterized [1] - 34:18
characterizing [1] - 8:11
Chicago [2] - 57:16, 57:21
child [1] - 14:16
chorus [3] - 11:16, 11:18, 11:20
chosen [2] - 30:4, 30:5
cigarette [1] - 13:19
circles [2] - 57:17, 57:18
circuit [1] - 4:5
Circuit [8] - 10:16, 19:8, 20:2, 20:3, 20:14, 20:19, 26:8, 33:5
circumstances [2] - 17:24, 30:12
citation [2] - 56:1, 57:9
citations [1] - 57:10
cited [1] - 24:13
City [1] - 37:24
CIVIL [1] - 1:11
civil [1] - 2:3
claim [4] - 5:12, 5:18, 49:1, 49:5
clamped [1] - 56:16
clarification [1] - 37:8
cleaner [1] - 55:20
clear [14] - 3:2, 3:20, 4:19, 10:17, 10:19, 18:4, 18:22, 27:25, 44:5, 48:16, 51:4, 59:10, 61:8
cleared [1] - 54:3
Cleveland [1] - 55:6

client [3] - 56:15, 56:16
clips [1] - 23:24
close [1] - 27:21
closely [1] - 22:23
closet [1] - 55:16
clothes [1] - 13:17
colleague [1] - 2:11
Collins [7] - 38:24, 39:7, 39:16, 39:20, 41:5, 44:20, 58:23
column [2] - 37:23, 37:24
columnist [2] - 37:23, 38:3
comment [2] - 21:25, 50:24
commenting [2] - 20:23, 45:19
commonance [1] - 10:4
community [2] - 9:16, 24:25
complaining [1] - 10:25
complaint [9] - 4:12, 4:24, 5:14, 6:3, 6:14, 7:3, 8:13, 47:9, 47:16
complaint.. [1] - 5:13
complete [1] - 8:15
completely [3] - 18:5, 19:4, 54:19
Computer [1] - 1:25
Computer-Assisted [1] - 1:25
conceded [1] - 7:6
concededly [1] - 19:15
concedes [1] - 9:19
concern [1] - 17:22
concerning [2] - 3:18, 41:3
concession [1] - 6:13
concluded [2] - 6:6, 61:17
conduct [3] - 10:10, 10:11, 10:12
conference [1] - 5:7
confess [1] - 7:11
conflate [4] - 18:1, 18:4, 29:7, 30:4
conflating [3] - 17:23, 18:12, 29:3
confusion [1] - 2:17
connection [1] - 43:12
consensual [15] - 13:1, 13:3, 17:21, 17:23, 29:15, 33:14, 34:4, 35:19, 36:24, 38:7, 38:15, 41:1, 41:21, 41:23, 48:8
consensually [8] - 29:2, 29:8, 30:10, 30:24, 31:3, 31:8, 31:9, 57:1
consent [57] - 7:24, 10:9, 12:3, 12:7, 12:15, 13:14, 13:15, 14:1, 14:11, 17:2, 17:10, 17:25, 18:10, 18:20, 18:23, 19:4, 22:13, 26:19, 27:17, 28:12, 28:19, 29:4, 29:13, 29:24, 30:12, 30:19, 31:4, 33:18, 33:20, 34:10, 34:12, 35:25, 36:17, 37:15, 38:10, 39:24, 42:2, 43:13, 43:25, 44:8, 44:10, 45:8, 45:11, 45:16, 45:20, 45:24, 46:19, 47:11, 48:11, 52:16, 52:21, 52:22, 53:1, 57:12
consented [1] - 57:12
consider [5] - 6:7, 6:10, 35:5, 51:3, 51:5
considerable [1] - 40:22
considered [7] - 21:10, 43:9, 44:23, 45:9, 46:20, 49:10, 51:11
constituted [3] - 12:7, 12:8
constitutional [1] - 6:10

**constriction** [1] - 20:17
**consulting** [1] - 40:19
**consuming** [1] - 56:10
**contemporary** [1] - 21:18
**contents** [1] - 4:3
**context** [13] - 12:14, 13:4, 17:5, 18:8, 18:13, 18:14, 18:20, 18:25, 19:5, 35:22, 35:24, 35:25, 41:22
**contexts** [1] - 18:17
**continued** [1] - 21:9
**contributed** [1] - 24:19
**controversial** [1] - 21:20
**controversies** [6] - 19:11, 21:10, 21:16, 35:9, 36:22, 43:6
**controversy** [68] - 7:25, 8:6, 8:7, 9:12, 9:15, 10:6, 10:7, 10:19, 10:23, 11:1, 11:4, 11:5, 17:13, 19:6, 19:15, 19:21, 20:18, 21:1, 21:12, 22:10, 22:12, 22:17, 22:20, 22:24, 23:2, 23:3, 23:10, 23:19, 24:16, 24:25, 26:12, 32:16, 32:17, 32:22, 34:15, 34:17, 34:21, 35:11, 35:12, 36:3, 36:11, 37:14, 39:12, 39:20, 40:7, 40:14, 40:24, 40:25, 41:2, 42:6, 42:7, 42:9, 42:21, 42:25, 44:21, 45:4, 45:21, 46:8, 46:10, 46:13, 47:1, 47:8, 50:5, 50:9
**conversation** [4] - 18:13, 18:16, 28:1, 28:11
**conversations** [1] - 31:20
**convicted** [2] - 43:17, 43:22
**convince** [1] - 3:5
**convinced** [2] - 11:3, 22:15
**copy** [1] - 16:12
**core** [1] - 31:20
**corner** [1] - 13:17
**correct** [3] - 15:22, 51:25, 61:21
**counsel** [3] - 2:5, 6:2, 6:13
**counter** [1] - 61:4
**counter-designation** [1] - 61:4
**couple** [3] - 3:15, 49:18, 54:22
**course** [12] - 10:13, 26:20, 34:24, 50:12, 51:19, 53:19, 53:22, 53:24, 54:13, 54:19, 55:1, 59:17
**Court** [19] - 1:22, 3:12, 3:18, 4:24, 20:16, 20:21, 20:24, 24:16, 25:11, 25:16, 27:8, 34:19, 36:15, 39:13, 40:12, 43:14, 43:21, 50:9, 54:9
**COURT** [202] - 1:1, 2:8, 2:12, 2:24, 3:3, 3:7, 3:13, 4:7, 6:15, 6:24, 7:6, 7:10, 7:17, 7:22, 8:2, 8:4, 8:9, 8:18, 8:23, 8:25, 9:4, 9:23, 10:1, 10:5, 10:13, 10:22, 12:5, 12:9, 12:17, 12:19, 13:11, 13:15, 14:8, 15:10, 15:13, 15:17, 15:20, 15:24, 16:1, 16:5, 16:9, 16:11, 16:13, 16:17, 16:20, 16:22, 16:24, 17:6, 17:16, 19:10, 19:13, 21:4, 21:6, 21:22, 22:2, 22:4, 22:14, 23:6, 23:16, 23:22, 24:5, 24:11, 25:8, 25:20, 25:25, 26:15, 26:23, 27:3, 27:11, 27:13, 27:23, 28:3, 28:6, 28:8, 28:13, 28:17, 28:19, 29:2, 29:6, 29:17, 29:19, 29:21,

29:25, 30:3, 30:14, 30:17, 30:23, 31:2, 31:11, 31:22, 32:2, 32:5, 32:8, 32:20, 33:1, 33:6, 33:10, 33:15, 34:1, 34:7, 34:17, 35:2, 35:4, 35:10, 35:20, 36:7, 37:3, 37:7, 37:15, 37:17, 37:20, 38:6, 38:11, 38:20, 38:25, 39:3, 39:5, 39:10, 39:15, 39:18, 39:22, 40:2, 40:4, 40:7, 40:10, 40:12, 41:10, 41:14, 41:16, 42:5, 42:17, 42:19, 43:5, 43:19, 44:4, 44:7, 44:16, 44:24, 45:2, 45:6, 45:17, 46:1, 46:14, 46:17, 46:22, 47:3, 47:7, 47:13, 47:23, 48:1, 48:3, 48:6, 48:16, 48:20, 48:24, 49:11, 49:13, 49:25, 50:10, 50:15, 50:18, 50:23, 51:13, 51:16, 51:21, 52:2, 52:7, 52:10, 52:17, 52:19, 53:3, 53:6, 53:9, 53:12, 53:17, 53:20, 53:23, 53:25, 54:3, 54:11, 54:15, 54:24, 55:4, 55:11, 57:20, 57:24, 58:20, 59:9, 59:13, 59:18, 59:24, 60:1, 60:4, 60:7, 60:9, 60:13, 60:19, 60:22, 61:10, 61:12, 61:14, 61:16
**court** [3] - 2:1, 14:4, 18:19
**Court's** [1] - 20:20
**Court..** [1] - 20:24
**Courthouse** [1] - 1:5
**COURTROOM** [4] - 2:2, 60:6, 60:8, 60:12
**covered** [1] - 50:14
**crank** [1] - 26:1
**crimes** [1] - 43:18
**criminals** [1] - 43:22
**criticism** [1] - 21:11
**criticized** [1] - 25:25
**criticizing** [1] - 20:20
**cross** [1] - 56:16
**crying** [1] - 55:18
**crystal** [2] - 18:4, 59:10
**curious** [1] - 59:20
**cursory** [1] - 12:25
**cut** [2] - 31:3, 32:22
**cuts** [1] - 13:18
**cutting** [1] - 30:8

