UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN ELLIOTT,

                                   Plaintiff,

            v.

MOIRA DONEGAN, and JANE DOES (1–30),

                              Defendants.

**MEMORANDUM AND ORDER**

18-CV-5680 (LDH)(SJB)

LaSHANN DeARCY HALL, United States District Judge:

Plaintiff Stephen Elliott brings the instant action against Defendants Moira Donegan and Jane Does 1-30, alleging defamation of character by libel.  Defendant Donegan moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's second amended complaint.

## BACKGROUND[1]

Plaintiff is an author and content creator.  (Sec. Am. Compl. ("SAC"), ¶¶ 15, 50, ECF No 37.)  Throughout his career, he has published dozens of articles and opinion pieces, personal essays, and books, including a memoir entitled *The Adderall Diaries.*[2]  (Reply Mem. L. Supp.

---

[1]     The following facts taken from the second amended complaint are assumed to be true for the purpose of this memorandum and order.

[2]     The Court takes judicial notice of excerpts of books and articles written by Plaintiff prior to the alleged defamatory incident that were attached to a declaration submitted by Defendant.  (Decl. Roberta Kaplan ("Kaplan Decl." ¶ 3-4, Ex. 1-A, ECF No. 61-1.)  These excerpts were compiled by Defendant due to their references to "rape, sexual assault, consent, and other Me Too-related issues, such as workplace harassment" and in furtherance of her argument that Plaintiff qualifies as a limited-purpose public figure.  (*Id.* at ¶ 5; Ex. 1.)

In taking judicial notice of these excerpts, the Court looks only to what statements the documents contain and "not for the truth of the matter asserted."  *Beaovoir*, 794 at 248 n.4.  The Court is not, as Plaintiff has warned, traversing the Second Circuit's recent decision in *Palin v. New York Times Company*.  (ECF No. 62 (citing 940 F.3d 804, 812 (2d Cir. 2019).)  There, the Second Circuit found that the district court improperly relied upon a credibility determination made during an evidentiary hearing on actual malice in deciding a motion to dismiss a defamation suit.  *Palin,* 940 F.3d at 812.  Rather, the Court is taking judicial notice of works for a similar purpose as the district court in *Biro v. Conde Nast,* 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).  The *Biro* court, as the Court does here, relied on various news articles by and about the plaintiff, which were attached to a declaration in support of defendants' motion to dismiss, in evaluating the plaintiff's status as a limited-purpose public figure.  *Biro*, 963 F. Supp. 2d at 271 n.9; *see also Condit v. Dunne,*

Def. Mot. Dismiss SAC ("Def.'s Reply") Appendix 12-21, ECF No. 45 (compiling a list of

books and articles written by and about Plaintiff).)  His written work—both fictional and non-

fictional—includes graphic and violent descriptions of sex,[3] often BDSM.[4]  Plaintiff describes

instances of rape, including recounting his own experiences as a victim of child abuse and sexual

assault.[5]  He writes about rape fantasies.[6]  His fictional work and non-fictional memoirs include

characters who have survived sexual assault.[7]  He has questioned the consensual nature of sex

---

317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) (taking judicial notice of news articles as evidence of an alleged "media frenzy" that was described in the complaint).

[3]     *See, e.g.,* Kaplan Decl., Ex. 1-A at 5 (From Stephen Elliott, *The Adderall Diaries: A Memoir* (2009): "Patty and I didn't use safe words. We didn't play 'safe, sane, and consensually.' She told me to call her 'daddy,' and threatened to shave my head . . . 'I don't know why I allow you to keep hurting me,' Patty says, sitting next to me on the bed. I wait, moving just enough that my shoulder is against her leg. She gets up and hits me again, much harder, then again. I stretch my fingers forward as she lays into me . . . Why is she doing this? I want her to stop but instead she goes back to the paddle, the thick wood landing heavily on my back. I don't scream or make any noise."); *id.* at 7 (From Stephen Elliott, *The Score*, Believer Mag., (Mar. 2007), https://believermag.com/the-score/: "Around this time I went to dinner with a woman, a sex worker, someone I used to date, someone I dated briefly. I always date briefly and I always date sex workers because they're the only ones who understand desire without sex. Real desire. Raw and unattainable and without purpose. Desire that ends there, all-consuming, for Nothing . . . This particular woman had been raped by her father and one day a client came to her. The client looked just like her father. She tied the client to a wooden cross, screwed clamps onto his nipples, and beat him until his back was bleeding. The man begged to see her again but she refused. Or something like that."); *id.* at 12 (From *Episode 33: Interview with Stephen Elliott*, Polyamory Wkly. (Nov. 7, 2005), https://www.youtube.com/watch?v=KeP1okL5yfg: "[O]ftentimes I would go looking to have an S&M interaction with someone, and I wouldn't practice 'safe, sane, and consensual.' I would go home with anybody. I would get burned with cigarettes. I would end up in scenes where nothing was negotiated, and no one would know safe words, and I basically put myself in some dangerous situations, and sometimes they didn't work out very well.").

[4]     BDSM includes bondage, discipline, domination, submission, sadism, and masochism, and often involves the infliction of physical pain for mutual sexual pleasure.  Margo Kaplan, *Sex-Positive Law*, 89 N.Y.U. L. Rev. 89, 116-17 n.135 (2014).

[5]     *See, e.g.,* Kaplan Decl., Ex. 1-A at 8 (From Stephen Elliott, *An Oral History of Myself #14: Judy*, Rumpus, (Mar. 2011), https://therumpus.net/2011/03/an-oral-history-of-myself-14-judy/: "I started talking back when I was fourteen and it became very violent very fast with both of them. My father once whipped me with a belt until I couldn't move anymore and just lay on the floor motionless. My mother, the last time I ever lived with them, held a kitchen knife against my throat and threatened to kill me. My father, for the first time in his life, stood up for me. He came out of his room, threw her down, and gave me twenty dollars while wrestling with her and told me to run. It was two in the morning. There was a church nearby and I knew one of the youth ministers lived there. He let me in, let me cry, rubbed my back. It happened so fast. He was on top of me. I didn't scream. I didn't do anything. No one would have heard anyway.").

[6]     *See, e.g., id.* at 1 (From Stephen Elliot, *Jones Inn* (1998): "I wanted to rape her. One day during therapy as she was asking another pointless question I wanted to grab her mouth with my hand and quickly stick my fingers up her dress and inside those panties.").

