UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN ELLIOTT,

*Plaintiff*,

- against -

MOIRA DONEGAN, and JANE DOES (1–30),

*Defendants*.

**Oral Argument Requested**

No. 1:18-cv-05680-LDH-SJB

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MOIRA DONEGAN'S MOTION FOR TARGETED SUMMARY JUDGMENT BASED ON IMMUNITY UNDER THE COMMUNICATIONS DECENCY ACT, 47 U.S.C. § 230**

Roberta A. Kaplan
Joshua Matz
Raymond P. Tolentino
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
rkaplan@kaplanhecker.com
jmatz@kaplanhecker.com
rtolentino@kaplanhecker.com
*Attorneys for Defendant Moira Donegan*

Served on March 22, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 1

STANDARD OF REVIEW .......................................................................................................... 8

ARGUMENT ................................................................................................................................ 8

I.   THE FIRST ELEMENT OF CDA IMMUNITY IS SATISFIED.......................................... 9

II.  THE SECOND ELEMENT OF CDA IMMUNITY IS SATISFIED................................... 10

    A.  MS. DONEGAN DID NOT "CREATE" THE ALLEGED DEFAMATORY
        STATEMENTS................................................................................................... 12

    B.  MS. DONEGAN DID NOT INPUT THE ALLEGED DEFAMATORY
        STATEMENTS IN VIOLATION OF A THIRD PARTY'S INTENT………………..12

    C.  MS. DONEGAN DID NOT MATERIALLY CONTRIBUTE TO MR. ELLIOTT'S
        ENTRY BY ALTERING THE ALLEGEDLY DEFAMATORY CONTENT………..14

    D.  MS. DONEGAN DID NOT SPECIFICALLY ENCOURAGE THE POSTING OF
        UNLAWFUL CONTENT ............................................................................... 16

    E.  MS. DONEGAN DID NOT CREATE OR DEVELOP ILLEGAL CONTENT.......... 19

III. THE THIRD ELEMENT OF CDA IMMUNITY IS SATISFIED ...................................... 20

CONCLUSION............................................................................................................................ 21

i

# TABLE OF AUTHORITIES

## Cases

*Ascentive, LLC v. Opinion Corp.*,
    842 F. Supp. 2d 450 (E.D.N.Y. 2011) ............................................................. 10, 14

*Barnes v. Malavi*,
    412 F. Supp. 3d 140 (E.D.N.Y. 2019) ................................................................. 8

*Brikman v. Twitter, Inc.*,
    No. 19 Civ. 5143, 2020 WL 5594637 (E.D.N.Y. Sept. 17, 2020) ........................... 21

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ......................................................................... 9, 14

*Elliott v. Donegan*,
    469 F. Supp. 3d 40 (E.D.N.Y. 2020) ........................................................... *passim*

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ............................................... 11, 12, 13, 14, 17, 18

*Fed. Trade Comm'n v. LeadClick Media, LLC*,
    838 F.3d 158 (2d Cir. 2016) .............................................. 9, 10, 16, 17, 18, 20

*Force v. Facebook*,
    934 F.3d 53 (2d Cir. 2019) ............................................................................ 10, 11, 14

*FTC v. Accusearch Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ........................................................................... 17

*Gregerson v. Vilana Fin., Inc.*,
    No. 06 Civ. 1164, 2008 WL 451060 (D. Minn. Feb. 15, 2008) ............................... 9

*Herrick v. Grindr, LLC*,
    306 F. Supp. 3d 579 (S.D.N.Y. 2018) ............................................................... 10, 14

*Jones v. Dirty World Ent. Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ...................................................................... 17, 20, 21

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) .............................................................................. 11

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) ........................................................................... 11

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ................................................................. 11, 17, 18

*Ricci v. Teamsters Union Loc. 456*,
    781 F.3d 25 (2d Cir. 2015) ................................................................................ 21

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) ............................................................................. 8

**Statutes**

47 U.S.C. § 230(b)(2) ......................................................................................... 16

47 U.S.C. § 230(c)(1) ........................................................................................... 8

47 U.S.C. § 230(f) ........................................................................................... 9, 10

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................. 8

Fed. R. Civ. P. 56(c) ............................................................................................. 8

**Other Authorities**

Local Civil Rule 56.1 ............................................................................................. 1

## PRELIMINARY STATEMENT

Last year, the Court noted that immunity under the Communications Decency Act ("CDA") "may prove to be a gating issue in this case." *Elliott v. Donegan*, 469 F. Supp. 3d 40, 61 (E.D.N.Y. 2020). The Court therefore ordered "narrowly tailored discovery to address factual issues related to Defendant's CDA immunity defense." *Id.* That discovery is now complete. And it confirms the Court's suspicion: Section 230 of the CDA indisputably forecloses Plaintiff Stephen Elliott's claim that Defendant Moira Donegan is liable for defamation by virtue of her role as publisher of the "Shitty Media Men" Spreadsheet. The record reveals that Ms. Donegan did not *create* the alleged defamatory statements about Mr. Elliott that appeared on the Spreadsheet. Indeed, she had no idea who Mr. Elliot was. Further, Ms. Donegan did not *develop* the alleged defamatory statements: she did not post them against somebody else's will, materially contribute to their alleged defamatory meaning, specifically encourage the posting of illegal content, or otherwise engage in conduct that would support holding her responsible for statements that an unknown third party (or unknown third parties) added to the Spreadsheet. As a result, and because the remaining statutory elements are plainly met, this is a straightforward case for the application of the CDA. No reasonable juror could disagree. The Court should therefore grant summary judgment.

