UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STEPHEN ELLIOTT,

*Plaintiff,*

- against -

MOIRA DONEGAN, and JANE DOES (1-30),

*Defendants.*

**Oral Argument Requested**

No. 1:18-cv-05680-LDH-SJB

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MOIRA DONEGAN'S MOTION FOR TARGETED SUMMARY JUDGMENT BASED ON IMMUNITY UNDER THE COMMUNICATIONS DECENCY ACT, 47 U.S.C. § 230**

**NESENOFF & MILTENBERG, LLP**
Andrew T. Miltenberg, Esq.
Nicholas E. Lewis, Esq.
Phil Byler, Esq.
363 Seventh Avenue, 5th Floor
New York, New York 10001

*Served May 7, 2021*

**TABLE OF CONTENTS**

TABLE OF AUTHORTTTES................................................................................................ ii

STATEMENT OF FACTS ...............................................................................................2

    A.    The Parties.......................................................................................................2

    B.    Ms. Donegan's Creation of the "Shitty Media Men" Spreadsheet. ...............2

STANDARD OF REVIEW ...............................................................................................7

ARGUMENT.....................................................................................................................7

    I.    MS. DONEGAN'S BURDEN OF PLEADING AND PROVING THE
        ELEMENTS OF CDA IMMUNITY. .................................................................8

    II.    MS. DONEGAN FAILS WHAT IS HER BURDEN OF ESTABLISHING THE
        SECOND ELEMENT OF CDA IMMUNITY............................................................9

        A.    The Second CDA Element: "Information Content Provider"............................9

        B.    Ms. Donegan Is An "Information Content Provider" Because She
            Materially Contributed to the Defamatory Meaning of the Allegations
            Against Mr. Elliott. ...................................................................................10

        C.    Ms. Donegan Is An "Information Content Provider" Because She
            Specifically Encouraged Unlawful Content......................................................14

        D.    Ms. Donegan's Destruction of Evidence Precludes Ms. Donegan From
            Establishing That Ms. Donegan Did Not Create The Defamatory
            Entries  On The "Shitty Media Men" Spreadsheet. .........................................17

    III.    MS. DONEGAN FAILS WHAT IS HER BURDEN OF ESTABLISHING THE
         THIRD ELEMENT OF CDA IMMUNITY. ................................................................19

    IV.    MS. DONEGAN'S CREDIBILITY IS AN ISSUE FOR THE TRIER OF FACT......19

CONCLUSION..................................................................................................................23

i

# TABLE OF AUTHORTTES

Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................................20

*Ascentive, LLC v. Opinion Corp.*,
   842 F.Supp.2d 450 (E.D.N.Y 2011) ....................................................................10

*Barnes v. Malavi*,
   412 F. Supp. 3d 140 (E.D.N.Y. 2019) ...................................................................7

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003)..............................................................................11

*Elliott v. Donegan*,
   469 F. Supp.3d 40 (E.D.N.Y. 2020) .............................................................. passim

*Fair Housing Council v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)........................................................................ passim

*Fed. Trade Comm'n v. LeadClick Media, LLC*,
   838 F.3d 158 (2d Cir. 2016) .......................................................................... passim

*FTC v. Accusearch, Inc.*,
   570 F.3d 1187 (10th Cir. 2009)......................................................................10, 12

*Gomez v. Toledo*,
   446 U.S. 635 (1980).................................................................................................8

*Herrick v. Grindr, LLC*,
   306 F. Supp. 3d 579 (S.D.N.Y. 2018)....................................................................9

*Holtz v. Rockefeller & Co.*,
   258 F.3d 62 (2d Cir. 2001)...................................................................................20

*Pace v. Baker-White*,
   432 F. Supp. 3d 495 (E.D. Penn. 2020) ............................................................11, 12

*Redd v. New York Div. of Parole*,
   678 F.3d 166 (2d Cir 2012).................................................................................20

*Shiamili v. Real Estate Grp. Of New York, Inc.*,
   17 N.Y.3d 281 (2011)...........................................................................................15

*Universal Commc'n Sys. v. Lycos,*
  478 F.3d 413 (1st Cir. 2007)....................................................................................................9

Statutes

47 U.S.C. § 230............................................................................................................... passim

Rules

Fed. R. Civ. P. 56...................................................................................................................7, 20

Plaintiff Stephen Elliott ("Mr. Elliott") respectfully submits this Memorandum of Law in opposition to the motion for summary judgment of Defendant Moira Donegan ("Ms. Donegan") who seeks dismissal of Mr. Elliott's defamation Complaint on the ground that Ms. Donegan has immunity under the Communications Decency Act ("CDA"). The motion should be denied because Ms. Donegan does not establish CDA immunity as a matter of material undisputed facts and entitlement to judgment as a matter of law.

The CDA at 47 U.S.C. § 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  As interpreted by the Second Circuit, this immunity applies where the defendant can make three showings: "(1) she is a provider or user of an interactive computer service; (2) the claim is based on information provided by another information content provider, and (3) the claim would treat the defendant as the publisher or speaker of that information." *Elliott v. Donegan*, 469 F. Supp.3d 40, 55 (E.D.N.Y. 2020), citing *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016).  While per the first element of CDA immunity, Ms. Donegan "qualifies as a provider of an interactive computer service during the time the Spreadsheet was online in the form of her google spreadsheet link," *Elliott v. Donegan*, 469 F. Supp.3d at 56, Ms. Donegan fails to meet what is her burden to satisfy the second element of CDA immunity: there is a genuine dispute of material fact as to whether Ms. Donegan was responsible for the creation or development of the defamatory statements in her "Shitty Media Men" Spreadsheet.  That failure to establish the second element of the CDA immunity means the third element of CDA immunity is not satisfied either: Ms. Donegan may be treated as a publisher or speaker of the defamatory "Shitty Media Men" statements.