**D**

**daddy** [1] - 57:2
**daily** [1] - 21:16
**Dairies** [1] - 51:17
**Date** [1] - 61:23
**date** [5] - 56:6, 56:7, 59:20, 60:5
**dated** [1] - 56:6
**dating** [1] - 14:25
**David** [1] - 61:23
**DAVID** [2] - 1:22, 61:23
**deal** [2] - 22:10, 22:11
**dealing** [1] - 47:1
**DEARCY** [1] - 1:11
**debate** [1] - 39:13
**decades** [2] - 22:8, 22:9
**decide** [2] - 3:12, 22:25

**decision** [5] - 10:18, 20:20, 22:7, 25:17, 58:5
**deem** [2] - 30:21, 31:2
**deemed** [5] - 20:9, 38:3, 38:12, 42:24, 58:10
**deep** [1] - 15:3
**defamation** [6] - 5:5, 5:12, 5:17, 48:25, 49:5, 59:12
**defamatory** [1] - 8:16
**defame** [1] - 43:21
**defamed** [1] - 48:25
**defendant** [12] - 2:10, 2:21, 3:24, 8:1, 9:7, 9:19, 12:10, 24:13, 25:4, 49:17, 50:3, 60:9
**defendant's** [1] - 20:22
**defendants** [4] - 1:7, 4:17, 4:21, 49:15
**Defendants** [1] - 1:18
**defendants'** [4] - 2:16, 5:16, 23:10, 24:15
**defense** [1] - 8:16
**define** [3] - 10:23, 11:1, 43:5
**defined** [9] - 23:11, 26:24, 32:22, 34:15, 34:17, 36:23, 42:7, 42:21, 42:25
**defines** [1] - 10:25, 25:14, 40:7
**defining** [4] - 35:9, 35:10, 35:11, 42:6
**definition** [8] - 8:6, 22:17, 29:23, 29:24, 35:12
**Delphina** [1] - 56:12
**delving** [1] - 38:10
**denominated** [1] - 28:1
**deposition** [1] - 61:7
**DEPUTY** [4] - 2:2, 60:6, 60:8, 60:12
**descents** [1] - 58:5
**described** [2] - 7:14, 39:13
**describes** [4] - 4:17, 13:20, 37:25
**describing** [2] - 22:16, 39:25
**designation** [2] - 61:4, 61:7
**desire** [3] - 56:8, 56:9
**desires** [2] - 43:24, 49:9
**detail** [1] - 4:18
**determination** [3] - 4:11, 23:6, 52:21
**determined** [1] - 50:9
**devoting** [2] - 20:4, 58:7
**Diaries** [4] - 12:21, 23:22, 51:14, 56:23
**difference** [1] - 52:2
**different** [5] - 18:15, 18:16, 19:4, 21:13, 42:2
**differently** [1] - 27:19
**digest** [2] - 7:11, 23:16
**digested** [2] - 30:17, 33:17
**Dilworth** [5] - 24:5, 24:6, 24:11, 24:16, 25:22, 26:5
**diminishing** [1] - 18:1
**dinner** [2] - 56:5, 56:13
**direct** [2] - 12:17, 15:13
**directed** [1] - 57:19
**disagree** [2] - 13:25, 21:1
**disagreement** [2] - 22:17, 23:2
**discern** [2] - 23:17, 24:14
**discussed** [3] - 17:13, 37:4, 47:15
**discussing** [2] - 50:17, 50:21

**discussion** [2] - 5:24, 29:16
**discussions** [1] - 41:2
**dismiss** [3] - 2:16, 6:8, 51:12
**display** [1] - 40:18
**dispute** [2] - 9:19, 49:19
**disputing** [1] - 5:14
**distinction** [7] - 14:6, 17:3, 17:5, 17:9, 17:16, 52:5, 52:7
**distinctions** [1] - 44:5
**distinctly** [1] - 14:23
**distinguishing** [1] - 43:3
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [4] - 20:16, 20:20, 20:21, 20:24
**divergent** [1] - 21:14
**Docket** [1] - 2:3
**doctrine** [1] - 6:11
**DOES** [1] - 1:6
**dominance** [1] - 28:12
**don't..** [1] - 57:5
**done** [2] - 5:2, 20:6
**DONEGAN** [1] - 1:6
**Donegan** [7] - 2:4, 2:10, 3:19, 3:20, 23:9, 32:22, 47:16
**Donegan's** [1] - 47:9
**Donna** [1] - 13:9
**door** [2] - 55:17
**down** [6] - 15:15, 15:18, 55:10, 55:21, 57:3, 59:14
**drawing** [1] - 44:5
**dreams** [1] - 56:19
**drroyofcr@gmail.com** [1] - 1:23
**dynamic** [1] - 17:25

### E

**ears** [1] - 56:20
**easier** [1] - 60:17
**East** [1] - 1:22
**EASTERN** [1] - 1:1
**edition** [1] - 56:24
**editor** [4] - 25:21, 40:19, 46:2, 46:5
**effort** [1] - 9:8
**either** [1] - 6:1
**element** [1] - 44:22
**elements** [5] - 9:22, 49:14, 49:19, 49:20, 50:3
**Elliott** [30] - 2:4, 2:6, 3:10, 10:25, 11:4, 14:20, 14:22, 17:20, 18:9, 18:18, 19:1, 19:3, 20:6, 24:22, 26:17, 27:19, 27:20, 30:11, 31:18, 32:16, 36:21, 36:25, 37:10, 39:23, 47:20, 51:18, 51:22, 57:14, 57:16, 58:16
**ELLIOTT** [1] - 1:3
**Elliott's** [13] - 2:19, 7:12, 12:24, 26:2, 33:12, 33:17, 33:20, 34:9, 35:16, 35:22, 42:24, 54:5, 60:10
**embarrassed** [1] - 55:7
**Empire** [1] - 1:18
**employ** [1] - 49:5
**encapsulates** [1] - 11:11
**encounter** [2] - 13:14, 13:20

**encounters** [11] - 30:20, 38:1, 38:14, 41:22, 47:24, 48:7, 48:8, 48:11, 49:9, 49:16, 49:22
**end** [1] - 4:22
**ended** [1] - 56:11
**ends** [1] - 56:9
**engages** [1] - 30:10
**engaging** [3] - 31:3, 31:8, 31:9
**enjoyed** [1] - 61:14
**enormous** [1] - 40:16
**enter** [1] - 21:19
**entertain** [1] - 4:4
**entire** [2] - 37:2, 47:21
**entitled** [2] - 13:10, 61:21
**entrusted** [1] - 25:15
**equal** [3] - 21:21, 39:17, 58:24
**equally** [1] - 58:25
**equated** [1] - 28:24
**error** [2] - 19:7, 32:15
**escapade** [1] - 41:1
**escapades** [1] - 37:25
**especially** [1] - 24:25
**ESQ** [3] - 1:17, 1:20, 1:21
**establishing** [1] - 50:4
**et** [1] - 18:11
**evident** [1] - 33:18
**exactly** [4] - 20:6, 20:17, 32:3, 57:18
**example** [1] - 10:24
**exceedingly** [1] - 34:15
**excellent** [1] - 40:22
**exception** [1] - 29:23
**exceptionally** [1] - 40:8
**excerpt** [1] - 12:20
**excerpts** [2] - 30:18, 33:16
**exchange** [1] - 40:20
**excuse** [2] - 14:3, 17:8
**exhibit** [1] - 16:15
**exist** [1] - 6:10
**existence** [2] - 4:3, 51:19
**expansive** [3] - 19:20, 19:24, 20:15
**expected** [1] - 37:9
**experience** [2] - 18:2, 53:15
**experiences** [1] - 11:9
**expert** [2] - 12:23, 29:9
**expertise** [2] - 40:17, 40:22
**explained** [1] - 2:18
**explicitly** [2] - 46:7, 47:1
**express** [1] - 46:7
**expressing** [1] - 4:15
**expressly** [4] - 44:10, 45:8, 45:10, 50:24
**extensive** [3] - 20:5, 44:2, 58:8
**extensively** [1] - 7:7
**extent** [2] - 35:20, 60:23
**extraneous** [1] - 34:25