[7]     *See, e.g., id.* at 8 (From Stephen Elliott, *An Oral History of Myself #2: John*, Rumpus (May 2009), https://therumpus.net/2009/05/two-john/: "So we're going back. We get picked up by that truck driver. You can ad-lib those details, I'm sure you remember. (We spent the night in his cab. In the morning he drops us at a donut shop in East L.A. He molested John while I was sleeping. He took everything we had left, which consisted of a small bag with some poetry and maps.)"); *id.* at 10 (From Stephen Elliott, *The Score*, Believer Mag., (Mar. 2007),

scenes, referring to one as "certainly border[ing] on rape."[8]  As Plaintiff has acknowledged, some of his work is "very dark," and not palatable to all audiences.[9]

On or about October 11, 2017, Plaintiff's name was published on a shared Google spreadsheet entitled "Shitty Media Men," (the "List").  (SAC ¶¶ 17, 24.)  He was identified as a "Freelance writer/novelist."  (*Id.* ¶ 24.)  Under the heading "ALLEGED MISCONDUCT," Plaintiff's entry initially stated, "rape accusations, sexual harassment."  (*Id.*)  On or about and between October 11 and October 12, 2017, the entry regarding Plaintiff was revised to read "rape accusations, sexual harassment [sic], coercion, unsolicited invitations to his apartment, a dude who snuck into Binders???"  (*Id.* ¶ 25.)  According to the complaint, Defendant, together with certain Jane Does, outlined Plaintiff's entry in red, signaling that Plaintiff was accused of physical sexual violence by multiple women.  (*Id.* ¶ 28.)  Likewise, the column headed "NOTES" indicated that "multiple women allege misconduct."  (*Id.* ¶ 25.)  Although the entry for Plaintiff initially appeared at row 13, it was subsequently moved to row 12.  (*Id.* ¶¶ 24-25.)  Plaintiff complains that the allegations about him included in the List are false.  (*Id.* ¶¶ 2, 37, 45, 47.)

---

https://believermag.com/the-score/: "This particular woman had been raped by her father and one day a client came to her. The client looked just like her father. She tied the client to a wooden cross, screwed clamps onto his nipples, and beat him until his back was bleeding.").

[8]      *See id.* at 8 (From Jennifer Sky, *Stephen Elliott's New Direction*, Interview Mag. (Feb. 2012), https://www.interviewmagazine.com/film/stephen-elliott-adderall-diaries-cherry: "Sky: "I heard whispers of a Heather Graham rape scene?" Elliott: "There is a scene between Heather Graham and her girlfriend Gillian, played by Diane Farr. It's breakup sex, and it's very violent, and it certainly borders on rape. I'm not sure I would call it rape. It's on the line."); *see also, e.g., id.* at 7 (From Stephen Elliot, *A Review of: Notice by Heather Lewis's*, Believer Mag., (Nov. 2004), https://believermag.com/heather-lewiss-notice/: "The book is filled with sex, most of it just barely consensual. And when I started I wondered if there wasn't maybe too much sex. I wondered if I was reading erotica or literature. But there wasn't too much sex. And it's never gratuitous. It's graphic, but not without reason, and you always know that really what you're reading about is something else, something very human and something that maybe sits inside a lot of us.).

[9]      *See, e.g., id.* at 12 (From *Episode 33: Interview with Stephen Elliott*, Polyamory Wkly. (Nov. 7, 2005), https://www.youtube.com/watch?v=KeP1okL5yfg: "Happy Baby is very dark and not everybody loves to read about that kind of stuff. A lot of the S&M in Happy Baby is nonconsensual, not 'safe and sane,' you know.").

Defendant Donegan is alleged to have created the List.  (*Id.* ¶ 39.)[10]  She, along with Jane Does, circulated the List to numerous women in the media industry via email and other electronic means.  (*Id.* ¶ 18.)  The purpose of the List was to "encourag[e] women to anonymously publish allegations of sexual misconduct by men" in the media sector.  (*Id.* ¶ 17.)  According to Plaintiff, participants were encouraged to publish allegations of misconduct, whether or not they had personal knowledge of the conduct or evidence to corroborate the allegations.  (*Id.* ¶¶ 22-23.)  Defendant, together with Jane Does, actively edited, removed, organized, published, highlighted, and added to the list.  (*Id.* ¶ 26.)  Defendant is alleged to have added heading names to the columns, including, "NAME, AFFILIATION, ALLEGED MISCONDCUT and NOTES."  (*Id.* ¶ 20.)  Defendant also added a header to the top of the List that read, "Men accused of physical sexual violence by multiple women are highlighted in red." (*Id.* ¶ 27.)

On October 12, 2017, *Buzzfeed* published an article about the existence of the List, and various other news outlets reported on it.  (*Id.* at ¶ 29.)  At this point, more than 70 men had been named on the List.  (Decl. Martha Fitzgerald ("Fitzgerald Decl.") ¶ 3, ECF No. 42, Ex. A at 9, ECF No. 42-1.)  By Defendant's own characterization, the List had gone "viral" and she took the List offline after about 12 hours.  (*Id*. at 10.)

In January 2018, Defendant published an article in *New York Magazine's* online division, "*The Cut*," identifying herself as the creator of the List.  (SAC ¶ 39.)  In the article, Defendant described her perspective on the List's susceptibility to falsehoods as follows:

---

[10]      An article entitled, "I Started the Media Men List: My Name is Moira Donegan," published on January 10, 2018 on TheCut.Com ("*The Cut*"), an online division of *New York Magazine*, has been incorporated into the complaint by reference.  (*See* SAC ¶¶ 39, 62; Decl. Martha E. Fitzgerald ("Fitzgerald Decl.") ¶ 3, ECF No. 42, Ex. A, ECF No. 42-1.)  "It is well established that '[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.'"  *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

> There were pitfalls.  The document was indeed vulnerable to false accusations, a concern I took seriously.  I added a disclaimer at the top of the spreadsheet: "This document is only a collection of misconduct allegations and rumors.  Take everything with a grain of salt."

(Fitzgerald Decl., Ex A at 7.)  Later in the article, Defendant went on to comment about the veracity of the claims:

> Some have expressed doubts about the veracity of the claims in the document, but it's impossible to deny the extent and severity of the sexual harassment problem in media if you believe even a quarter of the claims that were made on the spreadsheet.  For my part, I believe significantly more than that.

(*Id.* at 9.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendant's liability for the alleged misconduct.  *Id*. at 678. While this standard requires more than a "sheer possibility" of a defendant's liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp.2d 556, 565 (E.D.N.Y. 1999) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true."  *Id*. (citations omitted).

**DISCUSSION**

I.     **Defamation**

To state a claim for defamation in New York, a plaintiff must allege:  "(1) a written

defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault

(either negligence or actual malice depending on the status of the libeled party); (4) falsity of the

defamatory statement; and (5) special damages or per se actionability."  *Palin v. New York Times*

*Co.*, 940 F.3d 804, 809 (2d Cir. 2019).  With respect to the third element, if a plaintiff is

considered a "limited-purpose public figure," he must "show that the statements were made with

'actual malice'—that is, with knowledge that the statements were false or with reckless disregard

as to their falsity."  *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).  Defendant argues that

Plaintiff is a limited-purpose public figure thereby triggering this additional pleading

requirement.  (Def.'s Reply 1-3; Def.'s Resp. Mot. Leave File Sur-Reply ("Def.'s Sur-Reply

Resp.") 2, ECF No. 47.)  Often this inquiry is undertaken by a court only once parties have

completed discovery.  However, "[w]here the question whether a plaintiff is a public figure can

be determined based upon the pleadings alone, the Court may deem a plaintiff a public figure at

the motion to dismiss stage."  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y.