## STATEMENT OF FACTS

On or around October 11, 2017, using her personal Google account, Ms. Donegan created a Google Spreadsheet titled "Shitty Media Men" ("the Spreadsheet"). Statement of Uncontested Facts Pursuant to Local Civil Rule 56.1 ("56.1 Statement") ¶ 3 (Exhibit A ¶ 2). She wanted the Spreadsheet to be "a place where women could warn each other about sexual harassment and sexual assault without fear of retaliation or punishment or violent retribution for doing so." 56.1 Statement ¶ 4 (Exhibit B 115:17-115:20); *see also id.* (Exhibit C) (describing it as an "act of real solidarity and community among the women who work in this industry to attempt to keep one

1

another safe"). Ms. Donegan believed that women could be trusted to tell the truth about their experiences and to protect each other where so many institutions had failed. *See id.* (Exhibit C).

Ms. Donegan established a simple architecture for the Spreadsheet. At the top, she created a series of column headings: "Last Name", "First Name", "Affiliation", "Alleged Misconduct", and "Notes." 56.1 Statement ¶ 5 (Exhibit B 12:2-12:4). Above those headings, Ms. Donegan posted advisories about the Spreadsheet. *See* 56.1 Statement ¶ 6 (Exhibit B 9:5-9:8, 9:11-9:13, 9:16-9:17, 10:16-10:19). First, she included a disclaimer reminding readers that the document was "a collection of misconduct allegations and rumors" and to "[t]ake everything with a grain of salt." *Id.* (Exhibit B 9:5-9:8). Second, consistent with her goal of creating a space for women in the media industry to warn each other away from dangerous situations, she provided instructions on how to edit the Spreadsheet anonymously and asked users to "never name an accuser, and [] never share this document with a man." *Id.* (Exhibit B 10:16-10:19). Finally, she noted that "[m]en accused of physical sexual violence by multiple women are highlighted in red." *Id.* (Exhibit B 9:11-9:13, 9:16-9:17). Underneath these headings were empty rows in which users could enter text. *See* 56.1 Statement ¶ 7 (Exhibit A ¶ 6). The Spreadsheet itself did not limit what text could be entered; did not require or even ask users to enter text upon accessing the document; and did not offer any menu of proposed or required entries. *See* 56.1 Statement ¶ 8 (Exhibit A ¶¶ 5-6; Exhibit D). Users were free to enter text (or not) as they saw fit, and to decide what text they entered.

In creating the Spreadsheet, Ms. Donegan did not communicate with anyone else about the Spreadsheet's purpose, format, or architecture. 56.1 Statement ¶ 9 (Exhibit B 19:8-19:16, 19:25-20:10, 61:5-61:10). At first, Ms. Donegan selected settings that allowed only those who she invited to edit the Spreadsheet. 56.1 Statement ¶ 10 (Exhibit A ¶ 4). After a few hours, however, she

2

modified the settings so that any person with a link—even those who received it from someone unknown to her—could edit the Spreadsheet, either anonymously or in a manner that revealed their identity (for instance, if they edited the Spreadsheet while logged into their Google account). 56.1 Statement ¶ 11 (Exhibit A ¶ 4).

Sometime before noon on October 11, Ms. Donegan emailed approximately three to twelve people a link to the Spreadsheet. 56.1 Statement ¶ 12 (Exhibit B 20:25-21:3, 21:7-21:10). She does not recall their identities, nor does she recall writing anything in the body of the emails she sent them. *Id.* (Exhibit B 21:14-21:17, 25:25-26:2, 27:17-27:20). She has emphasized that she would not characterize the email with the link to the document as a request for recipients to input anything into the Spreadsheet. 56.1 Statement ¶ 13 (Exhibit B 45:2-45:4). To the best of Ms. Donegan's recollection, this was the first time she had communicated with anyone about the Spreadsheet. 56.1 Statement ¶ 14 (Exhibit B 22:10-22:16). Otherwise, Ms. Donegan recalls sending the link only to women who somehow learned of her involvement and specifically requested (usually via email or Twitter direct message) that she provide access to the Spreadsheet. 56.1 Statement ¶ 15 (Exhibit B 24:8-24:15, 46:8-46:12, 48:22-48:24). Ms. Donegan complied with these requests whenever she received them. *Id.* (Exhibit B 74:14-74:16). Generally, her response was purely administrative. 56.1 Statement ¶ 16 (*See, e.g.*, Exhibit F). In at least one case, she reiterated the substance of the advisories on the Spreadsheet and noted, "Any help you can give is really appreciated!" 56.1 Statement ¶ 17 (*See* Exhibit E); *see also* (Exhibit B 73:12-73:15) (explaining that, in this response, Ms. Donegan was "referring, again, to the help that is provided by solidarity and empathy [among] women who have experienced sexual violence").