Ms. Donegan is particularly disabled from meeting her burden of proving elements of the CDA immunity because, as shown in her Rule 56.1 Statement, her proffered summary judgment factual record relies upon assertions about her conduct that were once contained in documents, but

those documents were destroyed by Ms. Donegan.  Ms. Donegan's incredible claims and inconsistent

statements and Ms. Donegan's deletion of the majority of the relevant evidence puts Ms. Donegan's

credibility at issue; and without credible testimony from Ms. Donegan, she cannot carry her burden

of establishing the CDA immunity defense that is the basis for her motion for summary judgment.

**STATEMENT OF FACTS**

**A.**     **The Parties.**

Mr. Elliott, the Plaintiff, is a writer based in New Orleans, Louisiana.  Plaintiff's Response to

Defendant's Rule 56.1 Statement 2.  Ms. Donegan, the individually named Defendant, is a writer

and editor based in Brooklyn, New York.  Defendant's Rule 56.1 Statement 1.

**B.**     **Ms. Donegan's Creation of the "Shitty Media Men" Spreadsheet.**

On or around October 11, 2017, using her personal Google account, Ms. Donegan created a

Google Spreadsheet entitled "Shitty Media Men" ("the Spreadsheet"). Statement of Uncontested

Facts Pursuant to Local Civil Rule 56.1 ("56.1 Statement") 3, (Def. Exhibit A, 2).  Ms. Donegan

has claimed her sole motivation was a desire for the Spreadsheet to be "a place where women could

warn each other about sexual harassment and sexual assault without fear of retaliation or punishment

or violent retribution for doing so." 56.1 Statement 4, (Def. Exhibit B 115:17-115:20).  Ms.

Donegan attempts, however, to conceal her true, complete motivations, as well as the totality of her

conduct during the time the Spreadsheet was active, from the scrutiny of this Honorable Court.

While Ms. Donegan maintains the aforementioned altruistic goals of the Spreadsheet, her statements

after the Spreadsheet activity reveal a celebration of the weaponizing of same.  In late October 2017,

Ms. Donegan publicly proclaimed, via her personal Twitter account, "Small, practical step to limit

sex harassment:  Don't employ any men," and "I like the witch hunt but I love that it happened in

October," celebrating the ramifications of the Spreadsheet she created.  56.1 Statement, Response

to 4, (Exhibit 1-2).  Defendant would also reveal, in her subsequent proposal for a book entitled

2

SHITTY MEDIA MEN, "The book I want to write, SHITTY MEDIA MEN, will be, in part, a realization of the goal I had in creating the spreadsheet in the first place. It will not be a whisper network, but a yelling network, with the aim to study how our industry got to this point of intolerable misogyny, and how it has shaped the culture around in its own sexist image." 56.1 Statement, Response to 4, (Exhibit 3). Ms. Donegan argues she did not materially contribute to the defamatory rape allegations against Mr. Elliott and further claims, definitively, that she did not specifically encourage the posting of same. *See* Def. Memorandum of Law, p. 1. It is easy for Ms. Donegan to proclaim this, however, because she intentionally deleted the majority of the communications she sent or received regarding the Spreadsheet and claims to not recall what she wrote in the email she created to circulate the Spreadsheet. 56.1 Statement, Response to 16, (Def. Exhibit A ¶¶ 21-22 and Def. Exhibit B 25:22-25:25, 27:17-27:20).

Ms. Donegan created the Spreadsheet entitled "Shitty Media Men". At the top, she created a series of column headings: "Last Name", "First Name", "Affiliation", "Alleged Misconduct", and "Notes." 56.1 Statement 5 (Def. Exhibit B 12:2-12:4). Above those headings, Ms. Donegan posted advisories about the Spreadsheet. *See* 56.1 Statement 6 (Def. Exhibit B 9:5-9:8, 9:11-9:13, 9:16-9:17, 10:16-10:19). First, she included a disclaimer reminding readers that the document was "a collection of misconduct allegations and rumors" and to "[t]ake everything with a grain of salt." *Id.* (Def. Exhibit B 9:5-9:8). She then provided instructions on how users can shield their identity, by editing the Spreadsheet anonymously; shea asked users to "never name an accuser, and [] never share this document with a man." *Id.* (Def. Exhibit B 10:16-10:19). Finally, she added the direction, "[m]en accused of physical sexual violence by multiple women are highlighted in red." *Id.* (Def. Exhibit B 9:11-9:13, 9:16-9:17). Underneath these headings were empty rows in which users could enter text. *See* 56.1 Statement 7 (Def. Exhibit A ¶ 6). While Ms. Donegan claims, the Spreadsheet itself did not limit what text could be entered, the Spreadsheet entitled "Shitty Media Men" was created and

3

utilized for the specific purpose of publishing anonymous accusations of sexual assault and harassment. *See* 56.1 Statement Response to Statement 8 (Def. Exhibit B, 115:17-115:20), Exhibit 7. We are also unaware as to what Ms. Donegan instructed others to post specifically as she does not recall what she wrote in the email accompanying the link to the Spreadsheet and deleted both the Spreadsheet, itself, as well as the majority of communications sent. Id. (Def. Exhibit A ¶¶ 3, 21-22 and Def. Exhibit B 25:22-25:25, 27:17-27:20).

Sometime before noon on October 11, Ms. Donegan claims to have emailed somewhere between three and twelve people a link to the Spreadsheet. 56.1 Statement 12 (Def. Exhibit B 20:25-21:3, 21:7-21:10). Despite having a fairly narrow range of the number of people she circulated the Spreadsheet to, Ms. Donegan claims she does not recall their identities, nor does she recall writing anything in the body of the emails she sent them. *Id.* (Def. Exhibit B 21:14-21:17, 25:25-26:2, 27:17-27:20). Ms. Donegan's claim that she does not recall the identities of the people she initially sent the Spreadsheet to is belied by the admission that she "first shared the spreadsheet among [her] women friends and colleagues," in the aforementioned book proposal. 56.1 Response to Statement 12 (Exhibit 4). Ms. Donegan has emphasized that she would not characterize the email with the link to the document as a request for recipients to input anything into the Spreadsheet, but it is unclear how she remembers this detail without recalling the text she included in said email. 56.1 Response to Statement 13 (Def. Exhibit B 25:22-22:25).