### F

**face** [1] - 56:21
**fact** [7] - 6:9, 6:11, 8:15, 18:15, 48:2, 51:23, 54:21
**facts** [3] - 5:1, 7:3, 26:6

**factual** [2] - 6:18, 6:19
**Fair** [8] - 25:13, 25:20, 40:13, 40:15, 40:21, 40:23, 41:7, 46:4
**fair** [4] - 7:1, 49:23, 53:6, 53:9
**fairly** [5] - 11:11, 17:19, 42:20, 42:25, 48:7
**fall** [3] - 25:8, 34:11, 44:11
**false** [1] - 4:20
**familiar** [1] - 39:4
**famous** [3] - 38:24, 38:25, 41:6
**fancy** [1] - 56:13
**far** [4] - 11:21, 36:18, 49:4, 54:14
**fashion** [2] - 43:8, 43:11
**father** [3] - 56:14, 56:16, 56:20
**February** [6] - 1:7, 60:7, 60:9, 60:12, 60:13, 61:22
**Federal** [1] - 6:3
**fell** [1] - 35:14
**felt** [1] - 12:12
**female** [1] - 21:15
**Fifth** [2] - 1:16, 1:19
**figure** [36] - 2:20, 3:10, 3:11, 5:15, 5:19, 5:24, 6:22, 7:5, 8:5, 8:20, 20:22, 24:17, 25:6, 32:1, 32:2, 32:4, 33:13, 36:5, 36:7, 36:10, 38:3, 38:13, 38:17, 43:9, 43:16, 44:9, 44:12, 45:9, 46:21, 48:18, 49:4, 49:12, 49:17, 49:22, 59:14
**file** [1] - 7:3
**filed** [2] - 4:24, 6:3
**film** [6] - 19:17, 19:18, 19:22, 22:10, 39:8, 59:2
**films** [6] - 20:24, 21:15, 26:13, 27:8, 39:14, 58:25
**finally** [1] - 57:25
**finish** [1] - 59:22
**FINK** [1] - 1:18
**Fink** [1] - 2:10
**fired** [1] - 25:13
**first** [9] - 2:21, 3:8, 6:13, 8:13, 13:6, 13:24, 38:23, 40:17, 55:15
**First** [4] - 3:11, 10:21, 43:10, 44:2
**FITZGERALD** [1] - 1:21
**Fitzgerald** [1] - 2:11
**Floor** [1] - 1:16
**focus** [3] - 35:17, 35:18, 47:17
**focused** [1] - 47:9
**focusing** [1] - 9:21
**folks** [1] - 61:10
**follow** [1] - 53:20
**following** [6] - 6:23, 6:24, 7:7, 53:7, 60:11
**follows** [1] - 4:13
**foolish** [1] - 8:18
**FOR** [1] - 1:11
**forced** [1] - 17:25
**foregoing** [1] - 61:21
**forgive** [2] - 41:25, 43:19
**former** [1] - 14:24
**four** [5] - 9:6, 9:16, 14:18, 22:20
**four-part** [1] - 9:6

**four-step** [1] - 9:6
**fours** [2] - 26:13, 29:1
**frankly** [1] - 17:19
**fray** [1] - 21:19
**freely** [2] - 29:13, 29:15
**Friday** [3] - 1:7, 41:1, 60:3
**friend** [1] - 32:15
**full** [2] - 57:9
**fully** [1] - 15:3

## G

**gas** [1] - 55:22
**general** [4] - 21:9, 32:7, 36:16, 38:9
**generally** [3] - 11:11, 11:18, 21:16
**generated** [1] - 24:25
**girlfriend** [1] - 55:15
**girlfriends** [1] - 14:24
**given** [14] - 10:10, 18:10, 18:11, 26:19, 26:20, 29:14, 29:15, 30:13, 30:14, 30:15, 30:16, 42:9, 51:10
**glaring** [1] - 34:22
**go..** [1] - 5:9
**grabbing** [1] - 14:5
**graduated** [1] - 22:6
**grandmother** [1] - 55:16
**grappling** [1] - 30:19
**grasping** [1] - 42:1
**ground** [2] - 53:17, 53:20
**groups** [1] - 21:14
**guess** [5] - 3:16, 13:12, 17:16, 31:24, 39:24

## H

**halfway** [2] - 15:15, 15:18
**HALL** [1] - 1:11
**hand** [1] - 16:3
**handy** [1] - 55:3
**happy** [2] - 31:13, 59:23
**harassment** [9] - 11:10, 11:17, 11:24, 12:3, 13:22, 35:17, 47:10, 47:18, 47:20
**Harvey** [1] - 14:5
**head** [1] - 57:2
**hear** [1] - 2:21
**hearing** [1] - 19:2, 61:14
**heart** [3] - 5:11, 17:12, 57:13
**HECKER** [1] - 1:18
**Hecker** [1] - 2:10
**heels** [1] - 55:22
**held** [1] - 21:13
**help** [2] - 16:4, 43:2
**heroin** [1] - 55:17
**herself** [8] - 19:15, 20:4, 20:7, 40:14, 40:23, 45:20, 58:7, 58:9
**high** [2] - 22:6, 42:10
**highlighted** [1] - 23:24
**himself** [14] - 9:12, 10:3, 11:5, 12:11, 23:1, 27:25, 28:11, 31:17, 31:19, 32:17, 36:11, 36:21, 37:14, 50:5
**hint** [1] - 34:19, 34:22

**hit** [1] - 57:2
**hoc** [1] - 43:15
**hold** [1] - 24:7
**holding** [2] - 22:7, 56:20
**honest** [1] - 24:1
**honestly** [2] - 4:10, 23:20
**Honor** [124] - 2:7, 2:9, 2:23, 2:25, 3:6, 4:6, 4:10, 4:19, 4:23, 5:6, 5:8, 5:10, 5:22, 6:1, 6:6, 7:9, 7:16, 7:20, 9:5, 9:18, 10:12, 10:16, 12:2, 12:18, 13:25, 14:3, 14:20, 15:14, 15:22, 16:10, 16:18, 17:3, 17:15, 18:5, 18:12, 18:15, 18:19, 19:6, 20:2, 20:15, 20:16, 21:5, 21:25, 22:11, 23:5, 24:10, 25:10, 26:5, 26:10, 26:14, 26:25, 27:14, 27:25, 28:23, 29:10, 31:10, 31:16, 31:25, 32:12, 32:14, 32:18, 33:3, 33:7, 33:11, 33:12, 34:3, 34:14, 34:24, 36:5, 36:14, 36:18, 37:1, 38:18, 38:22, 40:5, 40:11, 41:6, 41:25, 42:12, 42:15, 43:3, 43:13, 44:6, 44:15, 45:22, 46:11, 47:2, 47:5, 48:5, 49:7, 49:18, 50:11, 51:8, 51:9, 51:20, 52:6, 53:8, 54:8, 54:12, 54:14, 54:17, 54:18, 54:19, 54:22, 55:13, 55:25, 56:3, 56:22, 56:25, 57:11, 57:16, 57:25, 58:1, 58:6, 58:14, 58:19, 58:21, 58:22, 59:8, 59:10, 59:17, 59:22, 60:18, 61:11
**Honor's** [2] - 6:23, 50:12
**HONORABLE** [1] - 1:11
**hook** [1] - 15:7
**horrible** [1] - 31:18
**horribly** [1] - 14:15
**hum** [1] - 60:14
**hurting** [1] - 57:6
**hypothetical** [5] - 37:18, 41:19, 41:20, 42:1, 44:18

## I

**I..** [1] - 56:24
**idea** [3] - 15:8, 29:12, 32:18
**identified** [2] - 42:20, 46:8
**identify** [3] - 34:9, 35:21, 61:1
**identifying** [2] - 60:16, 61:3
**ignores** [1] - 49:13
**imagine** [1] - 37:3
**implicates** [1] - 29:4
**implicitly** [1] - 38:14
**importance** [1] - 10:21
**inability** [1] - 47:19
**inaccuracy** [1] - 61:4
**inappropriate** [1] - 13:2
**incest** [1] - 20:25
**incident** [1] - 9:9
**included** [2] - 19:17, 19:23
**including** [1] - 24:12
**indeed** [1] - 34:10
**indisputable** [1] - 57:11
**individual** [3] - 3:9, 9:7, 46:9
**ineffectiveness** [1] - 47:19