2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015).

To prove that a plaintiff is a limited-purpose public figure, "[a] defendant must

demonstrate that a plaintiff has:

> (1) successfully invited public attention to his views in an effort to
> influence others prior to the incident that is the subject of
> litigation; (2) voluntarily injected himself into a public controversy
> related to the subject of the litigation; (3) assumed a position of
> prominence in the public controversy; and (4) maintained regular
> and continuing access to the media.

*Id.* (quoting *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir.1984), *cert. denied*, 471 U.S. 1054 (1985)).  Plaintiff effectively concedes that he satisfies the first and fourth elements of the limited-purpose public figure test.  (*See, generally,* Pl.'s Sur-Reply Mem. Law Opp. Def's Mot. Dismiss ("Pl.'s Sur-Reply"), ECF No. 56.)  The crux of the Court's undertaking, therefore, is defining the controversy related to the subject of the litigation and then determining whether (1) Plaintiff voluntarily injected himself into that controversy; and (2) assumed a position of prominence within it.

### A.  Public Controversy

The Second Circuit has defined a public controversy as "any topic upon which sizeable segments of society have different, strongly held views," even if the topic does "not involve political debate or criticism of public officials."  *Lerman*, 745 F.2d at 138.  *Waldbaum v. Fairchild Publications, Inc.*, an oft-cited D.C. Circuit case, defined a public controversy as a "real dispute, the outcome of which affects the general public or some segment of it in an appreciable way."  627 F.2d 1287, 1296 (D.C. Cir. 1980); *see also Biro*, 963 F. Supp. 2d at 272 (quoting same).  The *Waldbaum* court advised that "to determine whether a controversy indeed exists and, if so, to define its contours, [a court] must examine whether persons actually were discussing some specific question."  *Waldbaum*, 627 F.2d at 1296.

*Lerman,* a leading Second Circuit case on this issue, provides a helpful illustration as to how a court must approach identifying and defining a public controversy.  In *Lerman*, plaintiff was an internationally renowned author of nine novels.  *Id.* at 137.  In now-dated language, the *Lerman* court described plaintiff as "a controversial, outspoken authoress," whose books "are full of descriptions of sex, including deviate sex and orgies."  *Id.* at 137-138.  Plaintiff sued for defamation after a magazine published nude photographs and misidentified her as the "starlet" who was topless in one photo and the participant in an orgy scene in another.  *Id.* at 127.  While

the *Lerman* court noted that plaintiff had "voluntarily devot[ed] herself to the public's interest in sexual mores," it did not go so far as identifying the controversy related to the subject of the litigation as any aspect of sex, deviate sex, sexual mores, or orgies. *Id.* at 137. Rather, the *Lerman* court adopted defendant's construction of the controversy that the district court had rejected below—"sex and nudity in films." *Id.* In doing so, the court observed that plaintiff wrote about and had been interviewed on the then-controversial topic of whether there is a pervasive inequality with respect to the portrayal of male nudity versus female nudity in film and magazines and advocated for "equal nudes for all." *Id.*

In a more recent decision by the Ninth Circuit, *Makaeff v. Trump Univ. LLC*, the court further illustrated how to hone in on the controversy at play. 715 F.3d 254, 267 (9th Cir. 2013). There, a "disgruntled former customer" sued Trump University for deceptive business practices, among other things, and Trump University counterclaimed for defamation. *Id.* at 258. Importantly, the *Makaeff* court tethered its analysis of the controversy to the timing of the allegedly defamatory statements. Looking to *Waldbaum,* the court specifically inquired into whether a public controversy existed around Trump University when Makaeff made her allegedly defamatory statements about Trump University in Fall 2009. *Id.* at 266-67 (citing *Waldbaum*, 627 F.2d at 1297). The court recounted the temporal evolution of the controversy surrounding Trump University between 2007 and 2009 by referring to what was being discussed in newspapers and on public internet message boards. *Id.* at 267. In doing so, the court noted that by Fall 2009, "any general interest in Trump University stemming from its celebrity founder soon ripened into an actual dispute over Trump University's business and educational practices." *Id.*

Another application of *Waldbaum* can be found in *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016).  In that case, the allegedly defamatory statements made about plaintiff appeared in a report that focused on political and economic issues in Serbia after the assassination of Prime Minister Zoran Djindjic in 2003.  *Id.* at 582-83.  The district court had identified the public controversy as the "progress of political and economic reform in Serbia and the integration of Serbia into international institutions" post-2000, which included the period where Djindjic served as Prime Minister before his assassination.  *Id.* at 585.  On appeal, plaintiff argued that the controversy should be narrowed to focus only on the post-2003 period because it is "more directly tied to the report which contains the defamation."  *Id.* at 586.  The court observed that "[w]hen defining the relevant controversy, a court may find that there are multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another broader one.'"  *Id.* (quoting *Waldbaum*, 627 F.2d at 1297 n. 27)*.*  The court went on to state, "[plaintiff's] view that narrowing the definition of the controversy is required in order to relate it to the publication containing the defamation is not well taken" as controversies have been defined as "broader than the narrower discussion contained in the defamatory document."  *Id.*

Taking *Lerman*, *Waldbaum*, *Makaeff*, and *Jankovic* together, several key principles emerge.  A controversy is a specific question or real issue being discussed at the time of the defamatory statement.  *Waldbaum*, 627 F.2d at 1296; *Makaeff*, 715 F.3d at 266.  A controversy is broader than only the statement or discussion contained in the allegedly defamatory document. *Jankovic*, 822, F.3d at 586.  That is not to say that there are no bounds to what a controversy entails.  For example, as noted above, the Second Circuit defined the controversy in *Lerman* as "sex and nudity in films," and not any aspect of sex, sexual mores, or orgies.  *Lerman*, 745 F.2d

at 137.  Using *Lerman* as the Court's primary signpost, and with these principles in mind, the

Court now turns to defining the public controversy here.

The definition of the controversy has been argued at length, with much emphasis placed

on *Lerman* by both sides.  Plaintiff has relied on Defendant's own description of her rationale in

creating the List.  Piecing together various passages from Defendant's *The Cut* article, Plaintiff

articulates the controversy as, "the 'intractable problem' of widespread 'sexual harassment and

assault' against women as well as the difficulties women face reporting and preventing such

harassment and assault."  (Pl.'s Sur-Reply 4; *see also* Fitzgerald Decl., Ex A at 3-5).)

For her part, Defendant's definition of the controversy has morphed over time.  In her

opening brief, Defendant failed to define the controversy at hand, noting in a footnote that "Mr.