Whereas some individuals requested that Ms. Donegan provide a link to the Spreadsheet, others reached out to her with information that they wished to see added to the document. 56.1

3

Statement ¶ 18 (Exhibit A ¶ 17). This outreach occurred by electronic communication, rather than in person or by phone. *Id.* (Exhibit B 49:19-49:25, 83:1-83:8). In response to these requests, and consistent with her understanding of their instructions and purpose for contacting her, she added information to the Spreadsheet. *Id.* (Exhibit A ¶ 18). In doing so, she added information only when it was clear to her that the individual who had reached out specifically wanted the information that they had shared to be included on the Spreadsheet. 56.1 Statement ¶ 19 (Exhibit A ¶ 19). She also took pains to ensure that she added the information to the Spreadsheet faithfully and accurately. *Id*. When one person who had contacted Ms. Donegan informed her that they had changed their mind after directing her to add information to the Spreadsheet, Ms. Donegan removed that information upon their request. 56.1 Statement ¶ 20 (Exhibit B 50:6-50:11). At no point, then or since, has anyone who sent her information which she then added to the Spreadsheet informed her that the information she added was incorrect, altered from their communication with her in any respect, or added against their wishes. 56.1 Statement ¶ 21 (Exhibit A ¶ 20). To protect the privacy of those who sent her requests to add information, Ms. Donegan promptly deleted communications with them regarding the Spreadsheet. 56.1 Statement ¶ 22 (Exhibit A ¶ 21).

Aside from her role in creating the Spreadsheet—and her ministerial actions in providing a link, or entering text, upon requests from third parties—Ms. Donegan had little involvement with the document. She does not recall making any other edits or removing any information from any other entry. 56.1 Statement ¶ 23 (Exhibit B 99:7-99:11). She does not recall highlighting any entries in red, she did not direct anyone else to do so, and she does not know who highlighted any specific entry. *Id.* (Exhibit B 39:16-39:19, 94:23-94:25, 95:24-96:2). Apart from her initial email to approximately three to twelve people, she did not disseminate the Spreadsheet to individuals who did not request access. *See* 56.1 Statement ¶ 24 (Exhibit B 24:8-24:15). Nor she did publicize

4

the list to others on Twitter or through any other social media platform. *See* 56.1 Statement ¶ 25

(Exhibit B 31:6-31:14, 64:12-65:3; *see also* Exhibit G). Indeed, as far as Ms. Donegan can recall,

she went about her day normally on October 11: she woke up at home in Crown Heights, went to

work in Union Square, ate dinner at a friend's house, and returned home. *See* 56.1 Statement ¶ 26

(Exhibit B 46:25-47:8). During this period, she only intermittently accessed the Spreadsheet; when

she did so, it became apparent to her that many anonymous contributors—potentially dozens of

them—had populated cells with information. 56.1 Statement ¶¶ 27-28 (Exhibit A ¶ 6). But she had

no idea who those contributors were. 56.1 Statement ¶ 28 (Exhibit A ¶ 6); *see also id.* (Exhibit C)

("I don't even know who saw it, or who had it, added to it.").

      Consistent with her purpose in creating the Spreadsheet, Ms. Donegan did not encourage,

solicit, invite, or instruct anyone to enter any information of any kind into the document. *See* 56.1

Statement ¶ 29 (Exhibit B 91:17-91:21) ("I wouldn't say that I encouraged or incited or invited or

solicited. I would say that I made the document available for women to put their experiences of

sexual violence and sexual harassment into it."). When asked about this at her deposition, she

explained: "I made the document available to women to input their own experiences of sexual

harassment and sexual violence. It was very important to me at the time that no women felt

pressured or as if there was an expectation for them to disclose such sensitive information even in

an anonymous context." 56.1 Statement ¶ 30 (Exhibit B 108:17-108:23). Thus, even after someone

asked whether Ms. Donegan thought it was worth "adding a note in the doc about criteria for

inclusion," she did not do so. 56.1 Statement ¶ 31 (Exhibit D). Rather than push others to enter

information—and rather than make her own judgments about what should be included or deleted—

Ms. Donegan left users free to make their own decisions about whether and what to write in the

Spreadsheet. *See id.* (Exhibit D) (recognizing the wide range of potential misconduct that people

might decide to type into the Spreadsheet, agreeing that "it's dicey," and noting that people could "include anything that made them feel uncomfortable or unsafe . . .").

Sometime in the evening or night of October 11, Ms. Donegan learned that a *Buzzfeed* article would make the Spreadsheet's existence public. 56.1 Statement ¶ 32 (Exhibit H ¶ 4). Fearing that a media firestorm would overshadow the Spreadsheet's purpose of protecting women, she resolved to take down the document. *See* 56.1 Statement ¶ 33 (Exhibit H ¶ 4); *see also id.* (Exhibit G). Over a very short time span, Ms. Donegan first restricted who could access the Spreadsheet; then she made it only accessible from her personal Google account; and then she deleted the Spreadsheet from that personal account. *See* 56.1 Statement ¶¶ 34-35 (Exhibit A ¶ 3; Exhibit H ¶¶ 5-6). To the best of Ms. Donegan's recollection, the Spreadsheet was deleted from her personal account by 2:00 or 3:00 a.m. on October 12, 2017. 56.1 Statement ¶ 34 (Exhibit ¶ 8). After that point, it could no longer be edited or accessed by third parties (or, for that matter, by Ms. Donegan herself).