Aside from the initial email to her women friends and colleagues, Ms. Donegan recalls sending the link only to women who somehow learned of her involvement and specifically requested (usually via email or Twitter direct message) that she provide access to the Spreadsheet. 56.1 Statement 15 (Def. Exhibit B 24:8-24:15, 46:8-46:12, 48:22-48:24). Ms. Donegan claims, her response was purely administrative. 56.1 Statement 16 (*See, e.g.*, Def. Exhibit F). As proof of her neutral, merely administrative role, Ms. Donegan cites an email reply in which she wrote, "Any help

4

you can give is really appreciated!" to a sender requesting access to the Spreadsheet. 56.1 Statement 16-17 (*See* Def. Exhibit E).  In the same email chain, exchanged shortly after the Spreadsheet was accessible to third parties, on October 11, 2017, at 12:27 PM, the sender requesting access to the Spreadsheet, writes, "Hey Moira,  I saw your tweet, and it gave me all the feels (reminding me of some stuff I went through years ago…)," indicating she was reaching out to Ms. Donegan in response to a tweet. 56.1 Response to Statement 16 (*See* Def. Exhibit E).  We do not know what Ms. Donegan wrote in said tweet, but it successfully invoked "all the feels," and appears to have encouraged this woman to email Ms. Donegan requesting access to the Spreadsheet.  It is reasonable to assume the tweet contained encouragement or solicitation of some sort.  We will never know, unfortunately, because Ms. Donegan deleted the majority of the communications she sent or received regarding the Spreadsheet.  56.1 Statement, Response to 16, (Def. Exhibit A ¶¶ 21-22).

Ms. Donegan claims that she deleted the communications, to protect the privacy of those who sent her requests to add information. 56.1 Statement, 22 (Def. Exhibit A, 21).  This claimed motivation is questionable, however, as Ms. Donegan "immediately assumed she'd be sued" when she observed over 70 men had been named in the Spreadsheet.  *See* 56.1 Response Statement 22 (Exhibit 8). Defendant also "got advice from some lawyer friend that [she] and the other original non-anonymous commenters were open to libel suits," according to an email she sent October 12, 2017, at 2:12:20 A.M.  *Id.*  Ms. Donegan's assumption she would be sued, and discussion with her lawyer friend confirming this fear, were considerations that contributed to her shutting down and deleting the Spreadsheet and communications related thereto.

Ms. Donegan claims she did not encourage,  solicit, invite, or instruct anyone to enter any information of any kind into the document. *See* 56.1 Statement, 29 (Def. Exhibit B, 91:17-91:21) ("I wouldn't say that I encouraged or incited or invited or solicited. I would say that I made the document available for women to put their experiences of sexual violence and sexual harassment

into it."). Although, Ms. Donegan's certainty is belied by the acknowledgement that she does not recall what she wrote in the body of the email she sent with the link to the Spreadsheet, and the aforementioned tweet which invoked "all the feels" at or before October 11, 2017, at 12:27 PM.

Sometime in the evening or night of October 11, Ms. Donegan learned that a *Buzzfeed* article would make the Spreadsheet's existence public. 56.1 Statement, 32 (Def. Exhibit H, 4). Whether it was due to her assumption that she would immediately be sued, or for fear of a media firestorm would overshadow the Spreadsheet's purpose of protecting women, she resolved to take down the document. *See* 56.1 Response to Statement 33 (Exhibit 5); Statement 33 (Def. Exhibit H, 4); *see also id.* (Def. Exhibit G).

By the time Ms. Donegan deleted the Spreadsheet, there were entries of over 70 men, including Plaintiff, Mr. Stephen Elliott. 56.1 Statement, 36 (Def. Exhibit A, 7-8). The cells next to his name had been populated with the following text: "Freelance writer/novelist"; "Rape accusations, sexual harassment, coercion, unsolicited invitations to his apartment, a dude who snuck into Binders???"; and "Multiple women allege misconduct." 56.1 Statement, 37 (Def. Exhibit A, 8). This row in the Spreadsheet was highlighted in red, indicating that Mr. Elliott had been falsely accused of physical sexual violence by more than one woman. *Id.* (Def. Exhibit A, 8).

Ms. Donegan claims she had no idea who Mr. Elliott was. *See* 56.1 Statement, 38 (Def. Exhibit A, 9). Of the limited communications that remain in Ms. Donegan's possession from the period preceding and encompassing the time when the Spreadsheet remained on her personal Google drive, none makes any mention of or reference to Mr. Elliott or the alleged defamatory allegations about him. 56.1 Statement, 39 (*See* Def. Exhibit A, 22-23). Unfortunately, the majority of communications were deleted by Ms. Donegan; despite this fact, and Ms. Donegan's failure to recall what she wrote in the body of the email she sent with the Spreadsheet, Ms. Donegan claims she did not solicit or encourage anyone to add any statements, let alone false ones, about Mr. Elliott. 56.1

6

Statement 42(Def. Exhibit A, 12-14).

Ms. Donegan relies on the absence of emails she deleted, and her cloudy recollection, to conclude she did not add Mr. Elliott's name or any of the alleged defamatory statements about him to the Spreadsheet; did not encourage or solicit anyone else to do so; did not highlight his entry (or any other) in red; and, to this very day, she claims to have no idea who added the alleged defamatory statements about him. *See* 56.1 Statement, 39-47 (Def. Exhibit A, 10-15, 24-29; Def. Exhibit B 96:3-96:6).