**influence** [1] - 9:9
**information** [1] - 4:1
**initial** [1] - 5:7
**inject** [2] - 27:25, 46:12
**injected** [9] - 9:11, 10:3, 11:5, 28:11, 31:19, 32:17, 36:11, 36:21, 40:14, 40:23, 46:9
**injecting** [1] - 50:5
**insert** [2] - 31:17, 46:23
**inserted** [1] - 37:14
**insignificant** [1] - 40:20
**instance** [3] - 13:16, 15:6, 33:24
**instances** [5] - 19:1, 19:3, 34:9, 35:22, 36:1
**interactions** [1] - 38:8
**interest** [4] - 20:4, 21:10, 26:11, 58:7
**interested** [4] - 27:5, 27:6, 27:12, 27:17
**interesting** [1] - 61:10
**interject** [1] - 42:8
**interjected** [1] - 23:1
**interjection** [4] - 24:14, 24:15, 36:2, 42:24
**interpreted** [1] - 10:20
**intersection** [1] - 23:18
**intertwine** [1] - 15:3
**interview** [3] - 14:22, 17:2, 50:20
**interviewer** [1] - 52:25
**interviewer's** [1] - 53:3
**interviews** [1] - 51:11
**invited** [1] - 9:8
**involved** [3] - 27:16, 43:13, 43:25
**involvement** [2] - 20:12, 58:13
**involving** [1] - 21:11
**issue** [21] - 2:19, 3:18, 10:5, 11:16, 14:12, 18:10, 22:9, 22:22, 22:24, 27:24, 28:6, 31:4, 31:20, 35:25, 37:4, 39:6, 40:17, 44:21, 45:8, 45:11, 59:1
**issues** [23] - 3:15, 7:24, 7:25, 10:4, 10:15, 11:10, 11:12, 11:24, 12:2, 13:21, 14:1, 17:2, 17:10, 21:17, 26:18, 27:12, 27:17, 30:19, 37:20, 47:11, 47:15, 47:17
**itself** [2] - 10:24, 52:4

## J

**Jackie** [4] - 38:24, 41:5, 44:20, 58:22
**JANE** [1] - 1:6
**judge** [1] - 48:21
**JUDGE** [1] - 1:12
**Judge** [4] - 19:9, 25:17, 58:4, 61:13
**judicial** [6] - 3:23, 4:1, 4:3, 51:7, 51:17, 51:23, 52:4, 52:20, 52:23, 54:4
**Justin's** [1] - 55:15

## K

**Kaplan** [25] - 2:9, 2:10, 15:10, 31:12, 32:20, 33:15, 33:23, 34:8, 34:15, 34:18, 34:20, 35:8, 35:13, 35:21, 36:19, 37:13, 41:6, 42:19, 47:8, 50:17, 50:23, 52:13, 53:10, 54:13, 59:19

**KAPLAN** [114] - 1:18, 1:20, 2:9, 2:23, 2:25, 3:5, 3:8, 4:6, 4:8, 6:17, 7:1, 7:9, 7:16, 7:20, 7:23, 8:3, 8:8, 8:12, 8:22, 8:24, 9:2, 9:5, 9:24, 10:2, 10:7, 10:14, 12:1, 12:6, 12:10, 12:18, 13:5, 13:12, 13:24, 14:9, 15:12, 15:14, 15:18, 15:22, 15:25, 16:3, 16:7, 16:10, 16:12, 16:16, 16:18, 16:23, 17:1, 17:8, 18:3, 19:11, 20:1, 21:5, 21:8, 21:24, 22:3, 22:5, 23:5, 23:15, 23:21, 24:4, 24:9, 25:7, 25:10, 25:24, 26:4, 26:17, 26:25, 27:4, 27:12, 27:14, 27:24, 28:5, 28:7, 28:10, 28:14, 28:18, 28:20, 29:5, 29:10, 29:18, 29:20, 29:22, 30:2, 30:11, 30:15, 30:22, 31:1, 31:5, 31:13, 31:25, 32:3, 32:6, 32:11, 32:14, 32:24, 33:2, 33:7, 53:11, 53:13, 54:18, 54:25, 55:5, 55:12, 57:22, 57:25, 59:10, 59:21, 59:25, 60:3, 60:17, 60:20, 61:9, 61:11, 61:15
**Kaplan's** [1] - 59:2
**keep** [1] - 57:6
**kept** [1] - 55:16
**key** [4] - 4:18, 14:12, 21:3, 32:15
**kind** [7] - 5:10, 10:10, 20:17, 23:17, 33:4, 58:6
**kinds** [2] - 14:3, 18:20
**kissing** [1] - 15:5
**knife** [1] - 13:18
**knows** [2] - 9:6, 39:3

## L

**language** [12] - 4:18, 14:3, 14:4, 20:15, 20:16, 21:3, 21:5, 22:2, 24:6, 24:13, 42:20, 58:6
**large** [2] - 17:22, 25:21
**largely** [1] - 17:21
**larger** [3] - 22:22, 28:6, 41:8
**LASHANN** [1] - 1:11
**last** [1] - 38:16
**law** [2] - 10:17, 38:19
**lawyer** [1] - 4:25
**lawyers** [1] - 3:24
**LDH** [1] - 1:3
**least** [6] - 8:9, 20:11, 22:23, 34:9, 42:22, 58:12
**leave** [1] - 59:22
**leaving** [2] - 20:7, 59:21
**legal** [5] - 6:18, 7:2, 9:2, 9:5, 19:7
**legitimate** [2] - 41:19, 41:20
**legs** [1] - 13:18
**lend** [1] - 11:18
**lending** [1] - 40:17
**lens** [1] - 29:11
**Lerman** [25] - 10:16, 19:8, 19:14, 20:3, 20:9, 20:14, 20:22, 26:10, 26:12, 27:7, 27:8, 32:6, 38:21, 38:22, 39:6, 39:13, 42:20, 43:4, 44:17, 44:19, 50:7, 58:3, 58:5, 58:10, 58:22
**less** [1] - 39:8
**letter** [3] - 5:16, 37:8, 57:23

**LEWIS** [91] - 1:17, 2:6, 16:19, 16:21, 33:11, 33:22, 34:3, 34:14, 34:24, 35:3, 35:7, 35:16, 36:4, 36:9, 37:6, 37:12, 37:16, 37:19, 38:5, 38:7, 38:18, 38:22, 39:2, 39:4, 39:6, 39:12, 39:16, 39:19, 39:23, 40:3, 40:5, 40:9, 40:11, 41:4, 41:13, 41:15, 41:25, 42:12, 42:15, 42:18, 43:3, 43:7, 43:20, 44:6, 44:14, 44:17, 45:1, 45:5, 45:14, 45:18, 46:11, 46:15, 46:18, 46:23, 47:5, 47:8, 47:15, 47:25, 48:2, 48:5, 48:10, 48:19, 48:23, 49:7, 49:12, 49:24, 50:2, 50:11, 50:16, 50:19, 51:8, 51:15, 51:19, 52:1, 52:6, 52:9, 52:12, 52:18, 52:24, 53:5, 53:8, 53:19, 53:22, 53:24, 54:2, 54:7, 54:12, 54:16, 58:21, 59:17, 61:13
**Lewis** [3] - 2:7, 5:8, 5:21
**liable** [2] - 24:23, 25:1
**lie** [1] - 49:1
**life** [4] - 18:21, 41:3, 52:20, 55:12
**light** [2] - 3:25, 41:20
**limit** [1] - 60:15
**limited** [27] - 2:19, 2:20, 3:10, 7:21, 8:20, 10:23, 11:22, 20:23, 25:6, 26:1, 26:6, 26:7, 32:4, 36:9, 38:3, 38:13, 38:16, 44:9, 44:12, 45:9, 46:20, 48:18, 49:10, 49:16, 49:22, 61:3
**list** [6] - 4:21, 18:25, 24:23, 32:18, 32:24, 33:3
**listening** [3] - 21:6, 32:9, 47:4
**literary** [4] - 25:15, 26:11, 57:17, 57:19
**literature** [1] - 24:18
**litigation** [4] - 9:10, 9:13, 36:12, 50:6
**lives** [1] - 15:3
**living** [1] - 4:14
**LLP** [2] - 1:15, 1:18
**locked** [1] - 55:16
**look** [10] - 7:24, 23:9, 25:2, 26:8, 26:9, 26:25, 27:1, 27:4, 27:18, 53:17
**looked** [3] - 11:8, 36:23, 56:15
**looking** [6] - 11:8, 24:20, 27:7, 27:9, 32:11, 42:13
**looks** [2] - 10:15, 26:9
**loose** [1] - 43:12
**Louisiana** [1] - 4:14
**love** [2] - 21:22, 55:15
**loved** [1] - 55:23