Elliot has not mounted any serious challenge to our repeated observation that he qualifies as a

limited-purpose public figure."  (Def.'s Mem. L. Supp. Def.'s Mot. Dismiss SAC ("Def.'s

Mem.") 6 n.4, ECF No. 40.)  In her reply brief, Defendant defined the controversy as: "Debates

over the ethics of consent and the public significance of sexual misconduct by prominent men,"

and "permissible (and prohibited) sexual conduct."  (Def.'s Reply 3).  In a subsequent letter

filing, Defendant alternatively defined the controversy at play as the "#MeToo story," which she

defines as encompassing "sex, consent, morality and power."[11]  (Def.'s Sur-Reply Resp. 2.)

The Court agrees with Defendant that the controversy related to the subject of this

litigation is inextricably linked to what has been called, in shorthand, the "#MeToo" movement.

However, rather than defining the controversy as any aspect of "sex, consent, morality and

power"—which would traverse the Second Circuit's opinion in *Lerman*—the Court's definition

---

[11]      At oral argument, Defendant further articulated the #MeToo controversy as "issues of sexual assault, sexual
harassment, the meaning of consent and how societal views on that needed to change [from] sexist, and . . .
misogynistic understandings of what constituted consent, . . . [and] assault."  (Feb. 7, 2020 Oral Arg. Tr. 12:1-8,
ECF No. 64.)

of the controversy is tethered to the #MeToo movement as it existed at the time of the allegedly defamatory statements in October 2017.

A brief overview of the #MeToo movement is helpful place to start.  "Me Too" was first coined in 2006 by Tarana Burke, a Black female activist, as the name for a movement to help victims of sexual harassment and assault.[12]  #MeToo catapulted into the public's consciousness in October 2017.  On October 5, 2017, Jodi Kantor and Megan Twohey at the *New York Times* published an article detailing decades of sexual harassment allegations against the Hollywood producer Harvey Weinstein.  (*See* Def.'s Mem. 4 n.3 (citing Jodi Kantor and Megan Twohey, *Harvey Weinstein Paid Off Sexual Harassment Accusers for Decades,* N.Y. TIMES (Oct. 5, 2017), https://www.nytimes.com/2017/10/05/us/harvey-weinstein-harassment-allegations.html).)  Five days later, an article in the *New Yorker* detailed additional allegations against Weinstein.[13]  On October 15, 2017, actor Alyssa Milano wrote on Twitter, "if you've been sexually harassed or assaulted write 'me too' as a reply to this tweet."[14]  Within days, thousands heeded her call.[15]  And thus, the voices of few became many, and the #MeToo movement became a chorus bolstering the credibility of victims of sexual assault and harassment.  The "Shitty Media Men" spreadsheet was published by Defendant on or about October 11, 2017, in the 10-day period between when Kantor and Twohey broke the Weinstein story and Milano tweeted "me too."

---

[12]     *See Hardwick v. Indiana Bell Tel. Co., Inc.*, No. 115-CV-01161, 2018 WL 4620252, at *15 (S.D. Ind. Sept. 26, 2018) (identifying Burke as the founder of the "Me Too" movement); *see also* Sandra Garcia, *The Woman Who Created #MeToo Long Before Hashtags*, N.Y. TIMES (Oct. 27, 2017), https://www.nytimes.com/2017/10/20/us/metoo-movement-tarana-burke.html.

[13]     Ronan Farrow, *From Aggressive Overtures to Sexual Assault: Harvey Weinstein's Accusers Tell Their Stories*, NEW YORKER (Oct. 10, 2017), https://www.newyorker.com/news/news-desk/from-aggressive-overtures-to-sexual-assault-harvey-weinsteins-accusers-tell-their-stories.

[14]     Anna Codrea-Rado, *#MeToo Floods Social Media With Stories of Harassment and Assault*, N.Y. TIMES (Oct. 16, 2017), https://www.nytimes.com/2017/10/16/technology/metoo-twitter-facebook.html.

[15]     Karen Kaplan, *After Alyssa Milano's #MeToo tweet, Google searches about sexual assault hit record high,* L.A. TIMES (Dec. 21, 2018), https://www.latimes.com/science/sciencenow/la-sci-sn-metoo-google-searches-20181221-story.html ("The #MeToo hashtag was tweeted about 300,000 times on that first day alone.).

(SAC ¶¶ 17, 24.)  While the List pre-dated Milano's call for "me too" on Twitter by four days, the Court construes the List as part of the nascent #MeToo movement.

But what was the controversy in the first days of #MeToo?  The Court follows *Waldbaum's* mandate to "examine whether persons actually were discussing some specific question" at the time of the defamatory statement.  627 F.2d at 1296.  In this case, at the time of the defamatory statement—October 11, 2017—the discussions were centered on issues of sexual assault, sexual harassment, and consent in the workplace.[16]  In the wake of the Weinstein allegations, the burgeoning #MeToo movement was focused on how power dynamics and outdated expectations of gender roles in the workplace have worked to silence women.  Milano's first public statement about the Weinstein allegations illustrates this.  Milano, who published a statement on October 9, 2017, six days before she tweeted "me too," discussed her reaction to the Weinstein allegations solely in terms of sexual assault, harassment and sexism in workplaces.[17]  The Weinstein allegations inspired widespread and difficult conversations about what constitutes inappropriate behavior in professional settings and how to construe consent in sexual relationships between prominent industry players and those seeking opportunities within that industry.[18]  The List itself is evidence of this.

---

[16]     The Court uses "workplace" to refer not just to a place of employment, but also to events or communications that are meant to serve a professional purpose.

[17]     Alyssa Milano, *My Comment On The Harvey Weinstein Scandal*, PATRIOT NOT PARTISAN (Oct. 9, 2017), *http://patriotnotpartisan.com/general-commentary/my-comment-on-the-harvey-weinstein-scandal/* ("I've been asked a number of times to comment on the Harvey Weinstein scandal. While I am sickened and angered over the disturbing accusations of Weinstein's sexual predation and abuse of power, I'm happy - ecstatic even - that it has opened up a dialogue around the continued sexual harassment, objectification and degradation of women. To the women who have suffered any form of abuse of power, I stand beside you. To the women who have come forward against a system that is designed to keep you silent, I stand in awe of you and appreciate you and your fortitude. . . . In any - and every - profession, women are continuously mistreated. This is not an uncommon occurrence. This is a sick culture. Men like Harvey Weinstein are around every corner. Men who undermine women and their strength, ability and intelligence exist everywhere. Statistics say that 1 in 3 women are sexually harassed in the workplace.").

[18]     *See, e.g.,* Jim Rutenberg, *A Long-Delayed Reckoning of the Cost of Silence on Abuse,* N.Y. TIMES (Oct. 22, 2017), https://www.nytimes.com/2017/10/22/business/media/a-long-delayed-reckoning-of-the-cost-of-silence-on-abuse.html (detailing sexual assault allegations against prominent executives in various industries revealed in the wake of the Weinstein allegations); Sophie Gilbert, *The Movement of #MeToo*, THE ATLANTIC (Oct. 16, 2017)

Defendant titled the document "Shitty *Media* Men," limiting the document to her industry, and not, for example, her school, neighborhood, place of worship or some other non-professional setting.  (SAC ¶ 17 (emphasis added).)  The document included allegations against men in publishing, and was circulated among others in media, namely writers and journalists. (Fitzgerald Decl. Ex A at 3-4.)  Tellingly, when describing her perspective on the need for the List, Defendant stated:

> Human-resources departments, in offices that have them, are tasked not with protecting employees but with shielding the company from liability — meaning that in the frequent occasion that the offender is a member of management and the victim is not, HR's priorities lie with the accused.