By the time Ms. Donegan deleted the Spreadsheet, there were entries about over 70 men—including a man named Stephen Elliott. 56.1 Statement ¶ 36 (Exhibit A ¶¶ 7-8). The cells next to his name had been populated with the following text: "Freelance writer/novelist"; "Rape accusations, sexual harassment, coercion, unsolicited invitations to his apartment, a dude who snuck into Binders???"; and "Multiple women allege misconduct." 56.1 Statement ¶ 37 (Exhibit A ¶ 8). This row in the Spreadsheet was highlighted in red, indicating that Mr. Elliott had been accused of physical sexual violence by more than one woman. *Id.* (Exhibit A ¶ 8).

Ms. Donegan had no idea who Mr. Elliott was. *See* 56.1 Statement ¶ 38 (Exhibit A ¶ 9). To the best of her recollection, they had never met or spoken before that date. *Id.* If she had heard his name before then, or had interacted with him in any way, she had no recollection of it. *Id.* Of

the limited communications that remain in Ms. Donegan's possession from the period preceding and encompassing the time when the Spreadsheet remained on her personal Google drive, none makes any mention of or reference to Mr. Elliott or the alleged defamatory allegations about him. 56.1 Statement ¶ 39 (*See* Exhibit A ¶¶ 22-23).

Ms. Donegan did not originate, fabricate, or otherwise serve as the source of any information regarding Mr. Elliott that appeared on the Spreadsheet. 56.1 Statement ¶ 40 (Exhibit A ¶ 10). That includes the alleged defamatory statements. *Id.* (Exhibit A ¶ 11). Nor did Ms. Donegan solicit or encourage anyone else to add false statements or allegations about Mr. Elliott to the Spreadsheet. 56.1 Statement ¶ 42 (Exhibit A ¶ 12). That, too, includes the alleged defamatory statements. *Id.* (Exhibit A ¶ 13). As explained above, Ms. Donegan did not solicit or encourage *anyone* to add statements—let alone false ones—to the Spreadsheet. 56.1 Statement ¶ 43 (Exhibit A ¶ 14). Accordingly, Ms. Donegan has no recollection of soliciting or encouraging anyone to add any information about Mr. Elliott. *Id.* (Exhibit A ¶ 15). Nor does she have any recollection of adding any information about Mr. Elliott. 56.1 Statement ¶ 45 (Exhibit A ¶ 24). More broadly, Ms. Donegan has no recollection of receiving any communications requesting that she add information about Mr. Elliott to the Spreadsheet. 56.1 Statement ¶ 41 (Exhibit A ¶ 25). And since she did not know who Mr. Elliott was, had she received any such communication, she can think of no reason why she would have added it against the sender's wishes or altered the substance of the allegations in adding them. 56.1 Statement ¶ 44 (Exhibit A ¶ 26).

Simply put, Ms. Donegan did not add Mr. Elliott's name or any of the alleged defamatory statements about him to the Spreadsheet; she did not encourage or solicit anyone else to do so; she did not highlight his entry (or any other) in red; and, to this very day, she has no idea who added

the alleged defamatory statements about him. *See* 56.1 Statement ¶¶ 40-47 (Exhibit A ¶¶ 10-15, 24-29; Exhibit B 96:3-96:6).

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the evidence as to a fact that might affect the suit's outcome is such that a reasonable jury could find in favor of the non-movant at trial." *Barnes v. Malavi*, 412 F. Supp. 3d 140, 142-43 (E.D.N.Y. 2019) (DeArcy Hall, J.). "At summary judgment, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id.* at 143. "Once the movant meets that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(c)). "A court is to view all such facts in the light most favorable to the non-movant, drawing all reasonable inferences in his favor." *Id.* "Still, to survive summary judgment, a non-movant must present concrete evidence and may not rely on mere conclusory or speculative claims or denials." *Id.*

## ARGUMENT

In enacting the CDA, "Congress recognized the threat tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). To guard against that threat, and to ensure that the internet promoted new cultural and intellectual activity, Congress provided that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As interpreted by the Second Circuit, this immunity applies where the defendant can make three showings: "(1) she is a provider

or user of an interactive computer service; (2) the claim is based on information provided by another information content provider, and (3) the claim would treat the defendant as the publisher or speaker of that information." *Donegan*, 469 F. Supp. 3d at 55 (citing *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016)). To effectuate the purposes of the CDA, the statute is construed broadly, and "close cases must be resolved in favor of immunity." *Id*. Here, there is no genuine dispute of material fact as to whether Ms. Donegan satisfies all three requirements for CDA immunity. Accordingly, she is entitled to summary judgment.

## I.    THE FIRST ELEMENT OF CDA IMMUNITY IS SATISFIED

Section 230 defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . . ." 47 U.S.C. § 230(f)(2); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (noting that courts have adopted a "relatively expansive definition" of the statutory language). "Courts have typically held that internet service providers, website exchange systems, online message boards, and search engines fall within this definition." *LeadClick*, 838 F.3d at 174. "A Google spreadsheet is akin to an online message board, as it provides a publicly accessible platform where individuals can post comments." *Donegan*, 469 F. Supp. 3d at 56 (citing *Gregerson v. Vilana Fin., Inc.*, No. 06 Civ. 1164, 2008 WL 451060, at *9 (D. Minn. Feb. 15, 2008)). The Spreadsheet thus qualifies as an "interactive computer service"—and Ms. Donegan, who created it, plainly qualifies as a "user or publisher" of the Spreadsheet. This Court already concluded as much based on allegations in the Second Amended Complaint, *see id.* at 56 & n.22, and the summary judgment record only further reinforces that determination.