## STANDARD OF REVIEW

Summary judgment may be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the evidence as to a fact that might affect the suit's outcome is such that a reasonable jury could find in favor of the non-movant at trial." *Barnes v. Malavi*, 412 F. Supp. 3d 140, 142-43 (E.D.N.Y. 2019) (DeArcy Hall,). "At summary judgment, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id.* At 143. "Once the movant meets that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(c)). "A court is to view all such facts in the light most favorable to the non-movant, drawing all reasonable inferences in his favor." *Id.* "

## ARGUMENT

Before the Court is Ms. Donegan's motion for summary judgment to dismiss Mr. Elliott's defamation Complaint on the ground that Ms. Donegan has immunity under the Communications Decency Act ("CDA"). As stated at the outset of this Memorandum of Law, the motion should be denied because Ms. Donegan does not establish CDA immunity as a matter of material undisputed facts and entitlement to judgment as a matter of law. Ms. Donegan fails to meet what is her burden

to satisfy the second element of CDA immunity: there is a genuine dispute of material fact as to whether Ms. Donegan was responsible for the creation or development of the defamatory statements in her "Shitty Media Men" Spreadsheet.  That failure to establish the second element of the CDA immunity means the third element of CDA immunity is not satisfied either: Ms. Donegan may be treated as the publisher or speaker of the defamatory "Shitty Media Men" statements.  Further, Ms. Donegan's incredible claims and inconsistent statements and Ms. Donegan's deletion of the majority of the relevant evidence puts Ms. Donegan's credibility at issue; and without credible testimony from Ms. Donegan, she cannot carry her burden of establishing the CDA immunity defense that is the basis for her motion for summary judgment.

### I.   MS. DONEGAN'S BURDEN OF PLEADING AND PROVING THE ELEMENTS OF CDA IMMUNITY.

Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of an information provided by another information content provider.  47 U.S.C. § 230(c)(1). Because the CDA provides limited immunity, the burden of pleading and, of course, proving it "rests with the defendant." *Elliott v. Donegan*, 469 F. Supp. 3d 40, 56 (E.D.N.Y. 2020) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.")  Absent affirmative evidence establishing Defendant's conduct, CDA immunity may not be successfully invoked.

In order to successfully invoke CDA immunity for what would otherwise be a defamatory statement, the defendant must show: (1) she is a provider or user of an interactive computer service; (2) the claim is based on information provided by another information content provider; and (3) the claim would treat the defendant as the publisher or speaker of that information. *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016).

## II.   MS. DONEGAN FAILS WHAT IS HER BURDEN OF ESTABLISHING THE SECOND ELEMENT OF CDA IMMUNITY.

### A.   The Second CDA Element: "Information Content Provider".

The second element of CDA immunity requires that the claim be based on "information provided by another information content provider," *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d at 173. An "information content provider" thus does not enjoy CDA immunity.

An "information content provider" includes "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "This is a broad definition, covering even those who are responsible for the development of content only 'in part." *Universal Commc'n Sys. v. Lycos*, 478 F.3d 413, 419 (1st Cir. 2007). As the Ninth Circuit explained, "[i]f [a website] passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself . . . the website is also a content provider." *Fair Housing Council v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc).  That is, CDA immunity attaches only when a defendant can establish that the website or platform merely *passively displays* content that is *created entirely* by third parties. An individual is not properly classified as an information content provider when she provides only "neutral assistance" or the "tools and functionality that are available equally to bad actors and the . . . intended users." *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018) (*quoting Fair Housing Council v. Roommates.com*, 521 F.3d at 1169), *aff'd* 765 F. App'x 586 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 221 (2019).  That is not at all the case here.

As this Court noted, "[i]t is relatively easy to define what constitutes the creation of information." *Elliott v. Donegan*, 469 F. Supp. 3d at 56. "Determining what constitutes the development of information is a stickier task." *Id.* at 57. A defendant will not be held responsible for

9

the development of information "unless it assisted in the development of what made the content unlawful." *Fed. Trade Comm'n v. Leadclick*, 838 F.3d at 174. To quote then Senior District Judge Glasser in *Ascentive, LLC v. Opinion Corp.*, 842 F.Supp.2d 450, 474 (E.D.N.Y 2011), "one is responsible for the 'development' of information when [she] engages in an act beyond the normal functions of a publisher (such as deciding to publish, withdraw or modify third-party content that changes the meaning and purpose of the content." Moreover, "there may be several information content providers with respect to a single item of information (each being responsible, at least in part, for its creation or development." *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) (internal quotation marks omitted).

**B.    Ms. Donegan Is An "Information Content Provider" Because She Materially Contributed to the Defamatory Meaning of the Allegations Against Mr. Elliott.**

Prior to discovery, it was not known to the Court "whether the defendant "materially contributed to the allegedly defamatory meaning—which is the very fact on which CDA immunity turns." *Elliott v. Donegan*, 469 F. Supp.3d at 57. *See also Fed. Trade Comm'n v. Leadclick*, 838 F.3d at 174 (CDA immunity is not available if the Defendant "materially contribut[ed] to [the content's] alleged unlawfulness"). After completing the limited discovery ordered, Mr. Elliott submits that it is clear that Ms. Donegan did directly and materially contribute to the allegedly defamatory meaning. At a minimum, however, the extensive factual disputes about Ms. Donegan's conduct coupled with her destruction of evidence in anticipation of litigation compels denial of summary judgment for Ms. Donegan.

*In Ascentive, LLC v. Opinion Corp.,* Senior District Judge Glasser for this Court referenced the lack of clarity provided by the CDA in determining what makes a party responsible for content development, and further noted courts will often look to the totality of the circumstances in making this assessment. *Ascentive, LLC,* 842 *v. Opinion Corp.*, F. Supp. 2d at 474, *citing, e.g., Fair Housing*

10

*Council v. Roommates.com*, 521 F.3d at 1169; *Doe v. City of New York*, 583 F. Supp. 2d 444, 448 (S.D.N.Y. 2008) ("When [the defendant] Tefft attached his own commentary to his list serve he ceased to be a passive host of third-party information [and] Section 230(c)(1) would not immunize defendants with respect to any information they developed or created entirely by themselves."). Ms. Donegan cannot be treated as a passive, neutral host of third-party information if she, for example, attached her own commentary to the Spreadsheet or within communications containing links to the Spreadsheet.