## M

**machine** [1] - 1:24
**magazine** [3] - 40:18, 46:3, 46:5
**magic** [1] - 7:4
**main** [2] - 28:15, 28:17
**maintained** [1] - 9:16
**male** [2] - 21:15, 33:13
**malice** [2] - 5:23, 59:12
**Man** [1] - 16:6
**man** [4] - 28:24, 29:12, 38:1, 56:18
**man's** [1] - 23:16
**manner** [2] - 27:18, 27:19

**March** [1] - 5:8
**Maria** [1] - 55:14
**MARTHA** [1] - 1:21
**Martha** [1] - 2:11
**masculine..** [1] - 15:9
**Masochism** [2] - 14:21, 15:23
**masochist** [2] - 29:8, 33:14
**masthead** [1] - 40:19
**masturbating** [1] - 55:19
**materials** [5] - 3:23, 4:4, 4:10, 34:25, 35:6
**mathematician** [1] - 25:22
**matter** [7] - 4:2, 6:17, 20:25, 45:3, 50:25, 52:3, 61:21
**Matter** [1] - 61:17
**matters** [7] - 25:15, 26:11, 28:11, 28:19, 35:18, 36:17, 46:12
**me..** [1] - 55:23
**mean** [6] - 23:24, 29:8, 38:10, 49:21, 59:11, 60:24
**meaning** [2] - 12:3, 20:24
**means** [6] - 12:14, 18:11, 18:20, 22:13, 26:21, 59:12
**meant** [1] - 24:6
**media** [3] - 9:17, 21:16, 57:19
**Media** [1] - 57:18
**memorized** [1] - 37:1
**men** [4] - 10:8, 22:12, 39:8, 58:25
**Men** [1] - 57:18
**mentions** [1] - 59:4
**merely** [2] - 20:25, 42:10
**met** [3] - 5:17, 5:24, 50:3
**might** [5] - 30:21, 36:19, 42:15, 47:5, 50:11
**millions** [1] - 44:21
**MILTENBERG** [1] - 1:15
**Miltenberg** [1] - 2:7
**mind** [3] - 18:1, 22:23, 38:17
**Minkowitz** [1] - 13:10
**minute** [2] - 16:1, 24:1
**misconduct** [1] - 11:10
**misogynistic** [1] - 12:7
**misquoted** [1] - 60:25
**missing** [1] - 45:13
**misstate** [1] - 44:18
**misunderstanding** [1] - 29:25
**MOIRA** [1] - 1:6
**Moira** [1] - 2:10
**moment** [4] - 16:16, 16:18, 40:11, 44:25
**Monday** [2] - 60:1, 60:11
**money** [3] - 21:5, 55:17, 56:12
**Moods** [2] - 14:21, 15:23
**morays** [3] - 19:16, 20:5, 58:8
**moreover** [1] - 14:13
**morning** [5] - 2:7, 2:8, 2:12, 2:14, 2:15
**most** [5] - 7:14, 13:9, 14:20, 22:21, 55:12
**mostly** [1] - 11:25
**motion** [3] - 2:16, 6:8, 51:12
**movement** [12] - 11:15, 13:23, 14:12,

23:12, 35:15, 36:22, 43:1, 45:19, 46:25, 47:21, 48:3, 48:6
**multiple** [3] - 4:15, 12:13, 15:2
**Murder** [2] - 14:21, 15:23
**music** [1] - 5:20
**must** [2] - 20:9, 58:10

### N

**name** [3] - 40:18, 58:15, 58:16
**names** [1] - 2:5
**Nap** [2] - 19:9, 25:17
**narrow** [4] - 19:6, 19:12, 20:17, 29:11
**narrowed** [1] - 37:9
**narrowly** [5] - 2:18, 8:1, 10:20, 26:8, 39:19
**necessarily** [1] - 49:21
**necessary** [2] - 5:17, 19:24
**need** [7] - 6:12, 8:5, 25:2, 43:1, 48:3, 49:20, 51:21
**needed** [2] - 12:4, 59:14
**needs** [2] - 4:10, 46:15
**NESENOFF** [1] - 1:15
**Nesenoff** [1] - 2:7
**never** [2] - 36:15
**NEW** [1] - 1:1
**New** [8] - 1:5, 1:16, 1:20, 1:23, 4:14, 55:8
**next** [2] - 13:7, 57:7
**nexus** [2] - 25:16, 33:4
**Nicholas** [1] - 2:6
**NICHOLAS** [1] - 1:17
**night** [3] - 41:1, 55:22, 59:21
**nipples** [1] - 56:17
**non** [2] - 17:8, 29:16
**non-abusive** [1] - 29:16
**non-S** [1] - 17:8
**nonconsensual** [2] - 30:6, 35:17
**nonetheless** [3] - 13:3, 30:23, 49:20
**nonfiction** [1] - 4:16
**norm** [1] - 13:2
**normally** [1] - 14:4
**norms** [1] - 19:22
**note** [1] - 23:8
**noted** [4] - 34:3, 34:5, 40:6, 47:16
**nothing** [2] - 29:1, 56:10
**notice** [10] - 3:23, 4:1, 4:3, 51:7, 51:17, 51:23, 52:4, 52:20, 52:23, 54:4
**noticed** [1] - 51:10
**notion** [3] - 17:22, 34:12, 59:5
**notoriety** [2] - 20:7, 58:9
**nude** [3] - 27:8, 39:8, 59:1
**nudes** [2] - 39:17, 58:24
**nudity** [8] - 20:23, 21:9, 21:15, 21:18, 22:10, 26:13, 39:13, 59:1
**number** [2] - 16:15, 42:16

### O

**obviously** [3] - 3:2, 43:16, 44:18
**occurring** [1] - 30:23
**OF** [2] - 1:1, 1:11

**offer** [2] - 54:1, 59:20
**offering** [1] - 40:17
**officially** [1] - 28:1
**officials** [1] - 21:12
**often** [1] - 18:8
**Ohio** [1] - 55:6
**old** [1] - 55:18
**once** [3] - 45:16, 45:24, 58:18
**one** [30] - 3:21, 3:24, 6:11, 7:13, 9:7, 9:25, 10:2, 11:14, 11:20, 12:20, 15:1, 18:8, 19:5, 19:10, 26:4, 30:6, 32:15, 34:2, 34:18, 35:13, 36:4, 37:21, 38:15, 40:11, 42:21, 42:25, 50:2, 55:6, 56:14, 56:22
**one's** [1] - 42:8
**ones** [3] - 13:1, 13:2, 56:7
**online** [1] - 38:2
**oo0oo** [1] - 61:18
**oops** [1] - 7:4
**open** [7] - 2:1, 15:1, 43:11, 43:21, 44:1, 48:13, 59:6
**openly** [1] - 4:17
**operate** [1] - 34:19
**operating** [1] - 5:19
**opportunity** [1] - 7:10
**opposed** [1] - 30:20
**option** [2] - 45:12, 45:15
**oral** [2] - 2:3, 2:15
**ORAL** [1] - 1:11
**order** [3] - 2:18, 5:10, 14:5
**orgy** [3] - 19:17, 19:19, 19:23
**original** [2] - 4:11, 5:14
**Orleans** [1] - 4:14
**otherwise** [3] - 20:10, 48:14, 58:11
**outspoken** [1] - 21:20
**overlap** [3] - 11:3, 13:21, 27:10
**own** [4] - 8:7, 47:23, 49:16, 53:15

### P

**page** [5] - 15:16, 15:19, 40:10, 42:15, 60:15
**Page** [6] - 5:9, 12:21, 13:13, 15:14, 32:25, 56:24
**pages** [2] - 14:18, 60:20
**paradigmatic** [1] - 10:14
**Paragraph** [1] - 4:12
**paragraph** [4] - 4:23, 58:15, 58:16
**parenthesis** [1] - 13:16
**part** [5] - 9:6, 14:10, 20:10, 49:17, 58:11
**participate** [1] - 4:20
**participating** [1] - 26:12
**particular** [3] - 14:11, 51:9, 56:14
**particularly** [3] - 19:8, 35:13, 41:20
**parties** [2] - 5:14, 29:16
**partners** [1] - 15:2
**parts** [1] - 11:8
**party** [1] - 5:15
**Patty** [4] - 12:22, 56:23, 56:25, 57:6
**Pause** [3] - 24:8, 32:13, 42:14
**people** [14] - 15:9, 24:21, 25:14, 26:12,