(Fitzgerald Decl. Ex A at 5.)

Defendant presses that *Lerman* mandates that the controversy be defined "broadly, not narrowly, because of the importance of the First Amendment protection."  (Feb. 7, 2020 Oral Arg. Tr. 10:19-21, ECF No. 64.)  The Court agrees and has done so here.  In defining the controversy as sexual assault, sexual harassment, and consent in the workplace, the Court has not—as Defendant rightly warns against—shrunk the controversy only to the specific statements of which Plaintiff complains.  (Def.'s Sur-Reply Resp. 2.)  Nor has the Court narrowed the controversy to the subject of the publication containing the defamation—sexual assault and harassment in the media industry.  *See Jankovic*, 822 F.3d at 586.  Rather, at the time the List was published, there "were multiple potential controversies."  *Id.*  The List was part of broader

---

https://www.theatlantic.com/entertainment/archive/2017/10/the-movement-of-metoo/542979/ ("But as horrifying as the allegations against Weinstein have been, more appalling still is the sense that his behavior isn't uncommon. That in industries across the world, from media to music to modeling to academia, women have encountered their own Weinsteins and have deduced, for whatever reason, that nothing could be done about it and nobody cared."); Steve Hendrix, Ellie Silverman and Marc Fisher, *#MeToo has a 'chilling effect' on workplace camaraderie*, Chicago Tribune (Jan. 28, 2018), https://www.chicagotribune.com/business/ct-metoo-workplace-camaraderie-20180128-story.html ("Change has come for both women and men, as women feel emboldened to speak out against inappropriate behavior, and men think twice about what's acceptable at work.").

discussions regarding sexual assault, sexual harassment and consent in workplaces across the country, and the Court broadly construes the controversy in this case accordingly.

Of course, the #MeToo movement, even in its earliest days, undoubtedly inspired people to share stories about sexual harassment and abuse they experienced outside the workplace. And, it may be true that #MeToo is used today as short-hand for larger discussions regarding consent, power, or sex. However, the Court is bound to consider the specific questions being discussed at the time of the defamatory statement. The specific controversy in the immediate wake of the Weinstein allegations in October 2017 was not about all aspects of sex, consent, morality, and power, as Defendant urges. Defendant's own statements and conduct in creating the List reflect that the controversy in play at the time of the allegedly defamatory statement was tied to workplace conduct. Having found that the controversy here is sexual assault, sexual harassment, and consent in the workplace, the Court now turns to whether Plaintiff voluntarily injected himself into that controversy and assumed a position of prominence within it.

### B. Voluntary Injection Into and Assumption of Prominence Within the Controversy

"In the public controversies that daily swirl about . . . some plunge into the arena and enter the fray." *Lerman*, 745 F.2d at 138. An individual "can become a limited-purpose public figure only through his own actions, by entering voluntarily into one of the submarkets of ideas and opinions, one consents to the rough competition of the marketplace." *Biro,* 963 F. Supp 2d at 274 (citing *Dilworth v. Dudley,* 75 F.3d 307, 309 (7th Cir. 1996)). Any entry into a controversy does not transform a private individual into a public figure. The "degree of voluntar[y] involvement in the public controversy" is important. *Chandok v. Klessig*, 648 F. Supp. 2d 449, 458 (N.D.N.Y. 2009) (citing *James v. Gannett Co.,* 40 N.Y.2d 415, 422

(1976)), *aff'd,* 632 F.3d 803 (2d Cir. 2011).  That is to say, a "trivial or tangential" role will not

suffice.  *Biro,* 963 F. Supp 2d at 275 (quoting *Underwager v. Salter,* 22 F.3d 730, 734 (7th

Cir.1994)).

Plaintiff's degree of involvement in a controversy surrounding sexual assault, sexual

harassment and consent in the workplace, if any, is *de minimis*.  Defendant directed the Court to

only a few tangential references to sexual harassment or lewd jokes in the workplace in

Plaintiff's writing and interviews.[19]  And the Court is not willing to find that Plaintiff's more

extensive writings and interviews about sex, BDSM, and sexual assault—unrelated to workplace

issues—transforms him into a public figure with respect to the controversy here.[20]  This is unlike

*Lerman,* where the plaintiff "frequently" spoke on national TV and in interviews with mass

media about "sexual inequality," including that "women more frequently than men appear unclad

in films and magazines."  745 F.2d at 137.  In other words, the plaintiff there voluntarily and

substantially involved herself in the controversy around sex and nudity in films in her regular

media appearances.  Here, the same cannot be said.

*       *       *

---

[19]     Kaplan Decl., Ex. 1-A at 5 (From Stephen Elliott, *The Adderall Diaries: A Memoir* (2009): "At work things were tense. Someone erased all the emails and documents from my computer. I led a weekly meeting but people stopped showing up. My salesgirl refused to talk to me. I was called in to discuss possible sexual harassment charges. 'What are you talking about?' I asked. 'You've never worked in a corporate environment before. It's normal that you wouldn't understand certain protocols. We'll pay for you to take a class.'); *id.* at 4 (From: Stephen Elliott, *Looking Forward to It: Or, How I Learned to Stop Worrying and Love the American Electoral Process* (2004): "My friend, the filmmaker Peter Alton is fond of saying, 'Those that leave themselves something to fall back on inevitably do.' He also likes to say, 'I take my coffee like I take my women, by force.' But the second quote is neither here nor there. It's the kind of joke that can really get you in trouble in the wrong company, or if your timing's off. The important thing to me now is that I have nothing except the 2004 presidential election to keep me afloat."); *id.* at 3 (From: *Politically Inspired* (Stephen Elliott ed., 2003): "But many times I've gotten paid lots of money without working hard, like the time I broke into my boss's e-mail and discovered that he was putting nonemployees on the payroll and setting up people for phony sexual harassment suits.").

[20]     *See supra* notes 3, 5, 6-8.

As such, Defendant has failed to show that Plaintiff qualifies as a limited-purpose public figure at this pleading stage.  Accordingly, Plaintiff need not plead actual malice.  Defendant's motion to dismiss for failure to state a defamation claim is denied.[21]

## II.   Communications Decency Act Immunity

Defendant argues that Plaintiff's suit is barred by § 230 of the Communications Decency Act (the "CDA"), 47 U.S.C. § 230.  (Def.'s Mem. 13-20.)  Section 230 was enacted "to preserve

---

[21]      No analysis of actual malice is necessary.  Nevertheless, the Court takes the opportunity to briefly address the parties' arguments.  Actual malice is the "knowledge that the statements were false or [made] with reckless disregard as to their falsity."  *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).  As the Supreme Court has explained, while "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, we have made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal quotations, citations, and modifications omitted).  Furthermore, "'reliance on anonymous or unreliable sources without further investigation *may* support an inference of actual malice,' where the plaintiff includes additional allegations to buttress such an inference."  *Cabello-Rondon v. Dow Jones & Co., Inc.*, 720 F. App'x 87, 89 (2d Cir. 2018) (summary order) (emphasis in original) (quoting *Biro*, 807 F.3d at 546); *see also Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (finding that whether a publication "is based wholly on an unverified, anonymous source" is a factor "relevant to a showing that the defendant harbored actual malice").