## II.    THE SECOND ELEMENT OF CDA IMMUNITY IS SATISFIED

Because Ms. Donegan qualifies as the user or publisher of an interactive computer service, the next question is whether Mr. Elliott's claim "is based on information provided by another information content provider." *Id.* at 55. An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). As the Court has already recognized, Ms. Donegan meets this second element of CDA immunity so long as she is not "responsible . . . for the creation or development" of the alleged defamatory statements. *See Donegan*, 469 F. Supp. 3d at 56 (quoting 47 U.S.C. § 230(f)(3)).

"It is relatively easy to define what constitutes the creation of information." *Id*. "Determining what constitutes the development of information is a stickier task." *Id.* at 57. In the Second Circuit, that task is guided by *Force v. Facebook*, which framed the issue as whether "the defendant directly and 'materially' contributed to what made the content itself 'unlawful.'" 934 F.3d 53, 68 (2d Cir. 2019) (quoting *LeadClick*, 838 F.3d at 174). Thus, "one is responsible for the 'development' of information when [she] engages in an act beyond the normal functions of a publisher (such as deciding to publish, withdraw or modify third-party content) that changes the meaning and purpose of the content." *Donegan*, 469 F. Supp. 3d at 57 (quoting *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011)). In addition, "a defendant also loses CDA immunity if he or she 'specifically encouraged' unlawful content." *Id.* (citing *LeadClick*, 838 F.3d at 174). "By contrast, an individual does not develop content where she provides 'neutral assistance,' that is, 'tools and functionality that are available equally to bad actors and the . . . intended users.'" *Id.* (quoting *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018)).

Simply put, the second element of CDA immunity is satisfied where the defendant did not *directly* and *materially* contribute to what made the content unlawful. *See Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("[A] website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online."); *see also, e.g.*, *Force*, 934 F.3d at 69-71 (Facebook immune from liability for posts published by Hamas because it neither edited nor suggested edits to those posts); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269-70 (9th Cir. 2016) (Yelp immune from liability for negative ratings because it did "'absolutely nothing to enhance the defamatory sting of the message' beyond the words offered by the user") (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008) (en banc)); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 257 (4th Cir. 2009) (Consumeraffairs.com immune from liability for consumer complaints because its website did not encourage illegal content or require users to input illegal content); *Roommates.Com*, 521 F.3d at 1173-74 (Roommates.com immune from liability for statements in "additional comments" section of user profile pages because subscribers were free to write whatever they wished and the website only passively displayed their entries).

At the pleading stage, this Court concluded that discovery was necessary to ascertain whether Ms. Donegan had created or developed the alleged defamatory statements about Mr. Elliott. In so doing, the Court noted four specific actions she could have taken that would have deprived her of CDA immunity: (1) If Ms. Donegan "fabricated the allegations against [Mr. Elliott] and inputted them into the List," *Donegan*, 469 F. Supp. 3d at 57; (2) If she "inputted information into the List that was not provided to [her] for use on the Internet," *id.* at 58; (3) If she "published the allegedly defamatory accusations in the List as relayed to her by another person" and, in so

11

doing, "materially contributed to the allegedly defamatory meaning," *id.* at 57; and (4) If she specifically encouraged the alleged unlawful content, *id.* at 58-59. Following discovery into Ms. Donegan's conduct, as well as the surrounding circumstances, there can be no genuine dispute of material fact: she did not engage in *any* of these actions. Nor did she do anything else that would constitute creation or development of the alleged unlawful statements.

### A.      Ms. Donegan Did Not "Create" the Alleged Defamatory Statements

"CDA immunity does not attach where the defendant is being held accountable for its own unlawful acts." *Id.* at 57; *see also Roommates.Com*, 521 F.3d at 1162 ("[A]s to content that [a website] creates itself . . . the website is also a content provider."). But here, Ms. Donegan did not create the alleged defamatory statements. She did not "originate, fabricate, or otherwise serve as the source of any information regarding Mr. Elliott that appeared on the Google Spreadsheet," including "the alleged defamatory statements." Exhibit A ¶¶ 10-11; 56.1 Statement ¶ 40; *see also* 56.1 Statement ¶ 45 (Exhibit B 96:10-96:15) (disclaiming knowledge of who added allegedly defamatory statements in Mr. Elliott's entry). In fact, at the time she created the Spreadsheet, Ms. Donegan had no idea who Mr. Elliott was. *See* 56.1 Statement ¶ 38 (Exhibit A ¶ 9). In light of this uncontroverted testimony, there can be no genuine dispute. Ms. Donegan did not "create" the alleged defamatory statements.

### B.      Ms. Donegan Did Not Input the Alleged Defamatory Statements in Violation of a Third Party's Intent

This Court has held that Ms. Donegan would have "developed" the alleged defamatory statements if she received them from a third party and then entered them into the Spreadsheet in violation of that third party's intent. *See Donegan*, 469 F. Supp. 3d at 58 (citation omitted). Of course, if a third party merely "tendered the material for posting online," then Ms. Donegan's role was at most "to determine whether or not to prevent its posting—precisely the kind of activity for

12

which [the CDA] was meant to provide immunity." *Roommates.Com*, 521 F.3d at 1170. Applying those rules here, no reasonable juror could find Ms. Donegan developed the entries about Mr. Elliott in this manner.