Material contribution, therefore, might take several forms. To be sure, had the Defendant "inputted information into the Spreadsheet that was not provided to Defendant or use on the Internet, she would not qualify for CDA immunity." *Elliott v. Donegan*, 469 F. Supp.3d at 58. That is, had Ms. Donegan written the allegedly defamatory statements relayed by a third party who had not intended they be distributed on the internet, CDA immunity would not attach. See *Batzel v. Smith*, 333 F.3d 1018, 1033 (9th Cir. 2003).

*Pace v. Baker-White*, 432 F. Supp. 3d 495 (E.D. Penn. 2020), is also instructive. In *Pace*, the defendants created a website called the Plain View Project. The defendants dug up thousands of statements by police officers that appeared to endorse violence, racism, and bigotry, and reposted them on a website to expose the police officers. A police officer sued the website for defamation, alleging that "Defendants' publication of his name and comment implied that he is an officer who endorses violence, racism, and bigotry and who undermines public trust in the police by acting on those biases." *Id.* at 500. In *Pace*, the defendants argued that the CDA granted them immunity because they were only reposting content created by "another information content provider"— namely, the plaintiff police officer himself. The plaintiff responded, in essence, that the defendants helped develop the content by providing "a framing narrative" through the website's homepage, disclaimer, and "About" tab. *Id.* at 507. The Court denied defendants' claim of CDA immunity:

> In adding the framing narrative, Defendants did much more than merely "packaging and contextualizing[,]" structuring a website layout, increasing content's prominence, or selecting what to publish. . . .
>
> Here, the PVP website was not a "typical Internet bulletin board[,]" neutrally facilitating the sharing of harmful content. See *Accusearch*, 570 F.3d at 1199. It was "much more than a passive transmitter." See *Roommates*, 521 F.3d at 1166. Defendants created the introductory narrative on the PVP website thereby making a material contribution to the creation of the allegedly defamatory content and are therefore "responsible ... for the creation or development of information" at the core of this lawsuit. See 47 U.S.C. § 230(f)(3). Accordingly, they are not entitled to Section 230 immunity.

*Pace v. Baker-White*, 432 F. Supp. 3d at 507-08.

*Pace* helps clarify that a material contribution to defamatory meaning derives not just from the particular words themselves, but from the context in which the words are written or said. Consistent with this Court's prior findings, *Pace* simply illustrates what it means to materially contribute to the defamatory meaning of information content, such that one is properly classified as an information content provider for purposes of CDA immunity. The immunity question turns on the degree of Ms. Donegan's material contribution, responsibility for, and involvement in the publication of the defamatory content. The court's inquiry in *Pace* was obviously not limited to the sole individual entry regarding the plaintiff police officer. After all, "there may be several information content providers with respect to a single item of information (each being 'responsible,' at least in part,' for its 'creation or development." *Accusearch, Inc.*, 570 F.3d at 1197. Rather, the Court in *Pace* analyzed the defendant's involvement in the overall web page and the overall narrative created by the Spreadsheet.

It is combination of the Ms. Donegan's conduct with the conduct of a third party that created the defamatory meaning. Suppose Ms. Donegan had simply distributed a blank google spreadsheet to her friends without any context, or instructions, other than "add people you know." If Ms. Donegan took that blank Spreadsheet of names and later added a heading like "Shitty Media Men"—

12

a collection of rumors and secondhand allegations of sexual misconduct," there could be no question that she would be an information content-provider without any CDA immunity.  That would be so even though someone else entered the actual names on the Spreadsheet. It is the relation between the narrative crafted by Ms. Donegan about the meaning of the Spreadsheet and the specific names on the Spreadsheet that is unlawful.  As such, it would be improper to classify her as a neutral service provider; Ms. Donegan is rather an information content-provider who does not enjoy CDA immunity.

Moreover, the evidence now in the record presents a factual dispute about the nature and extent of Ms. Donegan's involvement in developing and curating the content of the Spreadsheet. After the Spreadsheet was made inaccessible, Ms. Donegan portrayed herself as the manager of the Spreadsheet: "There are a couple of people interested in taking it over who say they have the money, security, and time to do it right. If any of that works out, I'll let you know." [Exhibit 8]  Ms. Donegan also wrote in an email:

> Hey [redacted]
>
> Thanks for reaching out, and for contributing to the spreadsheet.  I got advice from some lawyer friends that I and the other original non-anonymous commenters were open to libel suits.  People were starting to use the sheet for calling out aggressive dates and creepy DMs, which are real violations but also not what I wanted to use the document for—*it put me in a position of arbitrating whose trauma "counted" and whose didn't, which just felt so awful*.  I decided to shut it down. (emphasis added)

*See* Defense Exhibit G.

If Ms. Donegan was merely a service provider—a provider of a neutral platform into which other users could enter information, she could not be possible "be in a position of arbitrating whose trauma counted and whose didn't." If Ms. Donegan was merely entering any information sent to her by other content providers, there would be no sense in which she was in the position of "arbitrating whose trauma 'counted' and whose didn't."   Her sentiments, repeated in several emails, reflected being in a position of control and influence over the content of the Spreadsheet, which "just felt

awful" to her so she "decided to shut it down.".  *See* Defense Exhibit G.