27:1, 27:4, 27:5, 27:7, 27:10, 27:15, 28:16, 29:6, 43:17, 43:23
**perceive** [2] - 30:7, 30:8
**perhaps** [3] - 11:4, 13:1, 13:2
**perhaps..** [1] - 31:24
**permissible** [4] - 7:2, 35:19, 44:1, 48:12
**permitted** [1] - 48:25
**person** [8] - 18:22, 24:24, 25:5, 25:25, 30:4, 31:7, 31:8, 46:20
**personal** [5] - 37:25, 47:23, 48:7, 48:10, 49:9
**personally** [1] - 31:2
**persons** [1] - 25:15
**persons's** [1] - 26:11
**perspective** [1] - 36:24
**pertains** [1] - 11:25
**phase** [1] - 51:12
**physically** [1] - 4:20
**pills** [1] - 57:4
**place** [1] - 18:14
**placing** [1] - 45:20
**Plaintiff** [2] - 1:4, 1:15
**plaintiff** [19] - 4:13, 4:17, 5:1, 6:2, 6:13, 6:20, 7:3, 17:18, 21:19, 23:8, 36:10, 40:14, 40:20, 42:10, 46:1, 59:13, 60:13
**plaintiff's** [1] - 24:15
**play** [1] - 57:1
**played** [1] - 40:15
**Plaza** [1] - 1:22
**pleadings** [1] - 48:21
**plunge** [1] - 21:18
**pocketbook** [1] - 21:17
**point** [10] - 3:25, 4:8, 8:10, 9:20, 30:1, 53:6, 53:9, 53:15, 57:11, 59:15
**pointing** [1] - 30:18
**political** [3] - 15:5, 15:6, 21:11
**politics** [1] - 21:17
**popular** [1] - 37:23
**portion** [1] - 45:21
**portions** [1] - 23:24
**portrayed** [1] - 58:25
**posit** [1] - 36:14
**position** [19] - 9:14, 10:3, 17:24, 34:25, 36:12, 36:16, 37:13, 39:7, 39:20, 44:19, 44:20, 44:22, 45:15, 49:7, 50:7, 50:12, 50:13, 54:5, 59:11
**possessed** [1] - 51:22
**possession** [1] - 51:24
**post** [2] - 31:14, 43:15
**post-argument** [1] - 31:14
**potentially** [3] - 42:22, 42:23, 44:8
**precise** [1] - 56:1
**precisely** [1] - 6:4
**preferences** [5] - 4:16, 4:18, 7:8, 7:17, 13:16
**press** [1] - 58:9
**pretty** [6] - 3:1, 6:22, 25:21, 42:7, 60:22
**previously** [1] - 25:5
**principally** [2] - 25:12, 25:14
**print** [1] - 21:16

**printout** [2] - 13:13, 14:17
**privacy** [1] - 20:11, 58:12
**problem** [1] - 47:10
**problems** [2] - 15:1, 56:12
**proceed** [1] - 5:17
**Proceedings** [1] - 1:24
**proceedings** [4] - 24:8, 32:13, 42:14, 61:21
**produce** [1] - 36:19
**produced** [2] - 1:25, 19:23, 36:20
**producer** [2] - 19:16, 19:18
**produces** [1] - 54:14
**proffer** [1] - 33:16
**proffered** [1] - 33:15
**profits** [3] - 20:7, 20:8, 58:9
**progress** [1] - 20:8
**prominence** [7] - 9:14, 36:13, 36:16, 44:24, 46:25, 50:7, 50:8
**prominent** [6] - 36:5, 36:12, 40:15, 40:18, 44:20, 44:22
**prompt** [1] - 28:4
**proof** [1] - 50:4
**proponent** [1] - 39:17
**proposing** [1] - 20:18
**propriety** [2] - 3:18, 21:15
**protect** [1] - 43:10
**protectable** [1] - 58:11
**protected** [1] - 20:11
**protection** [2] - 10:21, 44:3
**provide** [4] - 54:23, 60:10, 60:14, 60:18
**public** [55] - 2:20, 3:10, 3:11, 5:15, 5:18, 5:24, 6:22, 7:4, 7:25, 8:20, 9:8, 9:12, 9:15, 17:12, 20:22, 21:1, 21:9, 21:10, 21:11, 21:12, 21:16, 22:11, 22:23, 24:17, 25:6, 27:10, 31:19, 32:1, 32:2, 32:3, 32:4, 36:10, 36:11, 38:3, 38:13, 38:16, 39:7, 39:24, 40:13, 40:21, 41:2, 43:9, 43:16, 44:9, 44:12, 45:9, 46:20, 48:18, 49:12, 49:17, 49:22, 50:5, 50:7, 58:7
**public's** [1] - 20:4
**publication** [1] - 40:16
**publicity** [1] - 40:16
**published** [4] - 4:14, 4:21, 19:16, 25:1
**publishes** [1] - 24:17
**pull** [1] - 33:23
**purported** [1] - 25:5
**purportedly** [1] - 19:1
**purports** [1] - 14:21
**purpose** [18] - 3:11, 8:20, 20:23, 25:6, 32:4, 36:9, 38:3, 38:17, 44:9, 44:12, 45:9, 46:20, 48:18, 49:10, 49:16, 49:22, 56:9
**purposefully** [1] - 58:10
**purposely** [1] - 20:10
**purposes** [2] - 10:19, 45:10
**pursuant** [1] - 6:3
**put** [8] - 3:8, 13:17, 17:24, 31:13, 44:24, 56:1, 58:14, 58:15
**putting** [1] - 17:20

## Q

**qualify** [1] - 45:24
**questions** [1] - 58:1
**quickly** [1] - 55:9
**quite** [2] - 17:19, 23:19
**quote** [8] - 4:13, 4:22, 17:4, 23:7, 53:14, 55:2, 55:14, 57:5
**quotes** [4] - 54:22, 55:2, 55:23, 60:21

## R

**rag** [1] - 46:5
**rape** [12] - 7:18, 12:13, 35:17, 38:2, 38:12, 47:12, 47:17, 47:20, 48:15, 57:12, 59:4, 59:7
**raped** [4] - 14:15, 14:16, 31:16, 31:20, 33:24, 38:16, 56:14
**rapist** [3] - 43:9, 44:1, 59:5
**rather** [2] - 24:15, 60:17
**raw** [1] - 56:8
**reach** [1] - 44:2
**read** [12] - 5:16, 6:5, 10:11, 23:23, 23:24, 24:9, 28:21, 37:22, 54:22, 54:25, 55:4, 55:7
**Read** [2] - 28:22, 56:4
**readers** [1] - 44:21
**readership** [10] - 23:25, 24:18, 24:21, 26:1, 26:2, 26:23, 27:1, 36:6, 41:5, 57:17
**reading** [3] - 15:11, 40:10, 56:23
**readings** [1] - 36:18
**real** [2] - 52:20, 56:8
**really** [10] - 6:12, 9:21, 14:21, 15:6, 27:21, 28:15, 34:22, 41:10, 45:2, 61:14
**reaping** [1] - 58:8
**reasoned** [1] - 20:25
**rebuttal** [1] - 33:8
**received** [1] - 40:16
**recent** [2] - 13:9, 22:21
**recently** [2] - 7:14, 14:20
**record** [3] - 2:5, 47:6, 61:21
**recorded** [1] - 1:24
**recounts** [1] - 37:24
**refer** [3] - 13:6, 13:8, 61:5
**reference** [7] - 28:21, 28:23, 31:7, 33:23, 34:1, 34:4, 57:10
**referencing** [3] - 42:16, 46:8, 58:6
**referred** [1] - 43:17
**referring** [7] - 44:17, 45:21, 52:12, 52:24, 52:25, 53:1, 54:9
**refused** [1] - 56:18
**regard** [1] - 3:21
**regarding** [7] - 21:18, 33:12, 35:18, 43:15, 50:13, 52:15, 59:1
**regards** [1] - 59:1
**regular** [3] - 9:16, 17:4, 17:6
**rejected** [2] - 20:21, 35:2
**relate** [1] - 11:9
**related** [10] - 2:15, 2:17, 9:12, 11:24, 20:12, 36:11, 37:15, 50:6, 58:12,