In the original complaint, Plaintiff attempted to plead malice based on statements published by Defendant on social media in which she stated, "The problem is men," "I really hate men," and "I like the witch hunt." (Compl. ¶ 26, ECF No.1.)  Based on those statements, the Court previously indicated that Plaintiff had likely failed to adequately plead actual malice.  In the second amended complaint, Plaintiff's malice allegations are based in large part on statements made by Defendant in her article published in *The Cut*.  (SAC ¶¶ 62-63.)

In *The Cut*, Defendant stated that she "took seriously" the concern that the List was "vulnerable to false accusations."  (Fitzgerald Decl., Ex A at 7.)  Further, she added a header to the document directing readers to take the allegations included on the List with a "grain of salt."  (*Id.*)  Significantly, a "grain of salt" is defined as "to understand that something is likely to be untrue or incorrect."  *Grain of Salt*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/take-something-with-a-grain-of-salt (last visited June 29, 2020).  Moreover, Defendant stated that she believed "significantly more" than "a quarter of the claims on the spreadsheet."  (Fitzgerald Decl., Ex A at 9.)  This statement certainly allows for the reasonable inference that she doubted the veracity of certain accusations on the List, and potentially more than half of the allegations on the List.  Defendant's statements in *The Cut*, coupled with her reliance on "unverified, anonymous sources" may support an inference of actual malice for the purposes of a motion to dismiss.  *See Cabello-Rondon*, 720 F. App'x at 89.

Against this backdrop, Defendant argues that it is "black letter law" that courts "consider allegedly libelous statement[s] individually to determine whether a rational finder of fact could find actual malice by clear and convincing evidence."  (Def.'s Reply 6.)  Clear and convincing evidence is not the standard on a motion to dismiss.  *Cf. Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995) (considering "each allegedly libelous statement individually to determine whether a rational finder of fact could find actual malice by clear and convincing evidence" on a motion for summary judgment.)  Instead, on a motion to dismiss, Plaintiff only faces a plausibility hurdle.  *Biro*, 807 F.3d at 545 ("[M]alice must be alleged plausibly in accordance with Rule 8.").  "The hurdles to plausibly pleading actual malice, though significant given the First Amendment interests at stake, are by no means insurmountable."  *Id.* at 541 (citing 2 Robert D. Sack, *Sack on Defamation* § 16:2.2 at 16.7–8 (4th ed. 2010)).  For purposes of this academic exercise, the Court notes Plaintiff would have likely surmounted them here.

16

the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). To accomplish this, § 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). To invoke the protection of the CDA, a defendant must show: (1) she is a provider or user of an interactive computer service; (2) the claim is based on information provided by another information content provider; and (3) the claim would treat the defendant as the publisher or speaker of that information. *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016). As a number of courts, including the Second Circuit, have observed, § 230 immunity is broad and close cases must be resolved in favor of immunity. *Id.* (collecting cases).

Nevertheless, dismissal is only appropriate pursuant to § 230 on a motion to dismiss "if the statute's barrier to suit is evident from the face of the complaint." *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015). Stated another way, Plaintiff need not anticipate an affirmative defense in formulating his complaint. *See Ibarzabal v. Morgan Stanley DW, Inc.*, 333 F. App'x 605, 606–07 (2d Cir. 2009) (summary order) (collecting cases); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant. It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful. We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." (internal citations omitted)); *see also Curran v. Amazon.com, Inc.*, No. 2:07-CV-0354, 2008 WL 472433, at *12 (S.D. W. Va. Feb. 19, 2008) (denying motion to dismiss due to CDA immunity where defendant "relies upon the absence of facts not pled in the complaint and seeks to place

the onus on the plaintiff to plead around affirmative defenses, which it need not do").  Even so, the complaint provides ample basis to conclude that Defendant is an interactive computer service provider.

"The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." 47 U.S.C. § 230(f)(2).  Online message boards fall within this definition.  *LeadClick,* 838 F.3d at 174 (collecting cases).  Plaintiff alleges that Defendant, along with others, created the List as "a publicly accessible, shared Google spreadsheet," which "was accessible via a link," and could be edited anonymously by whomever received the link.  (*Id.* ¶¶ 1, 17-18, 67-68.)  A Google spreadsheet is akin to an online message board, as it provides a publicly accessible platform where individuals can post comments.  *See, e.g., Gregerson v. Vilana Fin., Inc.*, No. 06-CV-1164, 2008 WL 451060, at *9 (D. Minn. Feb. 15, 2008) (finding that an individual who was "an operator of a website where users can post comments" was a provider of an interactive computer service for purposes of the CDA).  Accordingly, Defendant qualifies as a provider of an interactive computer service during the time the List was online in the form of her Google spreadsheet link.[22]

Conversely, the Court is unable to find that it is evident from the face of the complaint that the allegations against Plaintiff included in the List were provided to Defendant by another information content provider.  "Information content provider" is defined to include "any person or entity that is responsible, in whole or in part, for the creation or development of information

---

[22]     Plaintiff alleges that Defendant publicized the existence of the List "many times" between October 11, 2017 and July 17, 2018.  (SAC ¶ 30.)  Furthermore, the List is still "freely available to download from public sites including *Reddit* and *Wordpress*."  (SAC ¶ 33.)  Neither fact, if true, evinces that Defendant served as the provider of an interactive computer service in this case beyond the time that her Google spreadsheet link was live.

provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). If an interactive service provider (here, Defendant) also serves as an "'information content provider' of the content which gives rise to the underlying claim," CDA immunity does not attach. *LeadClick*, 838 F.3d at 174. It is relatively easy to define what constitutes the creation of information. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,* 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) ("If [a website] passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself . . . the website is also a content provider."). Determining what constitutes the development of information is a stickier task.

The Second Circuit has instructed that a defendant will not be held responsible for the development of information "unless it assisted in the development of what made the content unlawful." *LeadClick*, 838 F.3d at 174. "[O]ne is responsible for the 'development' of information when [she] engages in an act beyond the normal functions of a publisher (such as deciding to publish, withdraw or modify third-party content) that changes the meaning and purpose of the content." *Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 474 (E.D.N.Y. 2011) (citing *Roommates.Com,* 521 F.3d at 1163). By contrast, an individual does not develop content where she provides "neutral assistance," that is, "tools and functionality that are available equally to bad actors and the . . . intended users." *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018) (quoting *Roommates.Com*, 521 F.3d at 1169), *aff'd,* 765 F. App'x 586 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 221 (2019). Importantly, a defendant also loses CDA immunity if he or she "specifically encouraged" unlawful content. *See LeadClick*, 838 F.3d at 174 ("For example, a defendant who paid researchers to uncover confidential phone records protected by law, and then provided that information to paying customers, fell within the

definition [of an information content provider] because he did not merely act as a neutral intermediary, but instead 'specifically encouraged development of what was offensive about the content.'" (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009))). Against this backdrop, as detailed below, Plaintiff's complaint has not foreclosed the possibility that Defendant created or developed the allegedly unlawful content.