For starters, Ms. Donegan does not recall receiving—or inputting into the Spreadsheet—any information about Mr. Elliott, and no document in the record suggests that she did so. As Ms. Donegan has explained, she has no memory of "adding any information about Mr. Elliott, including the allegedly defamatory statements, to the Google Spreadsheet." Exhibit A ¶ 24; 56.1 Statement ¶ 45. Further, she does not "know who input any of the alleged defamatory statements into Mr. Elliot's row." Exhibit B 96:10-96:12; 56.1 Statement ¶ 45. Given this unrebutted testimony, there is no basis to find that Ms. Donegan added anything about Mr. Elliott to the Spreadsheet.

Moreover, even if one were to speculate that Ms. Donegan may have added this content to the Spreadsheet after receiving it from a third party, there is no evidence that she would have done so without authorization. Ms. Donegan inputted content from third parties only when that was "consistent with [her] understanding of their instructions and purpose for contacting [her]." Exhibit A ¶ 18; 56.1 Statement ¶ 18. In other words, she inputted content at the behest of third parties only "when it was clear to [her] that the individual who had reached out specifically wanted the information that they had shared to be included on the Google Spreadsheet." Exhibit A ¶ 19; 56.1 Statement ¶ 19. The single instance in which she recalls removing content from the Spreadsheet was itself authorized by a third party: she accommodated the request of an individual who changed their mind after initially requesting that Ms. Donegan post their content on the Spreadsheet. *See* 56.1 Statement ¶ 20 (Exhibit B 50:6-50:11).

This evidence is squarely inconsistent with any claim that Ms. Donegan added information to Mr. Elliott's cells and did so against the wishes of a third party who sent her that information. Notably, Ms. Donegan testified that "at no point, then or since, has anyone who sent [her] information which [she] then added to the Google Spreadsheet informed [her] that the information [she] added was incorrect . . . or added against their wishes." Exhibit A ¶ 20; 56.1 Statement ¶ 21. The absence of any such communication further confirms that Ms. Donegan did not "develop" the alleged defamatory statements about Mr. Elliott in violation of any third party's intentions.

### C.    Ms. Donegan Did Not Materially Contribute to Mr. Elliott's Entry by Altering the Allegedly Defamatory Content

Under the CDA, publishers retain immunity for their traditional functions. For instance, they can modify the "presentation" of content, *Force*, 934 F.3d at 69; they can employ "algorithmic filtering, aggregation, and display functions," *Herrick v. Grindr*, 306 F. Supp. 3d at 589; they can make "minor changes to the spelling, grammar and length of third-party content," *Roommates.Com*, 521 F.3d at 1170; and they can "determine whether or not to prevent [content's] posting," *id.* As the Ninth Circuit explained in *Carafano v. Metrosplash.com*, "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process." 339 F.3d at 1124. However— as this Court has recognized—the CDA does not shield publishers who go beyond merely inputting third party content and instead do so in a way "that changes [its] meaning and purpose." *Donegan*, 469 F. Supp. 3d at 57 (quoting *Ascentive*, 842 F. Supp. 2d at 474). Accordingly, if Ms. Donegan added statements about Mr. Elliott at a third party's behest and, in so doing, "materially contributed to the allegedly defamatory meaning," she would lose CDA immunity. *Id.*

No reasonable juror could find that Ms. Donegan engaged in such conduct. Once again, Ms. Donegan has testified that she has "no recollection of adding any information about Mr. Elliott,

14

including the alleged defamatory statements, to the Google Spreadsheet." Exhibit A ¶ 24; 56.1 Statement ¶ 41. And nothing in the record would support an inference that she actually did so.

Moreover, Ms. Donegan has testified that when third parties sent her information to be inputted, she "took pains to ensure that [she] added the information to the Google Spreadsheet faithfully and accurately." Exhibit A ¶ 19; 56.1 Statement ¶ 19. Consistent with that recollection, nobody has ever informed Ms. Donegan that information she added to the Spreadsheet at their request was "incorrect" or "altered from their communications with [her] in any respect." Exhibit A ¶ 20; 56.1 Statement ¶ 21.

Taken together, this testimony precludes any finding that Ms. Donegan received information about Mr. Elliott from a third party and then, while inputting it (or at any later time), altered it in a manner that materially contributed to its defamatory meaning. Nor does the record reveal any reason why Ms. Donegan would have engaged in such conduct. *See* 56.1 Statement ¶ 44 (Exhibit A ¶ 26) ("Because I did not know who Mr. Elliott was . . . I can think of no reason why I would have . . . altered the substance of [any] allegations in adding them to the Google Spreadsheet."). There is thus no genuine dispute as to any material fact on this point.