The significance of this email is that it shows Ms. Donegan was in the position of actively arbitrating the *content* and, therefore, the *meaning* of Spreadsheet.  The email clearly indicates a much greater role that than of a mere publisher or neutral provider of a publishing platform or tools.  The email suggests it was Ms. Donegan who took the raw material provided by others and shaped it into a narrative about sexual misconduct and impropriety.  It was Ms. Donegan's Spreadsheet, the Ms. Donegan's content, and for purposes of CDA, it is clear that Ms. Donegan was an information content-provider.  Ms. Donegan, in her deposition, insists otherwise, claiming she was a mere neutral administrator who launched an open-ended spreadsheet, then went about her day.  But that testimony is belied by what documents we have, Ms. Donegan's curiously poor recollection and the fact that Ms. Donegan destroyed her documents while the "Shitty Media Men" Spreadsheet was being published.  Her involvement in the "Shitty Media Men" Spreadsheet is a disputed question of fact not susceptible to proper resolution on summary judgment.

### C.      Ms. Donegan Is An "Information Content Provider" Because She Specifically Encouraged Unlawful Content.

Interactive computer service providers enjoy no §230 immunity if they "specifically encourage" the posting of unlawful content. *Fed. Trade Comm'n v. Leadclick*, 838 F.3d at 174. For example, in *Fed. Trade Comm'n v. Leadclick*, 838 F.3d at 174, the Court held the defendant was not a neutral intermediary, but specifically encouraged development of what was offensive about the content. Defendant would forfeit her CDA immunity if through her website's design, or its headers, or through her personal communications with other people, or, otherwise, she 'specifically encourage[d]' the posting of the unlawful content. *Elliott v. Donegan*, 469 F. Supp. 3d at 57 (*citing Fed. Trade Comm'n v. LeadClick*, 838 F.3d at 174). To ascertain the "[t]he full contours of Defendant's conduct during the approximately 12-hour period during which her Google spreadsheet was online,"

this Court ordered limited discovery on the issue. *Elliott v. Donegan*, 469 F. Supp.3d at 59.

This Court previously noted that the Spreadsheet, circulated as a Google spreadsheet, was "akin to the comment boxes in *Roommates.com*." *Id.* at 59. Although the comment boxes in *Roommates.com* contained the opportunity for subscribers to write discriminatory comments, the Ninth Circuit found that the website "publishes these comments as written," "[i]t does not provide any specific guidance as to what the essay should contain," and it does not "urge subscribers to input discriminatory preferences." *Fair Housing Council v. Roommates.Com*, 521 F.3d at 1173-74. Similarly, in *Shiamili v. Real Estate Grp. Of New York, Inc.*, 17 N.Y.3d 281, 191 (2011), the Court found that a defendant-administrator of a blog was immune from suit because there was "no allegation that the defamatory comments were posted in response to any specific invitation for users to bash plaintiff." The possibility that someone may have entered defamatory content into this Spreadsheet does not mean that the defendant specifically encouraged unlawful content. *Elliott v. Donegan*, 469 F. Supp.3d at 60. This Court also made clear that neither the "disclaimer" stating that the document consisted of "a collection of misconduct allegations and rumors" together with the spreadsheet design "urges or requires users to input unlawful content. *Id.* at 59

However, the factual record here establishes a material question fact as to whether the Defendant did specifically encourage unlawful content, either alone or in combination with these factors. This Court authorized discovery, in part because the "full contours of Defendant [Ms. Donegan]'s conduct during the approximately 12-hour period during which her google spreadsheet was online [were] unknown." Unfortunately, the full contours of Defendant's conduct remain largely unknown. That is because Ms. Donegan purports to not recall much of her conduct during the 12-hour period in question. There is there is little in way of documentary evidence because Ms. Donegan destroyed it after being advised she could face legal liability. As the majority of communications are not before the Court, and Ms. Donegan cannot recall what she wrote in the email in which she

15

circulated the Spreadsheet, she fails to meet her burden regarding specific encouragement.

Although there is much Ms. Donegan cannot recall, the few recovered emails do shed some light on her conduct and are sufficient to raise disputed factual issues about her conduct. Initially, there is the issue of whether Ms. Donegan encouraged users to post on the Spreadsheet utilizing her twitter account. She received the aforementioned email shortly after the Spreadsheet was accessible to third parties, on October 11, 2017, at 12:27 PM. The sender seeking access to the Spreadsheet, wrote, "Hey Moira, I saw your tweet, and it gave me all the feels (reminding me of some stuff I went through years ago…)," *See* Def. Exhibit E. It is clear this anonymous sender was so moved by Ms. Donegan's tweet, that she was encouraged to contact Defendant to post on the Spreadsheet. As Ms. Donegan, again, deleted the great majority of the relevant communications, we do not know whether the inspiring tweet, encouraged an individual to post the defamatory allegations about Mr. Elliott.

In response to this sender's email, Ms. Donegan replied,

> "Thanks for reaching out—I've been really touched by how many people want to help with this and depressed by how many people need it. … The standard disclaimer I'm giving people is that these are all accusations and rumors, that some of the information is second hand, and not to freak out if you see a man you're friends with on there. *Any help you can give is really appreciated!*" (emphasis added)

*See* Defense Exhibit E.

The email is obviously a second request, after the inspiring tweet, for the recipient to contribute content to the Spreadsheet. This creates a factual dispute with respect to whether Ms. Donegan encouraged and/or solicited content.

This email contradicts Ms. Donegan's deposition testimony which contains the following exchange:

> Q: Ms. Donegan, did you encourage anyone to post – I'm sorry –to input any information into the Spreadsheet?
>
> A: I wouldn't say that I encouraged or incited or invited or solicited. I would say that I made the document available for women to put their experiences of sexual violence and sexual harassment into it.

16

Def. Exhibit B. 91:14-91:21.

In another email, Ms. Donegan emailed the Spreadsheet link and wrote:  "idk if [redacted] sent it to you yet.  I know you have people to add, though. Hope you're well." *See* Def. Exhibit B 103:19-103:20.

The inconsistency between her deposition statements and her emails to others creates disputed question of material fact about whether and the extent to which the Defendant solicited content for Spreadsheet, and also requires a determination of Ms. Donegan' credibility. Although she cannot "remember making the choice to create the document," [Def. Exhibit B, lines 16-17].  Ms. Donegan created a spreadsheet titled "Shitty Media Men" which she described as containing "rumors" and "second hand" reports of sexual impropriety.  The record contains evidence that she solicited contributions this Spreadsheet.  Statements about sexual impropriety that turn out to be false are unlawful and the CDA provides no immunity for those who specifically encourage such content.