60:10
**relates** [3] - 7:17, 11:5, 45:3
**relations** [1] - 28:12
**relationship** [16] - 12:16, 12:22, 14:2, 15:2, 17:4, 17:8, 17:23, 21:2, 21:8, 29:14, 34:4, 35:23, 35:24, 41:24, 43:12
**relationships** [17] - 10:8, 12:20, 13:1, 14:10, 17:22, 18:21, 26:18, 26:19, 26:20, 27:18, 33:14, 35:19, 36:17, 36:25, 41:22, 42:3, 46:19
**relevant** [1] - 5:4
**relied** [1] - 54:9
**rely** [3] - 34:24, 54:7, 54:10
**relying** [1] - 34:16
**remains** [1] - 22:7
**remind** [1] - 5:6
**repeat** [1] - 47:13
**rephrase** [1] - 22:18
**reply** [3] - 3:17, 22:21, 33:2
**Reporter** [1] - 1:22
**reporting** [2] - 47:12, 47:19
**reposits** [1] - 8:1
**reprehensible** [1] - 13:3
**represented** [1] - 40:20
**reputation** [1] - 40:22
**require** [1] - 19:24
**required** [1] - 33:4
**requires** [1] - 19:20
**requisite** [1] - 23:18
**respect** [5] - 8:13, 9:18, 20:2, 57:15, 58:14
**respectfully** [2] - 13:25, 43:14
**respects** [1] - 19:7
**respond** [2] - 48:4, 54:13, 60:23
**responding** [1] - 61:3
**response** [3] - 54:2, 60:14, 61:3
**restaurant** [1] - 56:11
**rests** [1] - 34:12
**result** [1] - 58:16
**resurrection** [1] - 40:13
**reversed** [2] - 20:16, 20:21
**review** [2] - 7:11, 12:25
**revised** [1] - 40:15
**rights** [2] - 20:11, 58:12
**rise** [4] - 2:2, 32:24, 33:2, 40:13
**road** [1] - 59:14
**ROBERTA** [1] - 1:20
**Roberta** [1] - 2:9
**rock** [1] - 57:17
**role** [1] - 40:15
**roy** [1] - 61:23
**ROY** [2] - 1:22, 61:23
**RPR** [1] - 1:22
**Rule** [2] - 4:25, 6:20
**ruled** [1] - 43:21
**rules** [2] - 53:17, 53:21
**Rules** [1] - 6:3

## S

**Saddest** [2] - 28:22, 56:3
**sadly** [1] - 29:7
**safe** [2] - 56:25, 57:1
**saga** [1] - 40:23
**salary** [1] - 40:20
**Salon** [1] - 13:9
**sane** [1] - 57:1
**satisfied** [1] - 49:20
**saw** [1] - 19:11
**scene** [3] - 19:17, 19:20, 19:23
**school** [1] - 22:6
**scope** [4] - 2:17, 42:6, 43:16, 43:25
**Score** [1] - 55:25
**screamed** [1] - 55:23
**screaming** [1] - 56:20
**screenplays** [2] - 20:13, 58:13
**screenwriter** [1] - 21:20
**season** [3] - 43:11, 43:21, 44:2
**seated** [1] - 2:13
**Second** [8] - 10:16, 19:8, 20:2, 20:3, 20:14, 20:19, 26:8, 33:5
**second** [4] - 3:14, 9:22, 9:25, 10:2
**see** [8] - 3:5, 12:19, 29:4, 32:11, 37:12, 52:4, 56:18, 60:15
**see..** [1] - 16:9
**seeing** [2] - 14:6, 29:11
**seem** [3] - 5:12, 13:21, 19:24
**segment** [1] - 30:9
**segments** [1] - 21:13
**sends** [1] - 37:13
**sent** [2] - 37:7, 55:17
**served** [1] - 46:5
**Seventh** [1] - 1:15
**sex** [15] - 20:23, 37:23, 38:2, 38:9, 39:13, 39:24, 41:3, 43:8, 43:11, 44:10, 45:7, 56:5, 56:7, 56:8, 59:3
**Sex** [1] - 37:24
**sex..** [1] - 58:24
**sexes** [1] - 21:8
**sexes..** [1] - 21:2
**sexist** [1] - 12:6
**sexual** [54] - 4:15, 4:17, 7:8, 7:17, 7:19, 10:8, 11:10, 11:16, 11:17, 11:24, 12:2, 12:15, 13:1, 13:13, 13:21, 13:22, 17:25, 19:16, 19:22, 20:5, 26:18, 26:19, 26:20, 28:12, 35:17, 35:18, 36:17, 37:25, 38:1, 38:8, 38:13, 41:1, 41:21, 41:23, 42:2, 43:24, 47:10, 47:12, 47:18, 47:20, 47:24, 48:7, 48:11, 48:12, 49:9, 49:16, 49:22, 58:8
**sexually** [1] - 33:24
**shave** [1] - 57:2
**sheet** [1] - 5:20
**Shitty** [1] - 57:18
**short** [1] - 4:5
**short-circuit** [1] - 4:5
**shorthand** [2] - 1:24, 28:8
**show** [3] - 31:11, 36:1, 59:12
**shown** [1] - 30:16

**side** [3] - 6:1, 20:18, 32:15
**Side** [2] - 13:10, 15:20
**sides** [1] - 55:20
**significantly** [1] - 41:8
**silly** [1] - 8:21
**similar** [3] - 6:11, 24:22, 41:5
**similarly** [3] - 17:15, 42:19, 56:3
**simply** [6] - 4:2, 30:3, 44:9, 46:5, 49:15, 52:3
**single** [2] - 33:23, 34:1
**sitting** [2] - 32:6, 57:7
**situation** [3] - 14:11, 26:7, 30:13
**sizable** [1] - 21:13
**slow** [1] - 55:9
**slowly** [1] - 55:4
**so..** [1] - 60:16
**social** [1] - 13:2
**societal** [1] - 12:3
**society** [3] - 10:15, 21:13, 30:9
**Softer** [2] - 13:10, 15:20
**solicitous** [1] - 53:16
**someone** [12] - 13:14, 14:1, 14:11, 15:5, 17:10, 31:3, 38:15, 46:12, 48:24, 56:5, 56:6, 57:5
**sometimes** [1] - 57:2
**somewhere** [1] - 16:14
**sorry** [13] - 15:10, 15:12, 15:25, 29:3, 41:25, 43:19, 43:20, 44:17, 47:13, 53:8, 55:5, 57:20
**sort** [1] - 43:15
**sought** [2] - 31:17, 43:21
**speaking** [1] - 46:24
**speaks** [1] - 35:25
**specific** [5] - 23:25, 36:18, 39:6, 41:9, 60:15
**specifically** [9] - 4:12, 11:23, 38:12, 39:9, 39:16, 39:20, 46:4, 47:11, 58:23
**spectrum** [1] - 14:10
**spent** [1] - 26:17
**spoken** [2] - 18:19, 37:10
**square** [2] - 38:20, 40:4
**squarely** [1] - 5:4
**stage** [1] - 51:8
**stance** [2] - 39:7, 39:24
**standard** [8] - 5:17, 5:18, 9:2, 9:5, 48:20, 49:1, 49:4, 49:8
**standards** [3] - 4:25, 21:18, 22:12
**star** [1] - 57:17
**start** [2] - 4:9, 9:24
**started** [1] - 57:4
**starting** [4] - 3:25, 8:10, 15:15, 15:18
**State** [1] - 1:18
**state** [1] - 2:5
**statement** [7] - 10:23, 24:23, 46:7, 50:22, 51:1, 51:2, 58:2
**statements** [12] - 6:2, 8:16, 25:3, 25:4, 50:13, 50:17, 50:18, 50:19, 50:20, 50:21, 52:14, 52:25
**states** [1] - 5:1
**STATES** [2] - 1:1, 1:12
**States** [1] - 1:5

**station** [1] - 55:22
**status** [1] - 2:19
**Stenographic** [1] - 1:24
**step** [1] - 9:6
**STEPHEN** [1] - 1:3
**Stephen** [2] - 2:6, 14:20
**still** [3] - 10:17, 14:24, 48:25
**still..** [1] - 14:23
**stood** [1] - 49:18
**stop** [2] - 3:13, 55:20
**Stories** [1] - 16:5
**Story** [2] - 28:22, 56:4
**story** [2] - 31:22, 31:24
**street** [1] - 57:4
**strictly** [1] - 47:17
**stronger** [1] - 11:21
**strongly** [1] - 21:13
**struggling** [1] - 23:19
**stuff** [2] - 54:24, 61:10
**subject** [9] - 9:9, 9:12, 13:22, 20:5, 34:10, 36:12, 45:3, 50:6, 52:22
**subjects** [1] - 59:6
**submission** [8] - 11:7, 13:9, 31:14, 54:23, 56:2, 58:18, 60:10, 61:2
**submissions** [1] - 22:21
**submit** [4] - 36:20, 43:14, 50:3, 59:23
**submitted** [2] - 13:8, 14:19
**successfully** [2] - 9:7, 34:8
**sued** [1] - 59:12
**suffered** [1] - 47:18
**suggest** [1] - 54:4
**suggested** [1] - 49:15
**suggesting** [4] - 25:2, 33:19, 38:14, 45:7
**suggestion** [1] - 24:12
**suggests** [1] - 24:20
**Suite** [1] - 1:19
**supplemental** [1] - 60:10
**support** [1] - 11:18
**Supreme** [1] - 43:14
**sur** [5] - 3:17, 22:21, 33:2
**sur-sur** [2] - 3:17, 22:21
**surprises** [1] - 37:7
**surrendered** [2] - 20:10, 58:10
**surrounding** [1] - 36:22
**swirl** [1] - 21:17