### A. Fabrication

CDA immunity does not attach where the defendant is being held accountable for its own unlawful acts. *LeadClick*, 838 F.3d at 176; *Roommates.Com*, 521 F.3d at 1162 ("[A]s to content that [a website] creates itself . . . the website is also a content provider."). Plaintiff alleges, in part, that Defendant fabricated the allegations against him and inputted them in the List. (SAC ¶ 56-57.) The parties—and the Court—agree that CDA immunity does not apply if that is proven true. (Pl.'s Mem. L. Opp. Def.'s Mot. Dismiss ("Pl.'s Opp.") 18; Def.'s Reply 8.)

### B. Publishing Another's Statements

Plaintiff alleges that Defendant published the allegedly defamatory accusations in the List as relayed to her by another person. (SAC ¶ 60.) Defendant argues that, if true, she is shielded by § 230 because she did not materially contribute to their allegedly defamatory meaning, and did not change the meaning and purpose of the content. (Def.'s Mem. 16.) However, this argument assumes a key fact not known to the Court at this juncture—whether Plaintiff materially contributed to the allegedly defamatory meaning—which is the very fact on which CDA immunity turns. *LeadClick*, 838 F.3d at 174 (finding that CDA immunity is available to an interactive computer service as long as Defendant has not "materially contribut[ed] to [the content's] alleged unlawfulness"). That Plaintiff did not explicitly plead that Defendant materially contributed to the unlawful statements she inputted in the list on someone else's

behalf is of no consequence.  Defendant may not "rel[y] upon the absence of facts not pled in the complaint" to secure CDA immunity on a motion to dismiss.  *Curran*, 2008 WL 472433, at *12.

Furthermore, Plaintiff also rightly points out that if Defendant inputted information into the List that was not provided to Defendant for use on the Internet, she would not qualify for CDA immunity.  (Pl.'s Opp. 19 n.8.)  "The structure and purpose of § 230(c)(1) indicate that the immunity applies only with regard to third-party information provided *for use on the Internet* or another interactive computer service."  *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003) (emphasis in original).  Thus, if Defendant wrote the allegedly defamatory statements in the List that had been relayed to her by a third party—and the third party never intended that communication "be placed on an interactive computer service for public viewing"—CDA immunity would not attach.  *Batzel,* 333 F.3d 1033; *see also id*. (stating that if "an individual who happens to operate a website receives a defamatory 'snail mail' letter from an old friend, the website operator cannot be said to have been 'provided' the information in his capacity as a website service."); *Roommates.Com*, 521 F.3d at 1170 (restating same).

### C.  Specifically Encouraging Unlawful Content

Plaintiff correctly notes that interactive computer service providers "forfeit their Section 230 immunity if through their website's design, or through its headers, or through personal communications with other people, or otherwise, they 'specifically encourage' the posting of unlawful content."  (Pl.'s Opp. 20 (citing *LeadClick*, 838 F.3d at 174).)  On this issue, Plaintiff directs the Court to the disclaimer at the top of the List, which described it as "only a collection of allegations and rumors" that should be taken "with a grain of salt."  (Pl.'s Opp. 21 (citing SAC ¶ 62).)  Plaintiff argues that "[t]his statement alone could reasonably have been interpreted by the List's recipients as encouraging them to post their own 'rumors'" and "[n]owhere did the List advise users that they were only to post about their own experiences."  (Pl.'s Opp. 21-22.)  To

the extent that Plaintiff relies on the List's design and headers to argue that Defendant

specifically encouraged unlawful content, that reliance would be misplaced.

     *Roommates.Com* provides a helpful illustration as to when the design of a website can be

found to have encouraged unlawful content.  521 F.3d 1157 (9th Cir. 2008).  Roommates

operated a website designed to match individuals seeking roommates.  *Id.* at 1161.  As part of the

online registration form for the service, Roommates required subscribers to answer questions

about their sex, sexual orientation and familial status, and their roommate preferences along

these same criteria.  *Id.*  The potential answers to these questions were pre-set by Roommates.

*See, e.g.*, *id.* at 1165 ("Subscribers who are seeking housing must make a selection from a drop-

down menu, again provided by Roommates, to indicate whether they are willing to live with

"Straight or gay" males, only with "Straight" males, only with "Gay" males or with "No

males.").  Roommates used the responses to these questions to populate a subscriber's profile

page.  *Id.*  The Ninth Circuit found that Roommates' website, by design, "force[d] subscribers to

divulge protected characteristics and discriminatory preferences, and to match those who have

rooms with those who are looking for rooms based on criteria that appear to be prohibited by the

FHA [Fair Housing Act]."  *Id.* at 1172.  Thus, Roommates was not entitled to CDA immunity on

this aspect of the registration form.  *Id.* at 1166 ("By requiring subscribers to provide the

information as a condition of accessing its service, and by providing a limited set of pre-

populated answers, Roommate becomes much more than a passive transmitter of information

provided by others; it becomes the developer, at least in part, of that information. And section

230 provides immunity only if the interactive computer service does not 'creat[e] or develop[ ]'

the information 'in whole or in part.'" (quoting 47 U.S.C. § 230(f)(3))).  Nothing about the

registration form's pre-set answers is analogous to the List.

Rather, the List, which was circulated in a Google spreadsheet, is akin to the comment

boxes in *Roommates.Com*.  Roommates also presented subscribers with a blank text box and

prompted subscribers to "tak[e] a moment to personalize your profile by writing a paragraph or

two describing yourself and what you are looking for in a roommate."  *Id.* at 1173.  Subscribers

could write as much or as little as desired, and the responses were visible to other paying

subscribers.  *Id.*  Certain subscribers took the opportunity to write discriminatory comments such

as, "NOT looking for [B]lack [M]uslims."  *Id.*  The Ninth Circuit found that the CDA protected

Roommates with respect to these comment boxes.  *Id.* at 1174.  The court reasoned that because

"Roommate[s] publishes these comments as written," "[i]t does not provide any specific

guidance as to what the essay should contain," and it does not "urge subscribers to

input discriminatory preferences," Roommates was not responsible for the development of this

content.  *Id.* at 1173-74; *see also Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281,

291 (2011) (finding that defendant-administrator of a blog was protected by CDA immunity for

allegedly defamatory remarks made by an anonymous poster in a discussion thread because,

among other things, there was "no allegation that the defamatory comments were posted in

response to any specific invitation for users to bash plaintiff").  As with Roommates' comment

box, the possibility that someone may have entered defamatory content into the List does not

mean that Defendant specifically encouraged unlawful content.  That the Defendant added the

disclaimer that the document consisted of "a collection of misconduct allegations and rumors"

does not change the Court's conclusion.  (SAC ¶ 62.)  Neither this header nor the design of the

spreadsheet urges or requires users to input defamatory statements—or otherwise unlawful

content—to view or contribute to the List.  In other words, based on the design of the List, that

Defendant circulated the List, without more, does not constitute specific encouragement of unlawful content.