As a fallback, Mr. Elliott may seek to reprise an argument that he advanced at the pleadings stage: namely, that Ms. Donegan "developed" the allegedly defamatory statements by highlighting his entry in red (which signified he was "accused of physical sexual violence by multiple women") and by adding an annotation (which read "Multiple women allege misconduct"). Second Amended Complaint ¶¶ 25, 27. Any such argument would fail as a matter of fact and as a matter of law. Factually, Ms. Donegan does not recall highlighting any entry, let alone Mr. Elliott's entry, in red. *See* 56.1 Statement ¶ 23 (Exhibit B 39:16-39:19) ("Q. Ms. Donegan, do you recall highlighting any of the rows on the List? A. No, I don't recall highlighting any of the rows on the List at any

15

time."); 56.1 Statement ¶ 46 (Exhibit B 96:3-96:6) ("Q. And of course you don't know, therefore who highlighted Mr. Elliott's entry, correct? A. No, I don't know."). And legally, the Court has already rejected "everything about this argument." *Donegan*, 469 F. Supp. 3d at 60; *see also id.* (explaining that the classification or aggregation of user content does not constitute creation or development within the meaning of the CDA).

In sum, no reasonable juror could find on this record that Ms. Donegan "assisted in the development of what [allegedly] made the content unlawful." *LeadClick*, 838 F.3d at 174.

### D.     Ms. Donegan Did Not Specifically Encourage The Posting of Unlawful Content

Because Ms. Donegan did not create any content about Mr. Elliott, post such content on the Spreadsheet against a third party's will, or alter a third party's content about Mr. Elliott to make it unlawful, there remains only one possibly legal theory on which Mr. Elliott may argue that she developed the alleged unlawful statements: specific encouragement. This Court has held that an interactive computer service provider can forfeit CDA immunity "if through their website's design, or through its headers, or through personal communications with other people, or otherwise, they 'specifically encourage' the posting of unlawful content." *Donegan*, 469 F. Supp. 3d at 58 (citing *LeadClick*, 838 F.3d at 174). Following discovery into Ms. Donegan's conduct relating to the Spreadsheet, however, there can be no genuine dispute of fact on this point. She did not specifically encourage any unlawful content.

Recognizing that the CDA exists to "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services," courts carefully assess claims of specific encouragement. 47 U.S.C. § 230(b)(2). Defendants have been found to engage in such conduct only where their own actions directly implicate them in the publication of illegal content: for instance, when they give specific instructions to third parties on creating illegal

16

ads, *see LeadClick*, 838 F.3d at 174-176; when they require users to select among pre-populated responses to inherently discriminatory questions, *Roommates.Com*, 521 F.3d at 1172; or when they purchase and publicize information that was known to be obtained through fraud, *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009). In cases like these, publishers have indeed developed unlawful content.

Outside that narrow range, publishers are fully protected by the CDA for their ordinary functions—even if it is still possible for users to input illegal or controversial content. Thus, a defendant "who does not encourage illegal content or design its website to require users to input illegal content is immune under § 230 of the CDA." *Nemet Chevrolet*, 591 F.3d at 257 (internal quotation marks omitted). The CDA thereby draws a "crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 414 (6th Cir. 2014).

Here, no reasonable juror could find that Ms. Donegan specifically encouraged defamatory content. "Neither [the] header nor the design of the spreadsheet urges or requires users to input defamatory statements—or otherwise unlawful content—to view or contribute to the List." *Donegan*, 469 F. Supp. 3d at 59. Those who accessed the Spreadsheet were free to enter content, or not, as they saw fit. The Spreadsheet consisted of blank boxes and neither restricted nor pre-selected user entries. Ms. Donegan did not pay anybody for their entry, nor did she instruct anyone to post specific content. And since it is not illegal or defamatory for people to report their own experiences of sexual assault or misconduct, "there is nothing unlawful about developing this type of content." *Nemet*, 591 F.3d at 257. Thus, Ms. Donegan's conduct in creating and circulating the

Spreadsheet did not constitute "specific encouragement of unlawful content." *Donegan*, 469 F. Supp. 3d at 59; *see also id.* (emphasizing that the mere "possibility that someone may have entered defamatory content into the [Spreadsheet] does not mean that Defendant specifically encouraged unlawful content").

Nor did Ms. Donegan engage in any other conduct constituting specific encouragement of illegal content. She created the Spreadsheet on her own. She provided access to a group of potential users, as is common for publishers of interactive computer services. *See, e.g.*, *Nemet*, 591 F.3d at 258; *Roommates.com*, 521 F.3d at 1174. She provided access to all other potential users whenever asked to do so. She entered information for third parties whenever asked to do so. She answered basic questions relating to the Spreadsheet but never exercised control over what third party content was included or deleted. She did not publicize the Spreadsheet on social media; she did not send out additional emails promoting it; and she did not solicit or encourage anybody to make any entry. After roughly 12 hours in which it the Spreadsheet was accessible to third parties, she deleted it when its purpose was undermined by anticipated controversy. This conduct all falls within the recognized functions of a publisher. It is not the conduct of an individual "specifically encourag[ing]" third parties to post false, defamatory statements. *See LeadClick*, 838 F.3d at 174.

That conclusion applies with full force to the alleged defamatory statements. Ms. Donegan did not know who Mr. Elliott was. She did not write anything about him on the Spreadsheet, she did not solicit or encourage anybody else to do so, she has no recollection of adding any statements about him, and she has no idea who originated or wrote the alleged defamatory statements. Given all that, there can be no genuine dispute of material fact as to whether she specifically encouraged the posting of the alleged illegal content about Mr. Elliott—a man who was a total stranger to her. Any reasonable juror would reject the notion that Ms. Donegan developed illegal content.