**D.**  **Ms. Donegan's Destruction of Evidence Precludes Ms. Donegan From Establishing That Ms. Donegan Did Not Create The Defamatory Entries On The "Shitty Media Men" Spreadsheet.**

"CDA immunity does not attach where the defendant is being held accountable for its own unlawful acts." *Elliott v. Donegan*, 469 F. Supp. 3d at 57 (citing *Fed. Trade Comm'n v. Leadclick*, 838 F.3d at 176 and *Fair Housing Council v. Roommates.com*, 521 F.3d at 1162).  The parties agree that if Ms. Donegan fabricated Mr. Elliott's entry, she would clearly enjoy no CDA immunity.  Plaintiff concedes that discovery produced no evidence that the Defendant inputted the text of Mr. Elliott's entry or fabricated the content of Mr. Elliott's entry on the Spreadsheet. Ms. Donegan claims that she "did not originate, fabricate, or otherwise serve as the source of any information regarding Mr. Elliott that appeared on the Google Spreadsheet."  (Def. Exhibit A ¶ 11). Because Ms. Donegan deleted the vast majority of her electronic communications and there are inconsistent accounts of her conduct

relating to the Spreadsheet, described further below, there remains a credibility issue appropriately resolved by the jury.

Mr. Elliott therefore submits that Ms. Donegan has not carried and cannot carry her burden of establishing that she is merely a computer service provider, as opposed to an "information content provider," with respect to the Spreadsheet. In her deposition and affidavit, Ms. Donegan repeatedly stated that she does not recall critical aspects of her conduct and behavior on the day in question. In her deposition, Ms. Donegan offered statements and accounts of her behavior relating to the Spreadsheet that are inconsistent with documentary evidence in the record. There are numerous disputed questions of fact about the nature and extent of her involvement with the Spreadsheet's content. An inexhaustive list includes: why she created the Spreadsheet, her actions during and in relation to the Spreadsheet, her solicitation contributions for the Spreadsheet, her communications with others about the Spreadsheet, the substance of a tweet that resulted in a person contacting Ms. Donegan to contribute to the Spreadsheet, the timing of her deletion of the Spreadsheet, the reasons for deleting Spreadsheet, the reasons for her destruction of evidence about and relating to the Spreadsheet. There is limited record evidence regarding precisely what Ms. Donegan did during the time period immediately preceding, during, and after the development, creation, and distribution of the Spreadsheet. That paucity of evidence exists because, after consultation with attorneys who advised her of potential legal liability, Ms. Donegan destroyed all electronic evidence. To allow Ms. Donegan to invoke CDA immunity because it is not possible for Mr. Elliott to establish the full extent of her material contributed to the defamatory content is not reasonable.

This is not a case where Ms. Donegan provided an electronic platform or neutral tools for other information content providers. She created a document called "Shitty Media Men," described it as a collection of accusations and rumors about undesirable sexual conduct, solicited participation from friends and colleagues encouraging them add names to the Spreadsheet and expressing gratitude

to them when they did so. She herself added material the Spreadsheet, clearly forfeiting any plausible claim that she was only an interactive computer service provider for purposes of the Spreadsheet. At a minimum, all parties agree she is an "information content provider" with respect to *some* of the Spreadsheet. The only question is whether she can establish that she was merely an interactive computer service provider with respect to *the rest* of the Spreadsheet. Given the fact that Ms. Donegan cannot recall key facts and details about her conduct that would render it possible for the Court to conclusively find that she was merely an interactive computer service provider and given that Ms. Donegan destroyed the relevant documentary evidence in anticipation of litigation, there is—at a minimum—a dispute question of material fact with respect to her development of the content. A reasonable jury could clearly conclude that Ms. Donegan directly and materially contributed to the unlawful meaning of the Spreadsheet. Accordingly, the second element of CDA immunity is not established by Ms. Donegan; summary judgment is not proper.

## III.   MS. DONEGAN FAILS WHAT IS HER BURDEN OF ESTABLISHING THE THIRD ELEMENT OF CDA IMMUNITY.

As the second element of CDA immunity is not met, the third element of CDA immunity cannot be met either: Ms. Donegan fails to establish what is her burden to establish that she may not be treated as a publisher or speaker of the defamatory "Shitty Media Men" statements. CDA immunity requires that the claim treat the defendant as the publisher or speaker of the subject information. *Fed. Trade Comm'n v. LeadClick Media, LLC,* 838 F.3d at 173 Because Ms. Donegan is an "information content provider," she may be treated as a publisher or speaker of the defamatory "Shitty Media Men" statements. Ms. Donegan's motion for summary judgment should again be denied, here because she does not satisfy as a matter of undisputed fact and applicable law the third element of CDA liability.

## IV.   MS. DONEGAN'S CREDIBILITY IS AN ISSUE FOR THE TRIER OF FACT.

The granting of summary judgment is proper only where there is "no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." *Redd v. New York Div. of Parole*, 678 F.3d 166, 173 (2d Cir 2012) quoting Fed. R.Civ.P. 56(a). At the summary judgment stage, the Judge's function is not to weigh the evidence, and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Redd,* 678 F.3d at 173-174, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where an issue of material fact cannot be resolved without observation of the demeanor of a witness in order to evaluate their credibility, summary judgment is not appropriate. *Redd,* 678 F.3d at 174 citing Fed.R.Civ.P. 56(e) Advisory Committee Note (1963).

The evaluation of ambiguous acts is a task for the jury. *Redd,* 678 F.3d at 174, citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). Credibility determinations, the weighing of evidence and the drawing of legitimate inferences from the facts are jury functions. *Redd,* 678 F.3d at 174. As referenced above, Ms. Donegan's credibility is an issue that warrants determination by the trier of fact. Defendant's convenient lapses in recollection, unconvincing explanations and inconsistent statements create, at a minimum, a credibility question warranting observation and evaluation by the jurors.