## T

**tailored** [2] - 2:19, 39:19
**talks** [10] - 7:23, 12:19, 12:22, 12:25, 13:12, 15:4, 18:9, 18:25, 30:11, 41:23
**target** [1] - 13:23
**technical** [2] - 5:25, 20:11
**temporarily** [1] - 13:19
**terms** [10] - 5:5, 8:10, 8:19, 11:2, 14:25, 24:14, 26:9, 36:2, 40:8, 61:2
**terrible** [3] - 12:12, 31:17
**terribly** [2] - 55:5, 55:7
**test** [2] - 36:9, 48:24
**theme** [3] - 28:15, 28:17, 33:17

themselves [8] - 24:16, 30:5, 42:8, 46:9, 46:12, 46:24, 59:7
theory [1] - 38:8
thereto [1] - 3:19
they've [1] - 60:25
thinks [1] - 55:8
third [5] - 9:22, 15:15, 44:12, 45:12, 45:15
threatened [1] - 57:2
threatening [1] - 13:18
three [2] - 9:14, 14:25
threshold [1] - 3:15
Thursday [1] - 38:16
tied [2] - 46:19, 56:16
Time's [4] - 17:12, 18:15, 31:21, 57:13
timing [1] - 59:19
title [1] - 40:19
today [6] - 17:14, 21:14, 22:11, 37:5, 37:11, 60:2
Too! [20] - 13:23, 14:9, 17:12, 18:14, 22:19, 23:12, 27:6, 27:16, 28:3, 28:15, 31:21, 35:15, 36:22, 43:1, 45:19, 46:25, 47:21, 48:3, 48:6, 57:13
took [4] - 39:7, 39:20, 39:23
top [2] - 16:8, 19:25
topic [9] - 20:25, 21:12, 28:14, 31:9, 33:20, 39:25, 57:11, 57:12, 58:8
topics [6] - 5:2, 5:3, 18:9, 21:9, 27:5, 27:6
topless [1] - 19:19
total [1] - 7:12
touch [3] - 22:15, 44:8, 45:8
touched [2] - 45:23, 48:9
touches [1] - 45:11
toward [1] - 53:16
town [1] - 59:21
tragic [1] - 55:16
transcript [5] - 1:25, 5:9, 6:4, 6:21, 61:21
TRANSCRIPT [1] - 1:11
Transcription [1] - 1:25
treated [1] - 61:6
Tribune [1] - 57:16
tribune [1] - 57:22
Troubled [1] - 16:6
troubles [1] - 18:2
true [5] - 7:16, 7:20, 20:9, 21:1, 50:21
truth [8] - 4:2, 6:9, 19:2, 50:21, 50:25, 52:3, 52:14, 54:20
try [4] - 40:1, 40:2, 41:16, 55:9
trying [6] - 22:24, 23:14, 24:14, 45:2, 49:4, 53:16
turned [1] - 39:10
twice [2] - 45:16, 45:24
two [8] - 3:22, 9:11, 14:7, 18:1, 18:5, 18:12, 34:9, 55:6
types [1] - 14:9

## U

unable [1] - 33:23

unconventional [1] - 43:24
under [6] - 4:24, 6:20, 33:4, 38:8, 40:19, 58:3
undermine [1] - 46:6
understandings [1] - 12:7
Understood [1] - 23:5
understood [6] - 17:20, 23:21, 39:12, 50:23, 59:15, 61:9
underwear [1] - 55:22
undisputed [1] - 5:1
unfair [1] - 11:14
unfortunately [1] - 29:6
UNITED [2] - 1:1, 1:12
United [1] - 1:5
universally [1] - 33:13
unless [1] - 57:25
unlike [1] - 10:2
unobtainable [1] - 56:9
unsubstantiated [1] - 4:20
up [9] - 5:7, 15:7, 16:3, 33:10, 37:21, 49:18, 54:3, 56:11, 59:7
Up [4] - 17:12, 18:15, 31:21, 57:13
uses [1] - 20:15

## V

vacuum [1] - 55:19
Vanity [8] - 25:13, 25:20, 40:13, 40:15, 40:21, 40:23, 41:7, 46:4
various [1] - 21:14
vastly [1] - 21:14
versions [2] - 8:7, 22:20
versus [2] - 2:4, 11:20
victim [1] - 12:13
view [6] - 5:3, 19:20, 19:24, 34:21, 36:1, 38:4
viewed [2] - 17:17, 19:22
viewpoint [1] - 22:25
views [4] - 9:8, 12:3, 21:14, 21:15
vitality [1] - 46:4
voice [1] - 11:20
voices [3] - 11:16, 11:18, 11:20
voluntarily [5] - 9:11, 10:3, 20:4, 36:10, 58:7
voluntary [1] - 50:5

## W

wait [2] - 15:17, 16:1
waived [2] - 3:19, 3:21
waiver [3] - 5:25, 6:16, 6:18
walked [2] - 37:10, 55:21
walking [1] - 57:3
Walston [2] - 43:17, 43:20
warned [1] - 43:14
watch [1] - 27:8
Wednesday [3] - 59:21, 59:23, 60:5
week [2] - 37:25, 60:2
Weinstein [1] - 14:5
whereas [1] - 41:22
wholly [1] - 34:12
wide [2] - 20:7, 58:9

woman [12] - 11:15, 15:7, 17:24, 19:14, 19:19, 21:22, 29:12, 31:23, 56:5, 56:14, 59:2
women [12] - 10:9, 11:19, 11:22, 11:25, 18:2, 22:12, 27:16, 39:8, 47:11, 47:18, 57:19, 58:25
women's [1] - 47:11
wooden [1] - 56:16
word [3] - 51:22, 51:24, 59:4
words [2] - 23:9, 56:25
worker [1] - 56:5
workers [1] - 56:7
workplace [2] - 11:10, 11:17
works [10] - 4:16, 11:8, 26:23, 33:17, 33:20, 34:10, 34:13, 36:2, 57:14, 59:24
world [9] - 10:7, 10:8, 10:11, 24:18, 29:7, 38:4, 38:24, 38:25, 41:5
worlds [1] - 57:19
worry [1] - 56:13
write [2] - 43:23, 45:10
writer [11] - 7:14, 38:23, 43:11, 44:8, 44:9, 45:7, 45:18, 45:23, 45:24, 48:13
writes [18] - 8:14, 8:15, 28:22, 31:5, 31:15, 31:16, 37:23, 38:9, 38:13, 40:12, 45:7, 49:8, 49:15, 49:21, 52:15, 53:1, 59:3, 59:6
writing [36] - 7:13, 7:18, 11:8, 12:11, 12:24, 12:25, 17:17, 17:18, 17:21, 20:12, 22:25, 26:18, 28:17, 28:24, 35:22, 38:7, 42:1, 42:2, 45:3, 45:11, 45:16, 46:13, 46:18, 47:9, 47:16, 47:22, 48:9, 48:10, 48:12, 50:20, 51:17, 52:4, 53:4, 53:14, 58:8, 58:13
writings [24] - 7:12, 7:20, 7:23, 12:14, 12:19, 18:7, 20:5, 22:15, 23:16, 23:18, 31:10, 31:19, 33:12, 33:13, 35:16, 36:23, 42:24, 46:21, 50:13, 51:6, 52:24, 54:5, 54:14, 58:19
written [18] - 5:2, 5:3, 12:13, 21:25, 22:8, 33:21, 38:12, 44:10, 47:23, 54:20, 54:21, 55:1, 56:1
wrongly [1] - 19:19
wrote [11] - 7:7, 31:22, 31:23, 38:15, 43:7, 43:11, 44:21, 51:24, 52:22, 57:14, 58:23

## Y

year [2] - 22:3, 22:5
years [1] - 55:18
yesterday [2] - 51:10
YORK [1] - 1:1
York [7] - 1:5, 1:16, 1:20, 1:23, 55:8

## Z

zillions [1] - 18:19