That is not to say that Plaintiff's complaint has foreclosed the possibility that Defendant encouraged the posting of unlawful content. The full contours of Defendant's conduct during the approximately 12 hour period during which her Google spreadsheet was online are unknown at this juncture. Accordingly, Plaintiff is entitled to discovery on whether Defendant specifically encouraged the posting of unlawful content on the List.

### D.  Highlighting in Red and Annotation of Plaintiff's Entry

According to Plaintiff, Defendant outlined his entry in red, signifying that he was "accused of physical sexual violence by multiple women." (SAC ¶ 27.) Furthermore, she's alleged to have annotated his entry in the List with, "Multiple women allege misconduct." (*Id.* ¶ 25.) Plaintiff's entry included "rape accusations," in the plural form, as well as "coercion." (*Id.*) Plaintiff argues that Defendant materially contributed to the allegedly defamatory statement in highlighting his entry in red because his entry did not reflect that he had been "accused of physical sexual violence by multiple women." (Pl.'s Opp. 18.) Plaintiff continues with the absurd proposition that "rape is often understood to include sex not involving physical violence (for example, sex with a person who is intoxicated), and the term 'rape accusations' could refer to just two accusations, whereas the word 'multiple' can be reasonably understood to mean 'numerous' or many or 'several' (*i.e.*, more than two)." (*Id.* 18 n.7.) The Court rejects everything about this argument.[23]

---

[23]     To be abundantly clear, beyond rejecting this argument, the Court finds it abhorrent and contrary to law. Alcohol is involved in approximately half of all sexual assaults and a significant majority of acquaintance sexual assaults. Allison C. Nichols, *Out of the Haze: A Clearer Path for Prosecution of Alcohol-Facilitated Sexual Assault*, 71 N.Y.U. ANN. SURV. AM. L. 213, 217 (2015). These—and all instances of rape—are crimes of violence. One need only look to the definition of a crime of violence in the United States Sentencing Guidelines to find so. Crimes of violence include "forcible sex offense[s]," which are defined to include "where consent to the conduct is not given or is not legally valid, such as where consent to the conduct is involuntary, incompetent, or coerced."

The key question in determining whether a defendant is liable for developing content is not whether she "augment[ed] the content generally," but instead whether she "materially contribut[ed] to its alleged unlawfulness." *See LeadClick*, 838 F.3d at 174 (quoting *Roommates.Com*, 521 F.3d at 1167–68). Defendant is correct that "visually aggregating or classifying user content does not constitute 'creation or development' under Section 230(f)(3)." (Def.'s Mem. 20.) The implementation of categorization features "constitute[s] quintessential neutral assistance." *Grndr.*, 306 F. Supp 3d at 589. In other words, categorizing information, without more, "does not transform [a defendant] into a developer of the underlying misinformation." *Id.* (internal quotations omitted) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003)).

Here, Plaintiff's entry included "rape accusations," in the plural form. (SAC ¶ 25.) In highlighting Plaintiff's entry in red, denoting that Plaintiff was "accused of physical sexual violence by multiple women," Defendant provided neutral assistance or generally augmented the content. Again, the Court rejects, in the strongest possible terms, any argument by Plaintiff that the Defendant materially contributed to the unlawful meaning of the allegations which is premised on a belief that rape does not necessarily involve physical sexual violence. And the Court will not take the absurd position that where more than one woman accused Plaintiff of

---

U.S.S.G. §§4B1.2(a)(2), comment (n.1). Should Defendant need to further educate himself, the Court directs him to countless stories of rape survivors, including the powerful victim impact statement written by Chanel Miller, and read by her under the pseudonym Emily Doe at the sentencing of her rapist, Brock Turner. Katie J.M. Baker, *Here's the Powerful Letter The Stanford Victim Read to Her Attacker,* BUZZFEED NEWS (June 3, 2016, 4:16 p.m.), https://www.buzzfeednews.com/article/katiejmbaker/heres-the-powerful-letter-the-stanford-victim-read-to-her-ra. Miller became intoxicated and unconscious, and was digitally penetrated by Brock Turner behind a dumpster on the campus of Stanford University. Miller recounts, in vivid detail, when she learned of the details of her assault that, according to Turner, he believed was consensual. She writes, "The night after it happened, he said he thought I liked it because I rubbed his back. A back rub. Never mentioned me voicing consent, never mentioned us even speaking, a back rub. One more time, in public news, I learned that my ass and vagina were completely exposed outside, my breasts had been groped, fingers had been jabbed inside me along with pine needles and debris, my bare skin and head had been rubbing against the ground behind a dumpster, while an erect freshman was humping my half naked, unconscious body." *Id.*

rape, categorizing those allegations as "accused of physical sexual violence by multiple women" materially altered the content. *See Seldon v. Magedson*, No. 11-CV-6218, 2012 WL 4475274, at *17 (S.D.N.Y. July 10, 2012) (dismissing the case on other grounds but noting that the defendant's act of adding the heading "Sexual Pervert" to a post that detailed how the plaintiff had allegedly kept "all kinds of perverted photos on his computer" did not alter the substance, meaning, or purpose of the content for the purposes of the CDA"), *report and recommendation adopted*, No. 11-CV-6218, 2012 WL 4475020 (S.D.N.Y. Sept. 28, 2012).  Therefore, Defendant's categorization of Plaintiff's entry in the List through text or highlighting does not bring her outside of the protection of the CDA.

*     *     *

In sum, the CDA's barrier to suit is not evident from the face of the complaint, and Defendant's motion to dismiss on the grounds that she is protected by CDA immunity is denied.[24]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED.  However, CDA immunity may prove to be a gating issue in this case and the Court wishes to avoid an unnecessary expenditure of judicial resources.  As such, the parties shall proceed without delay to narrowly tailored discovery to address factual issues related to Defendant's CDA immunity defense.  Once such discovery is completed, the parties may move for summary judgment on CDA immunity in accordance with this Court's Individual Practices.  The parties may proceed

---

[24]    As Defendant has failed to demonstrate that it is evident from the face of complaint that "the claim is based on information provided by another information content provider," the Court does not address whether "the claim would treat the defendant as the publisher or speaker of that information."  *LeadClick*, 838 F.3d at 173.

with discovery on the defamation claim should the parties decline to move for summary

judgment on CDA immunity or should the claim survive summary judgment.


                                        SO ORDERED.

Dated:  Brooklyn, New York              /s/ LDH_____
          June 30, 2020                 LaSHANN DeARCY HALL
                                        United States District Judge