### E.      Ms. Donegan Did Not Create or Develop Illegal Content

At the pleading stage, the Court identified four unresolved factual issues bearing on CDA immunity and permitted "narrowly tailored discovery" to address them. *Donegan*, 469 F. Supp. 3d at 61. That discovery process has definitively resolved all four factual issues. And it has confirmed that Ms. Donegan did not create or develop the alleged illegal content. As a result, she satisfies the second element of CDA immunity, since there can be no genuine dispute that Mr. Elliott's claim is "based on information provided by another information content provider." *Id.* at 55.

Based on his filings during the discovery process, Mr. Elliott may seek to escape that conclusion by arguing for a more expansive, inchoate view of what it means to "develop" illegal content. *See* Ex. I at 1-4. For instance, he may argue that Ms. Donegan should lose CDA immunity on the theory that she encouraged others to post on the Spreadsheet and one of those people could have written the alleged defamatory statements. *See id.* at 4. As explained above, every premise and every conclusion of such an argument would be mistaken. *See supra* at 16-18; *see also Donegan*, 469 F. Supp. 3d at 58-61. In the alternative, Mr. Elliott may assert that Ms. Donegan developed the alleged illegal content because "the overall webpage and the overall narrative created by the website" created a "framing narrative through which Plaintiff's defamation was viewed." Ex. I at 3. Yet this is not a new argument. It is a repackaging of his earlier contention that the structure, headings, and layout of the Spreadsheet specifically encouraged the posting of illegal content. Of course, the Court expressly (and correctly) rejected that contention at the pleading stage in a decision that is now law of the case. *See Donegan*, 469 F. Supp. 3d at 59-61. To the extent Mr. Elliott tries to revisit the issue, the record has only grown worse for him, since it

confirms that Ms. Donegan had nothing to do with the alleged defamatory statements and did not solicit contributions to the Spreadsheet.[1]

At times, it can be challenging to assess whether someone created or developed illegal content. But this case is straightforward. Based on the record before the Court, no reasonable juror could find that Ms. Donegan should be held responsible for the alleged defamatory statements concerning Mr. Elliott. She published a Spreadsheet where people were free to post the names of men who had sexually assaulted or abused them. Nothing about the design of the Spreadsheet— or her conduct while it was active—encouraged or required anyone to be untruthful. Users had complete discretion about whether to enter content and what content to enter. Ms. Donegan herself did not know who Mr. Elliott was and there is not a shred of evidence that she had anything to do with the statements about him that were posted in the Spreadsheet. The CDA exists for a case just like this one. As a matter of law and fact, she indisputably satisfies the statute's second element.

## III.    THE THIRD ELEMENT OF CDA IMMUNITY IS SATISFIED

The third and final element of CDA immunity directs attention to whether a plaintiff seeks to treat the defendant as the publisher or speaker of information provided by another information content provider. This rule precludes claims that seek "to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content." *LeadClick*, 838 F.3d at 174 (quoting *Jones*, 755 F.3d at 407). Here, to the extent Mr. Elliott has sued Ms. Donegan for simply "[m]aking information public and distributing it to interested parties," or for "failing to remove" the alleged defamatory statements,

---

[1] As part of his "framing narrative" theory, Mr. Elliott may argue that Ms. Donegan's statements since the Spreadsheet was deleted are somehow relevant to the CDA analysis. They are not. As the Sixth Circuit has explained, "[a] website operator cannot be responsible for what makes another party's statement actionable by commenting on that statement *post hoc*." *Jones*, 755 F.3d at 415. Moreover, none of Ms. Donegan's statements since October 12, 2017 have purported to (for example) adopt or vouch for the truth any specific allegation in the Spreadsheet. To the contrary, she has acknowledged that there was a risk of abuse (just as she did when she added the "grain of salt" disclaimer).

the CDA's third element is satisfied because these are "quintessential acts of publishing." *Brikman v. Twitter, Inc.*, No. 19 Civ. 5143, 2020 WL 5594637, at *3 (E.D.N.Y. Sept. 17, 2020). Similarly, to the extent Mr. Elliott would impose defamation liability on Ms. Donegan (as the publisher of an interactive computer service) for statements provided by a third party (namely, whoever actually wrote the alleged defamatory statements on the Spreadsheet), his claims collide with the plain text of the CDA and with settled precedent interpreting the CDA. *See, e.g.*, *Ricci v. Teamsters Union Loc. 456*, 781 F.3d 25, 27 (2d Cir. 2015) (per curiam) (holding that CDA immunity applied where plaintiff sought to hold a website liable "as the publisher or speaker" for defamatory statements made by a third party); *Jones*, 755 F.3d at 417 (holding that a defamation claim would "treat the defendants as a publisher or speaker" of defamatory statements). Accordingly, no reasonable juror could dispute that the third element of CDA immunity is met.

## CONCLUSION

For the foregoing reasons, the Court should grant Ms. Donegan's motion for targeted summary judgment based on immunity under the Communications Decency Act, 47 U.S.C. § 230.

Dated: March 22, 2021                          Respectfully submitted,

New York, New York                             */s/ Joshua Matz*

Roberta A. Kaplan
Joshua Matz
Raymond P. Tolentino
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883
jmatz@kaplanhecker.com

*Attorneys for Defendant Moira Donegan*

21