As an initial observation, Ms. Donegan's complete lack of recollection as to the identity of the "three to 12" recipients of her email containing the Spreadsheet strains credulity. Ms. Donegan claims she does not recall either the identity of those people or writing anything in the body of the emails she sent them. Def. Ex. B. 21:14-17, 25:25-26:2, 27:17-27:20. Ms. Donegan acknowledges in her book proposal, that she "first shared the spreadsheet among [her] women friends and colleagues." Exhibit 4. The premise that Ms. Donegan cannot recall the identity of one of her friends defies logic. In general, Ms. Donegan's failure to recall any meaningful details of the day she created the Shitty Media Men Spreadsheet is specious. Perhaps asking someone to recall a random day, one without meaningful incident, three years after the fact could garner poor recollection, but this day

was a most meaningful day in Ms. Donegan's life. Indeed, the notoriety, career success and related financial gain, after she outed herself as the Shitty Media Men List's creator, are significant. (*See* Exhibit 5, p. 7-9, discussing Ms. Donegan's book deal as well as her status as "an unflinching figurehead" and "feminist hero"). The career acclaim, as well as the negative attention garnered for her role in creating the Spreadsheet, renders her failure to recall meaningful details, like the identity of the friends she emailed the Spreadsheet to, questionable at best.

Ms. Donegan's memory issues are also inconsistent with her attempts to claim CDA immunity. The oft-cited example herein includes Ms. Donegan's claim that she did not solicit or encourage any entries, of any kind, nor did she seek to control what people wrote, and that her responses were generally purely administrative. 56.1 Statement of Fact 16. The definitive statements by Ms. Donegan are contradicted by her testimony that she does not recall what she wrote in the body of the email she sent with the link to the Spreadsheet. Def. Ex. B. 25:22-25:25, 27:17-27:20. Ms. Donegan's claim that she did not publicize the Spreadsheet to others via her public Twitter handle is similarly incredible. Def. Ex. B. 31:6-31:14, 64:12-65:3. In addition to the incongruity of having no recollection of any social media posts of any kind and assuredly affirming she did not publicize the Spreadsheet on Twitter, Ms. Donegan maintained the position after being shown the aforementioned email of the person who contacted her via email after Donegan's Tweet gave her "all the feels." Exhibit E. Ms. Donegan reviewed the email, which was sent to her at 12:27 PM on October 11, 2017, at her deposition, but claimed "I don't know what tweet she's referring to." Def. Ex. B.  64:10-64:11. Ms. Donegan's receiving the email within minutes of making the Spreadsheet accessible to third parties creates a credibility issue, and question of fact, as to whether Ms. Donegan publicized the Spreadsheet on Twitter.

All of Ms. Donegan's definitive conclusions regarding communications with third parties, specific encouragement, solicitations, instructions and assistance, are of questionable veracity,

given her failure to recall the details, or substance, of any specific communications.   The determination is made particularly difficult given Ms. Donegan's admitted deletion of the majority of her communications related to the Spreadsheet.

The deletion, and Ms. Donegan's excuse for that deletion, also warrant a credibility determination by the trier of fact.  Ms. Donegan maintains her reason for deleting the Spreadsheet, and communications, was to protect the privacy of the people who posted to the Spreadsheet.  This noble reasoning, alone, is unlikely to be the sole motivation in removing the evidence.  Ms. Donegan also feared the potential for litigation, the same day she created the Spreadsheet entitled "Shitty Media Men."   When Ms. Donegan observed more than 70 men on the Spreadsheet, "She immediately assumed she'd be sued." *Exhibit* 5; pg. 5 (ELLIOTT 000019).  Further, Ms. Donegan, "got some advice from some lawyers that [she] and the other original non-anonymous commenters were open to libel suits…" *See* Defendant*'s* Exhibit G, Donegan e-mail sent 10/12/2017 at 12:35:16 AM.  The potential for litigation recognized almost immediately after the Spreadsheet was active, and potential for Rule 37 spoliation sanctions, warrant a credibility examination of Ms. Donegan by the jury.[1]  The deletion of relevant evidence, combined with Ms. Donegan's poor recollection of the substantive content within that evidence, is both highly suspicious and highly prejudicial to Mr. Elliott.  For either reason, Ms. Donegan's motion for summary judgment should additionally be denied.

---

[1] On a related note, Plaintiff objects to Ms. Donegan's reliance on the absence of evidence (deleted e-mails) to establish her claim she did not specifically encourage the posting of defamatory allegations.  The Honorable Magistrate Judge Sanket J. Bulsara, at the behest of Ms. Donegan, would not permit Mr. Elliott to question Ms. Donegan on her deletion of documents at the deposition.  See ECF No. 81, Transcript of Proceeding before Magistrate Judge Bulsara, Jan. 5, 2021, p. 37:21-25; 38:1-15. The Magistrate Judge determined potential spoliation sanctions were premature at this juncture, but also noted that it would be improper for Ms. Donegan to deny discovery into the deletion but then gain a benefit by arguing lack of evidence. Id.at 38:1-38:4. Ms. Donegan is currently gaining precisely that benefit. *See* Defendant 56.1 Statement 39.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's motion for targeted summary judgment based on immunity under the Communications Decency Act, 47 U.S.C. § 230, and grant such further and other relief as the Court deems just and proper.

Dated: May 7, 2021
      New York, New York

Respectfully Submitted,

*/s/ Nicholas Lewis*
Nicholas Lewis, Esq.
Andrew Miltenberg, Esq.
Phil Byler, Esq.
Nesenoff & Miltenberg LLP
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500
nlewis@nmllplaw.com
AMiltenberg@nmllplaw.com

*Attorneys for Plaintiff Stephen Elliott*